Filed 8/21/14

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S012279 |
| v. | ) | |
| | ) | |
| DAVID ALLEN LUCAS, | ) | |
| | ) | San Diego County |
| Defendant and Appellant. | ) | Super. Ct. Nos. CR 73093 & |
| | ) | CR 75195 |
| _____ | ) | |

A jury found defendant David Allen Lucas guilty of the first degree murders of Suzanne Jacobs, Colin Jacobs, and Anne Swanke (Pen. Code, §§ 187, subd. (a), 189),[1] the attempted murder of Jodie Santiago Robertson (§§ 187, 664), and the kidnappings of Swanke and Robertson (§ 207, subd. (a)). The jury also found that he personally used a knife during each crime (§ 12022, subd. (b)) and inflicted great bodily injury upon Swanke and Robertson (§ 12022.7). The jury further found true the special circumstance allegation of multiple murder (§ 190.2, subd. (a)(3)). The jury acquitted defendant of the murder of Gayle Garcia and was unable to reach verdicts on the murders of Rhonda Strang and Amber Fisher.[2] On

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Eleven jurors voted to convict defendant of these murders. After defendant's sentencing, the trial court granted the prosecution's motion to dismiss the Rhonda Strang and Amber Fisher murder counts.

the allegation that he had a prior serious felony conviction for rape, the jury found the allegation true (§§ 667, subd. (a), 1192.7, subd. (c)(1)). Following the penalty phase of the trial, the jury returned a verdict of death. The trial court denied defendant's motions for new trial (§ 1181) and for modification of the penalty to life imprisonment without the possibility of parole (§ 190.4, subd. (e)) and sentenced him to death. The court also sentenced defendant to a 17-year term for the attempted murder of Robertson.[3]

This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

## I. FACTS AND PROCEEDINGS

From May 1979 to November 1984, there were six unsolved throat-slashing killings in the San Diego area. A seventh victim, Jodie Santiago Robertson, survived her throat-slashing injuries, and, in December 1984, she identified defendant as her attacker. Following defendant's arrest, police investigated defendant's possible involvement in the other killings, which eventually resulted in these consolidated proceedings charging defendant with six murders and Robertson's attempted murder. Because defendant makes extensive arguments contesting the consolidation and joint trial of these crimes and their cross-admissibility, we also include a factual summary of the crimes for which defendant was acquitted or that ended in mistrial.

---

[3] This 17-year term is comprised of the upper term of nine years on the attempted murder conviction with an additional three years for the great bodily injury finding plus a term of five years for defendant's prior serious felony conviction. Pursuant to section 654, the court stayed the one-year enhancements for use of a knife regarding each murder conviction and the 10-year term for each kidnapping conviction.

## A. Guilt Phase

### 1. The Homicides of Suzanne and Colin Jacobs

The 1979 killings of Suzanne and Colin Jacobs were unsolved for approximately five years until the investigation focused on a suspect, John Massingale, who had purportedly confessed to the crimes. At the time of defendant's arrest in late 1984, Massingale was in custody in San Diego awaiting trial for the Jacobs killings. Investigators reevaluated the evidence in the Jacobs killings and linked defendant to those killings, largely because of a handwritten note found at the crime scene that matched defendant's handwriting. After further investigation, detectives developed a case against defendant based on boot print evidence, hair evidence, a vehicle linked to defendant, and his lack of an alibi. Authorities later dropped all charges against Massingale, released him, and instead charged defendant with the Jacobs killings. Eventually, defendant's presentation at trial focused heavily on the evidence that had purportedly linked Massingale to the killings of Suzanne and Colin Jacobs.

#### a) Prosecution Evidence

##### (i) The Events Leading to the Homicides

On May 4, 1979, Michael and Suzanne Jacobs lived in a small white wood-frame house in the eastern end of San Diego, California, with their three-year-old son, Colin, and their two dogs. That day, Michael and Suzanne were expecting the delivery of a new dinette set.

Michael awoke that morning and started his normal workday routine by getting ready for work. He left the house at 6:00 a.m. and drove away in the family vehicle. Michael also kept in his driveway a blue off-road Volkswagen Beetle with the top cut off and outfitted with a roll bar.

Margaret Harris, a neighbor and friend who lived across the street from the Jacobs house, testified that she did not see Suzanne outside her house as she

3

usually did every morning.  Instead, she had seen a maroon or wine-colored sports car with a black top parked in the Jacobses' driveway between 8:00 and 9:00 a.m. Harris believed the car was an MGB and described it as having sun-damaged paint.**4**

Later that morning, around 11:00 a.m. to 11:30 a.m., Harris telephoned Suzanne, but no one answered.  She assumed that Suzanne had been picked up by whoever had arrived in the sports car.  About this same time, Michael also telephoned Suzanne but got no answer.

At approximately 12:30 p.m., deliveryman Louis Hoeniger arrived at the Jacobs residence to deliver the shipment of dinette furniture.  For approximately 10 minutes waiting for someone to answer the door, Hoeniger heard no response, except for the barking of the Jacobses' dogs in their backyard.  Harris observed the delivery truck arrive at the Jacobs residence and saw the deliveryman leave the dinette furniture on the front porch.  This surprised Harris because she knew Suzanne was expecting the delivery.

Around 5:00 p.m., Michael returned home and was puzzled by the discovery of their new dinette furniture on the front porch because Suzanne was supposed to receive the shipment.  Michael entered the house and discovered blood all over the bathroom.  As he backed out of the bathroom, he saw Colin lying dead on the bedroom floor.

---

**4**      Harris did not immediately identify the car as an MGB.  She explained she came to this conclusion two days later when she and her husband drove around town to see if she could identify the make and model of the car she had seen in the Jacobs's driveway.  When they saw an MGB, Harris believed it was the same make and model as the car she had seen two days earlier.

Michael walked out of the house and called out across the street to Margaret and Ed Harris, who were outside. Michael appeared to be in shock and collapsed on the ground. Michael was unable to talk, so the Harrises went into the Jacobs home to investigate. They discovered Colin's body just inside the entrance of the master bedroom and Suzanne's body further inside the master bedroom. Mrs. Harris called the police.

*(ii) The Scene of the Crime*

Emergency units and San Diego police officers arrived at the Jacobs residence and secured the crime scene to examine and collect evidence. There was a significant amount of blood on the bathroom floor and on the floor of the hallway leading to it. There was blood on the front and inside of the bathtub. On the bathroom rug was a folded, torn scrap of paper with handwritten printing that read "Love Insurance" and "280-1700."[5] The note had a bloodstain on it. Child-sized bloody footprints, consistent with Colin's, led from the bathroom to inside the master bedroom where his body was found.

Colin's throat had been severely slashed. Because of the amount of blood found in the bathroom, the child-sized bloody footprints leading from it, and the amount of blood on the front of Colin's clothing, Detective Gary Gleason believed Colin's throat had been cut in the bathroom but that he had survived long enough to walk down the hallway where he collapsed inside the master bedroom.

The master bedroom showed signs of a violent struggle. A padded railing had been dislodged from the edge of the waterbed and was lying on the floor. The bedsheets were out of place and had bloodstains. There was a smear of blood on

---

[5] Love Insurance was the name of an insurance brokerage firm in San Diego, and 280-1700 was the firm's telephone number.

the top of a chest of drawers, and items on it had toppled over or fallen to the floor. Next to the entrance to the master bedroom, there was a smear of blood on the light switch and the adjacent door and frame.

Suzanne's fully clothed body lay sprawled on the floor between the waterbed and the chest of drawers. In both of her clenched hands were several strands of blond hair. She had bruising across her back near her bra strap and her shirt had been torn in that area. Suzanne's throat had been slashed from ear to ear.

Because of the sheer volume of blood on the floor of the master bedroom, no one could have walked around the bodies without leaving footprints. Adult-sized bloody footprints with a distinctive Vibram-sole pattern were visible in the master bedroom, leading out of the bedroom, through the hallway and toward the kitchen. All the adult-sized footprints appeared to be made by one person because they were all the same size and had a consistent right-left pattern.

In the living room, the television had been left on; on top of it was a wine glass with some wine in it and an ashtray containing a cigarette butt. Around the television were more bloody footprints with the same Vibram-sole pattern. The footprints led toward the dining room and then into the kitchen.

In front of the kitchen sink, the footprints overlapped as if someone had stood over them repeatedly. Blood was on the kitchen sink, faucets, and the drain trap. Blood was on a washcloth in the sink, the soap holder, and a green paper towel left on the kitchen counter — all consistent with a bloodied assailant having used the sink to wash.

*(iii) The Forensic Evidence*

(1) The victims' injuries

According to forensic pathologist David Katsuyama, Colin's throat had been slashed by at least two distinct cuts — one that extended from the left side of

6

his neck across the throat, and the other that extended to the right side behind his ear — leaving a gaping wound that nearly extended to the backbone.  Because the cuts had severed his jugular vein and carotid artery, he bled to death.  Colin also had severe cuts on the tips of two fingers, his right thumb, and the palm of his left hand below the base of the thumb.

According to Dr. Katsuyama, Suzanne's throat had been slashed by at least six distinct cuts that transected the skin, fatty tissue, cartilage, and muscles of the neck leaving a gaping wound that exposed the backbone.  Her right jugular vein and right carotid artery were severed.  Suzanne also had three stab wounds:  a small wound above her left collarbone, a larger wound that severed her pulmonary artery, and a wound to her abdomen that deeply penetrated her liver.  Like Colin, Suzanne died of blood loss caused by all of her wounds.  Unlike Colin, Suzanne had evidence of petechial hemorrhaging — tiny specks of blood caused by the rupture of capillary blood vessels on her left eyelid.  Dr. Katsuyama explained that Suzanne's petechial hemorrhaging could have been caused by the loss of blood flow to that area caused either by strangulation or by her rapidly bleeding wounds. Suzanne, however, died with her tongue clenched between her teeth, which is consistent with strangulation.  Her body bore no signs of a sexual assault. Suzanne's blood-alcohol level at her death was .04 percent, which would have been consistent with her having consumed two eight-ounce glasses of wine within the hour before she died.[6]

In Dr. Katsuyama's opinion, Colin's and Suzanne's wounds were inflicted by a medium-length sharp-edged knife with a relatively stiff blade.

---

[6]  Michael and Mrs. Harris both testified that Suzanne did not ordinarily drink in the morning.

(2)  The "Love Insurance" note

On May 11, 1979, lab technician Pat Stewart took several photographs of the "Love Insurance" note found in the Jacobses' bathroom, unfolding it to reveal the handwritten printing on it.  He then applied ninhydrin, a chemical that detects fingerprints by staining them a color ranging from a light pink to a dark purple.  After he applied the ninhydrin, a partial fingerprint appeared.  At the time, Stewart was unaware that fingerprints that appear after ninhydrin is used fade over time, and he did not take a photograph of the fingerprint, believing that the latent print examiners would do so.

Three days later, San Diego Police Department latent print examiner Leigh Emmerson examined the partial fingerprint on the Love Insurance note and found five to six identifiable points, which he believed were not sufficient to determine to whom the print belonged but which could be used to eliminate potential suspects.  Emmerson informed the lead detectives that the fingerprint should be preserved.  But he did not take a photograph of it himself because it was department policy for the investigating officer to photograph such prints.  Emmerson returned the note to a locked file in the department's latent print section.

*(iv)  The Arrest of John Massingale for the Homicides*

John Massingale, a drifter and native of Harlan County, Kentucky, eventually became a suspect in the Jacobs murders.  On March 18, 1984, San Diego police detectives located Massingale in Kentucky and interrogated him.  During the initial interrogation, he admitted he was a drifter in Southern California in 1979 through 1980, but denied that he regularly carried a sheathed fixed-blade knife.  He also initially denied any knowledge of the Jacobs murders or that he had later bragged about killing them while hitchhiking with two men.  The following

8

day, however, in tape-recorded interviews, Massingale admitted he used to carry a fixed-blade knife and confessed to the murders, providing details matching the crime scene. These details included that the Jacobs home was white and had a blue dune buggy parked outside, the approximate ages of Colin and Suzanne, the location of the living room couch, that Colin had been killed in the bathroom, and that Massingale exited the back door while hearing the sounds of barking dogs. Massingale was arrested and transported to San Diego where he remained in jail through December 1984.

At defendant's trial, Massingale testified that he had made a "phony" confession because the officers, before his tape-recorded confessions, advised him not to speak with an attorney, claimed they had evidence and witnesses against him, and warned that he faced a death sentence unless he cooperated with the police. Massingale alleged that a detective had shown him numerous photographs of the crime scene. Massingale said he later used details from those photographs in his recorded confessions. He also admitted that he mostly smoked Marlboro brand cigarettes.[7]

Massingale, who grew up in the Appalachian Mountains of Kentucky, testified that he could read and spell small words but was basically illiterate. In Kentucky, he worked primarily as a painter and coal miner, but spent many years as a drifter and day laborer while staying at various Salvation Army missions.

---

[7] The cigarette butt found in the ashtray at the Jacobs residence was not preserved, but the defense, during closing statements, argued that the butt was consistent with a Marlboro brand cigarette based on crime scene photographs. At the time of her death, Suzanne Jacobs had matchbooks and a Winston brand cigarette in her pants pockets.

### (v) The Arrest of Defendant in December 1984 and Reexamination of the Evidence

Approximately five years after the Jacobs murders on December 16, 1984, following the throat-slashing murder of Anne Swanke (see *post*, at pp. 41-49) and after Jodie Santiago Robertson identified him as the assailant who slashed her throat (see *post*, at pp. 30-36), defendant was arrested. Therefore, because of the similarity of these cases to the throat-slashing murders of Suzanne and Colin Jacobs, local authorities reexamined the evidence collected at the Jacobs residence.

### (1) Comparison of defendant's handwriting to the Love Insurance note

In December 1980, after the police identified Massingale as a possible suspect in the Jacobs murders, police lab technician Pat Stewart reexamined the Love Insurance note but discovered that the partial fingerprint, raised by his previous application of ninhydrin, had faded away completely, and he was unable to find any photographs of the partial fingerprint. Stewart applied another application of ninhydrin, but nothing appeared. His lab sought the assistance of the FBI in re-raising the fingerprint and sent the note to the FBI. But when the note came back from the FBI, the fingerprint still was not visible, the paper had turned black and dark-purple, and the handwriting had become unreadable. Consequently, the investigation had to rely on photographs Stewart had taken of the note before he first applied ninhydrin to it in May 1979.

A few weeks after his arrest, defendant, while in jail, cooperated with police and gave investigators several specimens of his handwriting. John J. Harris, a handwriting expert and former president of two national associations for document examiners, examined these specimens, as well as other writings defendant had made in the past. Harris enlarged these specimens and compared them with enlarged photographs of the handwriting on the Love Insurance note.

10

Harris believed, with "reasonable certainty" that defendant wrote the Love Insurance note. Frank Clark, defendant's business partner in their carpet cleaning company, was familiar with defendant's handwriting and also believed defendant wrote the Love Insurance note.

Love Insurance was the name of an insurance brokerage in San Diego, and the numbers on the note matched its business telephone number. According to the brokerage's business records, two months after the Jacobs killings, defendant bought auto insurance for his 1972 Audi through the Love Insurance agency.

(2) Defendant's prior employment and the boot print evidence

Roy Nilson, a retired deputy sheriff who specialized in shoe print examinations, examined a photograph of a single bloody footprint found in the Jacobses' living room and concluded the sole pattern matched that of a size 12 Vibram style No. 100 sole. A Vibram sole was typically fitted to work or hiking boots.

In the spring of 1979 defendant worked at Precision Metal, a metal forging company, which had provided defendant with a new pair of Lehigh work boots, size 10 1/2 D, about one month before the Jacobs murders. Nilson researched this brand and size and learned that the manufacturer often used a size 12 Vibram sole, trimmed to fit a size 10 shoe. He compared an inked footprint from an exemplar pair of size 10 1/2 Lehigh boots with a photograph of a bloody footprint on the Jacobses' living room floor. Although the front portion of the boot sole matched the photograph well, the heel was out of alignment by three-eighths inch. Nilson believed this discrepancy could have been the result of minor inconsistencies in the manufacturing process, and that it was possible that the bloody prints could have been left by the same brand and size of boot as the exemplar.

11

(3) Blood and fingerprint evidence

Bloodstain samples taken from the kitchen floor, kitchen sink, the living room floor, the bedroom, Suzanne's nail clippings, the bathroom, and from the Love Insurance note all tested as type O blood, which was consistent with Suzanne's and Colin's blood type, but not with Michael Jacobs, John Massingale, or defendant, who all have type A blood.

John Torres, a latent print examiner for the San Diego Police Department, found only five prints at the crime scene with clear enough ridge detail to be of value for purposes of attempting a possible identification. Of these, Torres believed two prints lifted from a doorjamb leading from the dining room to the kitchen matched Michael Jacobs. Torres could not identify the three remaining prints, two recovered from the doorjamb between the dining room and the kitchen and a palm print from the bathroom doorjamb, as originating from defendant, Suzanne, Colin, or Michael. Torres, however, did not examine these three prints to ascertain whether Massingale could be excluded as the donor of these prints.

(4) Hair comparison evidence

John Simms, a criminalist at the San Diego Police Department forensic science laboratory, and James Bailey, a criminalist at the Los Angeles County Sheriff's Department criminalistics laboratory, each microscopically examined the hairs collected at the crime scene from Suzanne Jacobs's clenched right hand. They compared them with hair samples from defendant and John Massingale. Simms excluded Massingale as the source of those hairs calling them "very different from Massingale's." Simms, however, was unable to either include or exclude defendant as the source of the hair found in Suzanne's right hand but described some of the hairs as being very close to defendant's.

Bailey, in contrast, believed most of the hairs from Suzanne's right hand were similar physically and microscopically to defendant's hair and that they may

12

have come from him. According to Bailey, some of the hairs had characteristics closer to that of Colin Jacobs, but he could not eliminate defendant as the source of those hairs.

Bailey also examined additional hairs collected at the morgue from Suzanne's right hand and from her left elbow. Bailey believed many of the hairs collected from Suzanne's right hand at the morgue were consistent with Suzanne or Colin. Four of the hairs, however, were consistent with defendant and another two hairs were consistent with either defendant or Colin. He also believed the hair collected from Suzanne's elbow was similar to defendant's but not to either Suzanne's or Colin's. Finally, Bailey also believed a hair found on a rug underneath Suzanne's body was similar to defendant's hair.[8]

### (5) Defendant's mother's MG Midget

Because the Jacobses' neighbor, Margaret Harris, reported seeing what she believed was a maroon or wine-colored MGB sports car parked outside the Jacobs residence on the morning of the crimes, the investigation focused on whether defendant ever had access to such a vehicle.

On December 20, 1974, defendant's mother had bought a 1974 MG Midget roadster. On November 11, 1976, defendant was stopped for speeding while driving his mother's MG, and he was involved in an accident in the same vehicle eight days later. An MG Midget and MGB are very similar, with the MGB being slightly larger. The rear of the MG Midget and the MGB were identical during their respective production years.

---

[8] Simms, however, examined the same hair and was unable to include or exclude defendant as the source.

13

(6) Defendant's whereabouts on the day of the murders

At the time of the Jacobs murders, defendant lived in a residence hall associated with the Salvation Army. When he lived there, defendant's presence was monitored and, due to his employment schedule at Precision Metal, he was not permitted to leave the facility earlier than 9:00 a.m. and had to return by 1:00 a.m. But according to Precision Metal's employee attendance records, defendant was not at work on either Thursday, May 3, or Friday, May 4, 1979.

b) *Defense evidence*

(i) *The Impeachment of John Massingale*

The defense called several witnesses to impeach Massingale's trial testimony that he was not involved in the killing of Suzanne and Colin Jacobs, his habit of carrying a fixed-blade knife, his purported admission to the killings to fellow hitchhikers, and his claim that the police had coerced his confession.

On August 15, 1980, California Highway Patrol Officer Robert McLean stopped and cited John Massingale for hitchhiking near a freeway in San Diego County. Massingale was wearing a sheathed knife with a six- to eight-inch fixed blade. Officer McLean recalled the incident because Massingale had "crazy eyes" and appeared to be "a very scary individual."

In late August 1980, John "Shorty" Smith, also a native of Harlan County, Kentucky, met Massingale at an Arizona gas station. According to Smith, Massingale "looked like he was from my part of the country," and he offered Massingale a ride to a mine in California for work. But Massingale claimed he was wanted for murder in California. Smith did not take Massingale seriously, and convinced Massingale to go to California, offering to eventually take him back to Harlan County. According to Smith, Massingale wore a four-and-one-half-inch Buck knife. Because the California mine was closed when Smith and

14

Massingale arrived, they drove to Los Angeles, and along the way picked up a second hitchhiker, Jimmy Joe Nelson.[9]

According to Smith, during the drive to Los Angeles, Massingale talked a lot and bragged to him and Nelson about having cut someone's head off.

Nelson testified that, during the trip in Smith's van, they discussed failed marriages and Massingale replied that if a woman treated you badly "you just cut their head off and get it over with." Nelson described Massingale as having a dual personality that could shift unpredictably from being a nice person to being "one of the most violent people in the world."

Nelson saw Massingale carrying a knife with an 11- or 12-inch blade that he had strapped around his waist in a leather holster. When riding in Smith's van, Massingale constantly practiced and played with the knife "like a kid with a toy." Massingale repeatedly showed off how he could unholster the knife quickly, flip it through the air with his wrist, and get it to stick in a wood board at the back of the van. Because of Massingale's personality and knife skills, Nelson was afraid of making Massingale mad while he played with his knife.

After arriving in Los Angeles, Massingale took Smith and Nelson to a gay bar in Hollywood. According to Smith and Nelson, although Massingale was a handsome, "flashy dresser" and portrayed himself as "a ladies' man," he appeared to prostitute himself with various male patrons of the bar — leaving with each of them briefly and then returning with cash he shared with Smith and Nelson.

---

[9] Smith explained that, because Nelson suffered from seizures during the trip, Massingale did not like Nelson and tried to convince Smith to leave Nelson behind. At the time of his testimony, Nelson was incarcerated in Texas for the manslaughter of William Calvin Toups and had been previously convicted of numerous theft and forgery crimes.

At the bar, according to Nelson, Massingale later ingested "windowpane" LSD. After that point, Nelson described Massingale as talking nonstop with the "floodgates open" as he bragged about the things he had done. One of the things Massingale bragged about, according to Smith and Nelson, was killing a mother and her little boy, over a year earlier, in the spring of 1979. According to Smith and Nelson, Massingale claimed he had met a woman named "Sue Ann," "Anne," or "Suzanne" in San Diego and went to her home in East San Diego.[10] Massingale explained to Nelson that they had consumed a couple of drinks at her home and were sitting on the living room couch "making out," but her little boy interrupted them, saying he needed to go to the bathroom.[11] When the boy refused to go to the bathroom by himself, the mother got up to help the boy, which "pissed off" Massingale. Massingale said he grabbed "that bitch by the hair," "worked on" slicing her throat, and then "worked on" the little boy so "he would never have to go to the bathroom again." According to Nelson, Massingale claimed he killed the boy in the bathroom.

The next day, Massingale decided to stay behind in Los Angeles and did not leave town with Smith and Nelson. Before they parted, however, Massingale gave Nelson some of his clothes, a pair of boots, and some other items. This included a striped brown-and-white silk shirt that appeared to have blood on it and

---

**10** Smith testified that he remembered Massingale mentioning the name "Anne." In his 1981 interviews with police, Nelson said Massingale had referred to the victim by her full name "Suzanne Jacobs." At trial, Nelson testified that Massingale referred to the victim as "Sue Ann." Massingale did not describe the circumstances of how he met the woman.

**11** Smith testified that Massingale told him that the boy was "pestering" him and his mother about going to the bathroom and that he "shut the kid up" and cut the mother's head off.

runs consistent with a woman's fingernails having raked down the left sleeve. Massingale also gave him a set of his work boots. Nelson told police that Massingale wore engineer-type boots "all the time."

Soon after Nelson left Los Angeles and parted ways with Smith, Nelson became a suspect in a Texas killing. Chickasaw Police Detective Sergeant Harold Phillips arrested Nelson for that death in Alabama on December 6, 1980. Nelson assisted Alabama and Texas authorities in locating the other suspects in that killing,[12] and also told them about the Jacobs killings.[13] According to Detective Sergeant Phillips, Nelson told him that a man named "Johnny" had confessed to knife-slashing the throats of a woman and her child in San Diego in the bedroom of her white wood-frame home. Nelson mentioned a blue vehicle at the home. Nelson said Johnny and the woman had been drinking. At the time, Detective Sergeant Phillips knew nothing about the Jacobs murders. Detective Sergeant Phillips contacted San Diego Police Detective David Ayers and told him of Nelson's statements.[14]

---

[12] These other suspects were Rochelle Coleman and David Ray Woods.

[13] At the time of the Jacobs murders, Nelson was in custody for various theft-related crimes.

[14] The San Diego Police Department's homicide unit had a policy of withholding details concerning the circumstances of murders the unit is investigating so as to be able to identify suspects that would have information that only the actual perpetrator would know. According to Detective Gleason, in the present case, the unit did not publicly disclose the discovery of the bloody footprints in the home, the blood in and around the kitchen sink, or the theory that Colin was killed in the bathroom.

17

The authorities transported Nelson to Texas where Detective Ayers interviewed him in January 1981.[15] Nelson described his encounter with Massingale and described his barroom confession. Nelson stated that he still had the items Massingale had given him, including the bloody shirt and the work boots. Nelson gave the officers permission to retrieve those items from his mother's Alabama residence.[16]

After locating Massingale in Harlan County, Kentucky, in mid-March 1984, Detective Ayers and San Diego County District Attorney Investigator William Green traveled there to interview him. Ayers and Green met with Kentucky State Police Detective Denny Pace, who was familiar with Massingale, and they interrogated him the next day. According to Detective Pace, Massingale had a reputation for dishonesty in Harlan County.[17]

---

[15] In their first interview, Nelson told Detective Ayers that David Ray Woods was responsible for the Jacobs murders, but later claimed he said so only because he was angry that Woods had tried to blame him for the Texas killing. In his January 27, 1981, interview of Nelson, Detective Ayers seems to suggest that Woods had a solid alibi at the time of the Jacobs murders. But Woods and his girlfriend were investigated as possible suspects in the Jacobs killings. (See *post*, at p. 135.)

[16] Detective Sergeant Phillips later retrieved the bloody silk shirt from Nelson's mother's Alabama residence. It was as Nelson described, with runs and what appeared to be bloodstains. Phillips believed he had boxed the shirt and other items collected from the residence and Nelson and had sent the box to Detective Ayers in San Diego. But upon inspecting the same box before his testimony, he found it contained the other items but not the bloody silk shirt.

[17] The defense also offered Sidney Douglass, a Harlan County attorney and former judge advocate general, former county circuit judge, and former prosecutor, who testified that he had worked with Detective Pace in several cases over the years. He regarded Detective Pace as having a good reputation for honesty in the community.

Over the next five hours, Massingale admitted he had been in San Diego in the early summer of 1979 and that he had met Smith hitchhiking a year later. But he denied any involvement in the Jacobs murders, confessing to the murders, or ever carrying anything other than a small pocket knife. He also denied knowing or ever having met Nelson.

During this first interview, Detective Ayers and Inspector Green showed Massingale four photographs related to the Jacobs murders. Two photographs, full-body shots of each victim as they appeared facedown in the bedroom, did not show their neck wounds. The other two photographs showed the Jacobs residence from the front and the side. Detective Ayers, Inspector Green, and Detective Pace each denied ever showing Massingale any additional photographs related to the Jacobs murders.

The officers also intentionally withheld from Massingale various details surrounding the murders during this first interview, including the fact that the victims had nearly been decapitated. In fact, Detective Pace did not know details of the Jacobs murders, except that Colin had been killed in the bathroom. At one point, Massingale asked Detective Pace if he should get an attorney, but Detective Pace replied, "Johnny if you didn't do anything wrong, I don't feel like you need an attorney." Massingale then voluntarily continued with the interrogation. But he later ended it by indicating that he wanted a lawyer.

After the end of the first interview, Massingale said he wanted to speak with Detective Pace alone. In that discussion, Massingale asked Detective Pace what kind of sentence he faced and what he should do. Detective Pace told Massingale that death was the maximum penalty and that he should not admit to anything he did not do. Detective Pace explained that Detective Ayers and Inspector Green knew details about the crime that they had not disclosed during their five-hour interrogation. Massingale asked Detective Pace what those details

19

were, but Pace said he could not disclose the details without Ayers's and Green's permission. Massingale asked Detective Pace to get their permission to tell him those details.

Detective Pace later spoke with Inspector Ayers, who gave him permission to tell Massingale that Colin had been killed in the bathroom and gave Pace a picture of the Jacobses' bathroom to show Massingale. Detective Pace returned to Massingale and confronted him with this evidence and explained that they also knew he was lying about carrying a knife. Detective Pace said that Nelson had been in prison at the time of the murders, that Nelson told Pace that Colin had been killed in the bathroom, that the location of Colin's murder had not been made public, and that, therefore, Massingale must have been present at the scene of the crime. According to Detective Pace, Massingale replied, "I am guilty." According to Detective Pace, Massingale appeared relieved by his admission and became more talkative.

Massingale then admitted to Detective Pace that he had been lying during the earlier interrogation. Massingale explained that he met "Sue Ann" in a bar, could not remember how he got to her residence, but recalled that she did not have a car. He had recognized the pictures of the Jacobses' white house that the officers had shown him and remembered that a blue dune buggy was parked beside the home. Massingale told Detective Pace that he recalled sitting on the living room couch of Sue Ann's home and pinching her leg, but that she smacked him in the face. Massingale said he then "went crazy" because he was high on LSD. He got up off the couch, and she told him to get out. The little boy told Massingale, "don't hit my mommy," and he remembered cutting both of them with a knife that he had holstered on his belt. He remembered cutting the little boy in the bathroom, washing up in either the bathroom or kitchen sink, and then leaving through the back door with the sound of dogs barking.

20

Massingale told Detective Pace he believed Sue Ann was about 27 years old and the boy was around five years of age. He said he went to the Salvation Army and got new clothes and then later buried the knife in the Mexican desert. He said he remembered Nelson because he was bothered by Nelson's seizures. He also admitted giving Nelson one of his shirts.

The following day, Massingale gave a tape-recorded confession to Detective Pace in which Massingale agreed with Detective Pace's description of the circumstances of Massingale's confession the night before. Massingale then largely repeated the same details about the murder that he had given Detective Pace the night before. Massingale explained that he was sorry, that he had never killed anyone before and that he would never hurt a child, but that the LSD made him nervous and "plum out of [his] mind."

Later that same day, Massingale gave a second tape-recorded confession with Detective Ayers and Inspector Green also present. In this confession, Massingale repeatedly said he was sorry for what he did. He explained that it was hard for him to remember the details of the crimes because he was high or drunk most of the time and because he suffered from memory problems. In addition to some of the details he had provided in the prior interrogations, he also correctly identified the Jacobses' couch as being on the right side as one entered the front door. He remembered the mother had run from him and believed that he may have cut her in the kitchen. At the end of the interrogation, Inspector Ayers asked Massingale if he had anything else to say, and he replied, "I'm guilty."

Inspector Green and Detectives Ayers and Pace each testified that they did not ever threaten or yell at Massingale at any time during the interrogations.

21

*(ii)  The Temporary Residences of Massingale and Defendant in 1979*

The defense presented evidence in support of its theory that Massingale had left the Love Insurance note at the crime scene because it must have been in clothing that defendant had left for donation to the Salvation Army.

According to a chaplain of the San Diego Salvation Army rescue mission in downtown San Diego, Massingale stayed at the mission a few times in 1979. Massingale seemed out of place because he was more well-dressed than the typical transient.  In addition to shelter, the mission provided free clothing to its residents.

The residence hall in which defendant stayed in May 1979 was also associated with the Salvation Army.  The hall was also in the same building as the Salvation Army rescue mission.[18]

*(iii)  The MG*

The defense presented evidence to rebut the state's theory that defendant's mother's MG was at the Jacobs house on the morning of the killings.

One of the Jacobses' neighbors, Jeanette Robertson, drove by the Jacobs residence around 9:00 a.m. on May 4, 1979 and two more times later that same morning.[19]  She did not see any car parked in the driveway on any of those occasions.

---

[18]      In closing statements, the defense theorized that the Love Insurance note could have come from a piece of clothing that defendant had donated while he lived at the Salvation Army and that this clothing eventually could have been given to Massingale who dropped the note at the crime scene.  In contrast, the prosecution theorized that defendant had met Massingale at the Salvation Army, and defendant had bragged about the killings to Massingale, providing him details that Massingale later repeated to Nelson and Smith.

[19]      According to Robertson, Suzanne and her son Colin typically were early risers and they would spend their weekday mornings outside with Suzanne

*(Footnote continued on next page.)*

Margaret Harris, who had seen a wine-colored or faded maroon sports car in the Jacobses' driveway on the morning of the murders, did not tell police her belief that the car was an MGB until sometime in 1988.[20] She also admitted that she could not distinguish amongst the various different models of MG — an MGA, MGB, or a Midget.

In 1974, defendant's mother, Patricia Katzenmaier, bought a used 1974 purple MG Midget that was only a few months old at the time. According to Katzenmaier, from March 1979 until she sold the car in 1981, the Midget was parked in her garage and was not driveable. In late 1979 or early 1980, Curt Andrewson, a family friend of the Lucas family, saw the MG Midget in Katzenmaier's garage. According to Andrewson, the car was purple and was inoperable because the engine was in pieces. Dennis Smith bought the MG Midget from Katzenmaier in 1981. According to Smith, the car was purple and did not run. He fixed the car, painted it red, and sold it in 1986.[21]

### (iv) Boot Print Evidence

The defense presented evidence challenging the state's theory that defendant had left the bloody boot prints found at the crime scene.

*(Footnote continued from previous page.)*

gardening while Colin rode his tricycle nearby. But on the weekday morning of the murders, she never saw them outside.

[20]  According to Inspector Green, Harris claimed the car was an MG, but she later identified a photograph of a 1974 maroon MGB as being the same make and model of the car she had seen on May 4, 1979.

[21]  The prosecution provided no evidence of what color the vehicle was in May 1979, but it provided evidence of a December 1986 traffic stop, after Smith had sold the vehicle, in which the detaining officer described the vehicle as "black over maroon."

Fire Captain Edward Fairhurst, who was the first emergency responder to walk inside the Jacobs residence on the day of the murders, testified during the prosecution's case-in-chief that he was not wearing Vibram-soled boots that day and denied ever owning any such shoes. He also claimed that the bloody boot prints did not match the soles he was wearing that day.

But Captain Fairhurst's shoemaker, David Daywood, remembered resoling Fairhurst's boots the month before the murders with Vibram soles and heels. Daywood recalled that Captain Fairhurst wore size 10 or 10 1/2 boots and that he applied new size 12 Vibram soles to his boots, which he trimmed down to fit the smaller boot size.

In addition, defense investigator William Pon Cavege spoke with Captain Fairhurst in 1985, and showed him a photograph of a bloody boot print at the crime scene. According to Cavege, Captain Fairhurst admitted that the pattern looked similar to the soles he had been wearing that day and admitted that his shoemaker had put new soles on his boots shortly before the murders. A second defense investigator, Thomas Caldwell, testified that he contacted Captain Fairhurst in 1986, and Fairhurst admitted he was wearing Vibram-soled boots when he entered the Jacobs home. Captain Fairhurst testified that he was unaware of anyone ever checking or comparing his boots with the prints found at the crime scene. Captain Fairhurst had thrown away the boots in question by the time the defense investigators had first approached him about the boots.

George Jackson, who worked alongside defendant in 1979 as a furnace operator at Precision Metal, described the floor conditions at the plant. He said the plant floor was covered in lubricants, steel grit, and steel shot used in the forging process. These materials would heavily soil the operators' clothes and boots, with the materials getting stuck in crevices of the boot soles. Because of these conditions, the furnace operators had a changing room and lockers where they

24

stored their overalls and boots. According to Jackson, if someone tried to wear their boots outside the plant, they would ruin the carpets in their vehicle or at home.

### (v) Hair Evidence

The defendant re-called hair comparison expert John Simms, who had testified for the prosecution but was unable to reach any strong conclusions as to whether the hairs recovered from the crime scene were consistent with defendant's hairs or excluded him. According to Simms, because blond hairs typically exhibit a limited range of characteristics, they are more likely to appear similar from one blond person to another. Also, defendant's hair could have changed in the five years between the homicides and when the samples were obtained from him.

### (vi) The Love Insurance Note

The defense called David Oleksow, a handwriting expert for the San Diego County Sheriff's Department crime laboratory. Oleksow examined the handwriting on the Love Insurance note on several occasions, both before and after the note had been rendered unreadable, as part of his normal casework for the laboratory. After defendant's arrest, Oleksow compared defendant's known handwriting samples with photographs of the Love Insurance note. He observed "numerous unexplained variations," but also no "significant differences" between those samples and the note. Accordingly, Oleksow could not positively identify defendant as the author of the Love Insurance note, nor exclude him. Oleksow explained that the handwriting on the Love Insurance note had a limited amount of writing from which to make useful comparisons. Because he was dealing with a photograph of the note, he was unable to conduct a microscopic examination of the original or examine the fluctuations in embossing created by handwriting pressure. Oleksow, however, acknowledged that in a report dated late March

25

1985, he wrote that defendant was "probably responsible" for the handwriting on the Love Insurance note.

### c) Prosecution Rebuttal

According to two close friends of Suzanne Jacobs, Bunnice Jacobs and Deborah Watts-Gaydos, Suzanne was not known to frequent bars alone and meet men.

Inspector William Green, who was assigned to the Jacobs murders, wrote a report explaining that he had examined the boots of Fire Captain Fairhurst and his crew and determined they were different from the pattern on the footprints in the Jacobs house.

## 2. The Homicide of Gayle Garcia

The jury acquitted defendant of the December 8, 1981 homicide of real estate agent Gayle Garcia, who was killed inside the home she had advertised for sale or lease. We briefly summarize the evidence presented concerning this incident for purposes of evaluating defendant's challenges to the consolidation of the crimes for trial and their cross-admissibility.

### a) Prosecution Evidence

#### (i) Defendant's Activities Before the Homicide

In December of 1981, defendant worked as a manager at M & A Carpet Care, along with Frank Clark, his good friend and business partner. On the afternoon of December 8, 1981, defendant was not at work and Clark filled in for him.

#### (ii) The Events Leading to the Homicide

In 1981, Annette Goff owned a house in Spring Valley, San Diego County, with William Greene. The relationship between Goff and Greene had

26

deteriorated, creating animosity between them. Goff had obtained a restraining order against Greene that kept him out of the house and had filed a civil suit against him in a property dispute. Due to their estrangement, Goff decided to sell the house and hired her friend, Gayle Garcia, as her real estate agent.

On December 8, 1981, the day she was killed, Garcia was at the house from 4:00 to 6:00 p.m. to show it to prospective clients, having placed a newspaper ad listing the property as "rent to own."

Greene, who still had a key to the house, wanted to show the property to his friends that evening, but Goff refused. Over several telephone calls, Goff and Greene argued about allowing Greene's friends to see the property. Goff eventually hung up on Greene and called Garcia at 5:35 p.m. to let Garcia know that she would be at the house in 20 minutes, and that Greene may be coming.

Goff arrived at the house at approximately 6:05 p.m., with her brother Chris and one of her business employees. The front door was open and the phone was ringing as they entered the house. When Chris answered the phone, Greene was on the line asking him if Garcia was still there. Goff took the phone, and Chris began walking around the house looking for Garcia. He discovered Garcia's body lying on the floor of the dark, unlit bedroom.

### (iii) The Scene of the Crime

Homicide Detective Thomas Streed, called to investigate Garcia's death, found Garcia's body lying on the floor atop vacuum cleaner tubing. A broken fingernail of Garcia's was found in the hallway just outside the bedroom. All the blood at the scene was under Garcia's body or in the immediate vicinity. Her pants had two parallel smears running down them that appeared consistent with wipe marks from a bloody knife blade.

*(iv) The Forensic Evidence*

Dr. Howard S. Robin performed Garcia's autopsy on December 9, 1981, at the San Diego coroner's office. The body had a large, gaping neck wound, extending from the angle of the jaw on the left side all the way across the neck to the angle of the jaw on the right side. The wound went through her carotid arteries and jugular veins on both sides, cut through the neck muscles and the membrane between the hyoid bone and the top of the thyroid cartilage, and nicked the second cervical vertebrae on her right side. Garcia ultimately bled to death due to laceration of the carotid arteries.

In addition to the neck wound, there were superficial abrasions on the left side of Garcia's forehead, a one-inch abrasion in the mid-forehead region, and one on her nose. There was an abrasion near her left ear and scratches or lacerations under her chin. Small, fine petechial hemorrhages were found over the conjunctiva of her eyes. These hemorrhages could have been caused by choking.

When a 1985 search of defendant's residence resulted in the seizure of a sheath from a model 112 Buck knife, Detective Streed compared photographs of the blood smears from Garcia's pants with an exemplar model 112 Buck knife and concluded that the stains were consistent with that model. Streed did not compare the smears with any other type of knife and admitted that the model 112 was a relatively common knife.

Criminalist Ron Barry examined the 12 usable latent fingerprints lifted from the crime scene, but none matched defendant. He did not examine Garcia's broken fingernail for skin, blood, or other trace evidence.

*b) Defense Evidence*

On the night of the homicide, while she was standing outside her home as the police investigated, Goff saw a motorcyclist go down her street who looked like William Greene's brother, Richard, who lived with Greene nearby. Sergeant

Steven Blackwood of the San Diego County Sheriff's Department noted that the motorcyclist seemed very interested in the scene and almost stopped in front of the house. As Blackwood wrote down the license plate number, the motorcyclist sped off. Blackwood followed, stopped the motorcyclist, and identified him as Richard Greene.

Richard Greene gave Sergeant Blackwood his address, and at 1:00 a.m. Detective Streed picked William Greene up for questioning at the police station. William Greene owned a Buck knife, but police never seized it for testing.

Later that day, in the afternoon, Greene called Goff, and they discussed the events from the night before. During this call, Greene denied having ever said he was going to their residence while Garcia was there.

Parker Bell, a forensic expert, used eight different kinds of knife blades to wipe human blood on pants, and compared those smears with the smears found on Garcia's pants. He believed that none of the eight knife blades could be eliminated from having made the stains and that any similar type of knife could have left the smears.

Defendant presented the testimony of several relatives and family friends, including his mother, his former stepfather, brother, sister, and brother-in-law, who said that defendant was at a family birthday party on the evening of December 8, 1981. They testified that defendant arrived around dusk with his girlfriend and future wife, Shannon, and their children. They stayed two to three hours, leaving after dark. Defendant's departure from the party was memorable because it was sparked by a derogatory comment made by his brother. The trial court took judicial notice that December 8, 1981, was a Tuesday and the sun had set at 4:43 p.m.

Officer Thomas Caldwell drove the route from the house where the family birthday party was held to the house where Garcia was killed. The houses were 11

miles apart. Caldwell made the trip between 4:30 and 4:45 p.m. It took him 42 minutes because the route was congested with traffic.

### 3. The Attempted Homicide of Jodie Santiago Robertson

#### a) Prosecution Evidence

##### (i) Defendant's Residence and Vehicle at the Time of the Crimes

In early 1983, defendant moved to the Spring Valley area and bought a house on Casa de Oro Boulevard. The home had a semicircular driveway with concrete steps leading to a porch. That same year, defendant bought a black 1983 Datsun 280ZX with a manual transmission. He attached to it a customized license plate that read "CMC INC 2," which referred to the name of his company, Carpet Maintenance Company, Inc. At the beginning of June 1984, one of defendant's employees, Richard Adler, moved into a spare bedroom in defendant's house, living out of boxes he kept there.

##### (ii) The Abduction

On the evening of June 8, 1984, 34-year-old Jodie Santiago Robertson, who was in the San Diego area visiting her brother, left a restaurant in El Cajon sometime between 10:30 and 11:00 p.m. to walk back to her brother's apartment. As Robertson passed the apartment complex's parking lot, a man, whom she eventually identified as defendant, came up behind her, placed a knife at her throat, and told her that if she ran or screamed he would cut her throat. Defendant led Robertson to a dark-brown sports car, similar to a Datsun 280ZX, with louvers on the back window. The car was already running and the driver's side door was ajar. Robertson noticed the license plate, but could remember only that it was comprised of three numbers and three letters.

Defendant forced Robertson through the driver's side door, and she became seated partially in the center console area and partially in the passenger seat. The seats had sheepskin seat covers. Defendant placed the knife in front of him on the dashboard, behind the steering wheel. Defendant drove the vehicle with his left hand on the steering wheel while keeping his right hand wrapped around Robertson's right shoulder and neck. During the drive, Robertson was also able to note that defendant had a mustache, blond hair, and "bulging" blue eyes. She did not remember if the car had a stick shift and she did not notice defendant shifting gears as he drove.

Defendant drove up to a house with a semicircular driveway. He led Robertson out of the car and up some stairs to the front door. Defendant led her to a bedroom with boxes where he tied her hands behind her. He took Robertson into another bedroom and placed her on a bed. When Robertson tried to lift up her head to cough, defendant began choking her until she lost consciousness. Robertson did not remember anything after that point.

### (iii) The Rescue of Robertson

The following morning at approximately 6:40 a.m., two women on a morning walk discovered Robertson lying in the brush and weeds on the side of the road at a residential intersection about a mile from defendant's home. She was naked below the waist and had blood all over her face and down her shirt. Robertson was moaning and making gurgling sounds. She had a severe cut across the front of her neck and deep cuts to her fingers. There was a significant amount of blood on the paved portion of the roadway and on the weeds in the overgrowth at the side of the road, suggesting that her injuries had been inflicted at the scene.

At the hospital, a vascular and trauma surgeon examined the extent of Robertson's neck wounds. The wound was above her Adam's apple and extended

31

into the larynx above the vocal cords. The wound reached back to the bones of her neck vertebrae. Robertson's left external jugular vein was severed but the carotid artery, the right external jugular vein, and both internal jugular veins remained intact. The wound was consistent with a cutting instrument having been used with a sawing or carving type motion. Below the wound, Robertson's neck had bruising consistent with a smooth ligature having been applied with enough force to constrict her neck.

Robertson's head had a severe skull fracture extending from behind her head nearly across to each of her ears. Along the fracture, just behind each ear, portions of the skin on her scalp had split open. The cuts to Robertson's fingers on her right hand went through the tendons to the bone.

Surgeons successfully reconstructed Robertson's neck, and she was released from the hospital 18 days later.

### (iv) Defendant's Sale of His 280ZX

Three days after Robertson's abduction, the local newspaper ran an article about Robertson's abduction and her survival. Two days later, defendant traded his Datsun 280ZX for a Toyota pickup truck. Defendant told his friend and employee, Richard Adler, that he could no longer afford the insurance and payments on the car. Adler helped defendant remove the personalized license plate and sheepskin covers from the 280ZX's seats and transferred them to the pickup.

### (v) Robertson's Identification of Defendant, His Residence, and His Vehicle's Make and Model

Following the murder of Anne Swanke (see *post*, at pp. 41-49), in mid-December 1984, Robertson returned to San Diego at the request of the San Diego Police Department to view a photo lineup. After examining the photo spread, Robertson identified a picture of defendant as that of her attacker.

Robertson had previously told detectives that she would recognize "on sight" the house to which she had been abducted. From memory, she also drew a small diagram of the interior of the house and the circular driveway. Following her identification of defendant's photograph, detectives drove Robertson to the location of her brother's apartment complex, but she was unable to retrace the route of her abduction. The detectives also purposefully drove by defendant's residence, but Robertson did not alert them to the house. Later that morning, the detectives asked Robertson to draw a larger sketch of the house from her memory, and she again drew a circular driveway with additional detail of the interior of the house.

In the afternoon, the detectives again took Robertson to defendant's neighborhood. Detective Robert Fullmer slowed the car as they drove by defendant's house. Robertson turned her head and looked at the house while turning slightly in her seat. She asked Detective Fullmer to do a U-turn and drive past the house again. On this last pass, Detective Fullmer again slowed the vehicle, and Robertson turned in her seat again while staring at the house. Detective Gary Fisher asked her if she saw something that she recognized, and Robertson identified defendant's house as the one to which she had been taken.

Robertson identified several photos of a Datsun 280ZX as being the same make and model vehicle in which she was abducted. She also identified several photos of defendant's actual 280ZX as being consistent with the vehicle used on the night of her assault, except that the rear window louvers were missing. She also identified a sheepskin cover taken from defendant's pickup truck as being consistent with the covers used in the vehicle in which she had been abducted. When taken to see the 280ZX actually owned by defendant at the time of her abduction, however, Robertson could not positively identify it as the vehicle used in her abduction.

*(vi) The Datsun 280ZX's Louvers and Manual Transmission*

Two of defendant's neighbors testified that they had often seen defendant's 280ZX parked outside and that it had rear window louvers. After defendant traded in the 280ZX, it was subsequently sold to Michael George. According to George, the 280ZX had no rear window louvers when he took possession of it, but he had to clean off a rubbery, glue-like substance adhering to the four corners of the rear window. One type of aftermarket rear window louver for a 280ZX could be installed with a clip and adhesive on the glass. It could be removed without leaving any permanent damage to the car.

In order to explain why Robertson did not recall defendant making any gear changes during her abduction, San Diego County district attorney investigator William Green drove the same 280ZX owned by George, and previously by defendant, from the site of Robertson's abduction to defendant's home. Green drove the entire route in second gear without use of the gear shifter. He was able to follow the posted speed limits and traffic signals and signs without stalling the vehicle.

*b) Defense Evidence*

*(i) The Effects of Trauma on Robertson's Memory*

When paramedics brought Robertson to the hospital, her blood pressure was 70 over 0, suggesting that the heart was unable to pump a normal volume of blood and oxygen to the brain. According to Dr. Sheldon Zigelbaum, a physician and psychiatrist, this loss of oxygen, if significant in duration, can cause damage to brain cells and result in memory impairment. During her recovery in the hospital, Robertson displayed significant signs of psychomotor retardation, meaning that she spoke and moved slowly.

After Robertson's release from the hospital, both a social worker and a physician-psychiatrist diagnosed Robertson as suffering from posttraumatic stress

34

disorder.  According to Dr. Zigelbaum, closed-head injuries and diagnoses of posttraumatic stress disorder are related and can increase the possibility of memory loss.  Closed-head injuries can impair a person's ability to perceive, remember, and contemplate events and surroundings and to use that information effectively later.

According to her treating physician-psychiatrist, Dr. Wendy Freed, Robertson had expressed depression and suicidal thoughts, but later expressed happiness and relief after she believed that her assailant had been found and arrested.

### (ii)  Defendant's Datsun "280ZX"

Four of defendant's former employees, William Johnson, Mitchell Hoehn, Dennis Adair, and Loren Linker, testified they worked for Carpet Maintenance Company, Inc., in 1984 and were familiar with defendant's "280ZX."  They all agreed that the car did not have louvers on the back window.  Adair, in particular, testified that he had washed defendant's car a number of times at work and there was nothing on the rear that blocked him from directly washing the rear window.

According to Hoehn, he had been a passenger in defendant's 280ZX on several occasions.  The car had a computerized female voice that alerted when the door was opened.  Robertson heard no such sounds when the doors opened during her abduction.

According to loan records, after defendant traded the 280ZX for the Toyota pickup truck, his monthly car payment was reduced from $412.23 to $287.11.

### (iii)  Defendant's Alibi

Loren Linker and his wife testified that defendant visited them on the night of Robertson's abduction on June 8, 1984.  Loren Linker testified that he and defendant arrived at the Linker residence about 9:00 p.m., and defendant left

around 11:00 p.m. to midnight.[22]  The visit was memorable because the Linkers had a new chair delivered that same day, and defendant had commented on how nice it was.

### (iv)  Other Defense Evidence

According to Detective Fullmer, in the final drive-by of defendant's house, just before Robertson identified it as the place to where she had been abducted, he heard someone in the vehicle say "this house" or "what about this house?" Detective Fisher had previously stated that it was possible that he had made such statements before Robertson made a positive identification of the house.

At the hospital, a rape kit was performed on Robertson.  Vaginal swabs taken from that examination tested presumptively positive for the presence of sperm cells, and criminalist Randall Robinson visually detected the presence of sperm cells.  The ABO blood type test results from the vaginal swabs neither included nor excluded defendant as the donor of the sperm cells.  In the opinion of Dr. Phillip Miller, an emergency room physician familiar with rape kits, the detection of sperm cells in the vaginal swabs indicated that sexual intercourse could have occurred as early as within minutes or as late as one to two days prior.

### c) Prosecution Rebuttal

Defendant could not be ruled out as contributing the seminal fluid and sperm found on the two deep vaginal swabs from Jodie Robertson because both defendant and the swabs tested as nonsecretor — that is, one whose blood-type antigens are not secreted into bodily fluids.

Deputy Nancy Zuniga was present when Robertson identified defendant's house from a police vehicle.  She testified that, as Detective Fullmer drove past

---

[22]    Robertson was abducted between 10:30 and 11:00 p.m. that night.

36

defendant's house, Robertson looked at it intently. Detective Fullmer made a U-turn and drove past the house again, and slowed down upon Robertson's request. Robertson then identified defendant's home as the house she had been taken to, and she listed the things about the house that she recognized, including its color, its concrete steps, and its circular driveway with a tree. According to Deputy Zuniga, no one in the vehicle had guided Robertson's attention to the house prior to her identifying it.

### 4. *The Homicides of Rhonda Strang and Amber Fisher*

With 11 of 12 jurors voting in favor of conviction, the jury was unable to reach a verdict concerning whether defendant murdered Rhonda Strang and Amber Fisher on October 23, 1984. The trial court declared a mistrial as to those counts, and the court later granted the prosecutor's motion to dismiss these charges. Again, we briefly summarize the evidence presented regarding this incident for purposes of evaluating defendant's challenges to the consolidation of the crimes for trial and their cross-admissibility.

#### a) Prosecution Evidence

##### (i) Defendant's Relationship to the Strang Family's Narcotics Dealing

At the time of her death, 24-year-old Rhonda Strang was married to Robert Strang, and they had a baby named Jessica. Robert used marijuana, cocaine, and methamphetamine. To Rhonda's dismay, Robert began selling drugs out of their house. Defendant's friend and employee, Richard Adler, was Rhonda's brother and he introduced defendant to the Strang family. Occasionally, defendant would visit the Strang home to purchase drugs.

Rhonda was afraid of Robert's drug activity and of one of his suppliers. Rhonda became very conscious about security at home and would compulsively

37

keep the doors and windows locked, and would check to see who was at the door before opening it. Rhonda considered divorcing Robert and kept a diary of the drug transactions. She believed that the house was being watched.

*(ii) The Events Leading to the Killings*

Because of a 48-hour jail commitment stemming from a drunk driving conviction, defendant was supposed to report to the San Diego County detention facility at Descanso for work credit on October 23, 1984. But defendant asked to reschedule for a later date, claiming that he had a large carpet job on October 23. According to the carpet company's dispatch logs, however, the large carpet cleaning job scheduled for October 23 had been completed three days earlier. On the morning of October 23, 1984, defendant called in sick at his carpet company.

On the morning of October 23, 1984, Robert Strang arrived for work around 8:00 to 8:30 a.m., and remained there until 3:30 p.m. Robert's foreman, William Ralls, regularly took special note of Robert's presence at work because Robert had a reputation for sneaking off the job site without permission.

Between 9:00 and 9:30 a.m. that morning, Gregory Fisher, a long-time friend of Rhonda's, left his three-year-old daughter Amber with Rhonda for her to babysit while he was at work. In the early afternoon, Rhonda's five-year-old daughter, April, came home from school and discovered the bodies of her mother and Amber Fisher. April ran to a neighbor's home. Emergency responders arrived around 1:30 p.m.

*(iii) The Scene of the Crime*

Arriving firefighters found the bodies of Rhonda and Amber. They also found Rhonda's baby daughter, Jessica, inside a playpen in the living room, lethargic, but unharmed.

Detective Robert Fullmer examined the crime scene. He found no signs of forced entry. All of the doors to the house were locked — except the door between the kitchen and the locked garage. Inside the house, Rhonda Strang was lying on her back on the living room floor with her throat cut from ear to ear and with some abrasions on her neck. Amber Fisher was lying on her side next to the doorway leading out the other side of the house. Her throat also had been cut.

### (iv) The Forensic Evidence

Dr. Robert Bucklin performed the autopsies on both Rhonda and Amber.

Rhonda's gaping neck wound extended across the front part of her neck, and it transected through the structures of the neck, including both carotid arteries, all the jugular veins, and the larynx. There were cutting marks penetrating the cervical vertebrae. Based on the borders of the wound, the cuts appeared to have been made from her right to her left. Dr. Bucklin believed that the skin wounds and marks on the cervical vertebrae revealed at least five distinct cutting strokes.

Rhonda's neck had prewound abrasions consistent with her gold necklace having been used to strangle her. The skin on her face and the whites of her eyes had a number of small, superficial hemorrhages consistent with strangulation. Rhonda's head showed suffusion, a dusky color that is consistent with choking. In addition, she had a bruise on her right shoulder.

Amber's gaping neck wound also appeared to have been cut from her right to her left. The wound severed the larynx, the carotid arteries, and the jugular veins. Some of her cervical vertebrae had cutting injuries. The skin on Amber's neck indicated that the wound was cut using more than one stroke.

Amber had a cut through the tip of her finger. Like Rhonda, Amber also had a bruise on her right shoulder.

*b) Defense Evidence*

*(i) Domestic Violence in the Strang Household*

Several witnesses testified concerning incidents of violence against Rhonda by her husband Robert.

At a party, a family friend saw Robert grab Rhonda by the throat and say, "I am going to kill you, bitch." Later, the friend saw Rhonda with bruises on her shoulder and scratches on her neck, which Rhonda claimed were caused by Robert beating her up.[23]

On July 8, 1984, a neighbor heard a loud argument from the Strang house and eventually heard a woman screaming, "Help me. Help me. He's trying to kill me," followed by the sounds of pounding and breaking glass.

Friends of the Strangs reported seeing Rhonda on occasions with a black eye and bruises on her face and arms. They testified that Robert had an explosive temper and would often threaten her with a gun. On one occasion in August 1984, a roommate saw Robert threaten Rhonda with a gun. The roommate called the police, resulting in Robert's arrest.

According to Rhonda's daughter, April, on the night before her mother's murder, Rhonda and Robert had an argument.

*(ii) Rhonda's Fear and her Documentation of Robert's Narcotics Activities*

In the summer of 1984, Rhonda began cooperating with San Diego Police Detective Dale Kitts concerning her husband's drug activities, offering information regarding Robert's supplier. Rhonda told several of her friends that she was covertly tracking Robert's activities by keeping a diary, tapes of phone

---

[23]   Rhonda's statement was not admitted for the truth of the matter asserted, but instead to show her state of mind and to explain her conduct.

conversations, and a list of drug dealers and drug deals. Rhonda expressed her fear of Robert and his supplier to several friends and family members. In the weeks before her murder, she repeatedly expressed her belief that she was being followed and was going to be killed because she knew too much about the narcotics activities.

Following the murders, Detective Fullmer searched the Strang house but did not locate Rhonda's diary, cassette tapes, nor any list of names of people involved with Robert's drug activities.

### (iii) Other Evidence

Robert collected knives, would frequently sharpen them, would often carry a Buck knife on his belt, and sometimes concealed knives in his boot.

Dr. Cyril Wecht, a specialist in anatomic, clinical and forensic pathology, testified that the direction of the neck wounds on Rhonda and Amber suggested that the assailant was left-handed.

### 5. The Homicide of Anne Swanke

#### a) Prosecution Evidence

##### (i) Defendant's Activities Before the Homicide

On the evening of November 19, 1984, defendant and his business partner, Frank Clark, left work in defendant's truck and went to a bar, where they drank several beers and consumed crystal methamphetamine. They then drove to Clark's home around 10:00 to 10:30 p.m. where they drank more beer. The night was memorable to Clark and his wife, Cecilia, because she was watching the concluding part of the television miniseries "Fatal Vision." Defendant stayed through the end of the program at 10:58 p.m. and left the Clark residence at approximately midnight or thereafter.

41

*(ii)  The Abduction of Anne Swanke*

On the evening of November 19, 1984, 22-year-old Anne Swanke was visiting her boyfriend, Gregory Oberle, near the San Diego State University campus.  Before Swanke left Oberle's apartment between 12:30 a.m. and 1:00 a.m. on November 20, she mentioned to him that her Dodge Colt was low on gasoline.

On that night, Gale Graham was an employee of a gas station on Jackson Drive, near the intersection with Fletcher Parkway, in La Mesa.  Sometime after midnight, Graham encountered Swanke, who walked in with a gas can and purchased gasoline.  Swanke then left on foot.

Soon thereafter, Richard Leyva, while driving home, was stopped at a traffic light at the intersection of Jackson Drive and Fletcher Parkway.  Leyva saw a car parked at a nearby curb and saw someone bent over at the rear of the car as if pouring gasoline into the filler.  Leyva looked away momentarily and when he looked back, he saw another vehicle had parked behind the first one, and it had a license plate with an unusual combination of letters, "TNCCNC," "CNCTNC," or possibly "CNCINC," plus a number.  As Leyva made his turn and passed the vehicles, he noticed the silhouette of two people who appeared to be in an embrace, although he briefly considered that it might be a kidnapping.

In the early morning hours of November 20, 1984, Officer Charles Drake of the La Mesa Police Department learned from the California Highway Patrol that a Dodge Colt had been abandoned at the intersection of Jackson Drive and Fletcher Parkway.  When he arrived at the car, Officer Drake opened the car door and retrieved Anne Swanke's wallet from the passenger seat.  On the driver's side rear corner of the trunk lid were Swanke's car keys, a flashlight, and the gas tank cap.  The gas tank flap was open, and a gas can was on the ground.

*(iii)  Defendant's Facial Scratches and the Discovery of Anne Swanke's Body*

On the morning of November 20, 1984, defendant called Frank Clark and said that he needed to take a week off work because he had gone to a bar after leaving Clark's home and someone there had hit him with a beer mug. Defendant's roommate, Richard Adler, saw defendant that morning and observed fresh scratches on his forehead and both sides of his face and cheeks.  The scratches were still bleeding, and Adler commented to defendant that he looked like he had been run over by a truck.  Defendant told Adler that he had been in a bar fight the night before and was hit in the face by a beer mug or pitcher. Another roommate, Vicky Johnson, also noticed the scratches on defendant that morning.

Defendant appeared at work on Friday, November 23, 1984, and Frank Clark noticed that defendant had deep scratches on the left side of his face that had begun to heal.  They were about four inches long and started from his eyelid and went down his cheek and off his chin.  Two advertising representatives who visited the carpet cleaning business that day also noticed the scratches, and defendant told them that he received them during a bar fight.

The following day, on the morning of November 24, 1984, James McNelly was walking in the hills near his Spring Valley home and discovered Swanke's body in a rough, rocky, steep, remote area about two miles away from defendant's home.  McNelly returned home and called the police.

*(iv)  The Scene of the Crime*

San Diego County Sheriff's Detectives Robert Fullmer and Craig Henderson arrived at the scene.  Swanke's body was lying facedown in the mud near the bottom of a steep, rocky hill.  Except for socks, Swanke's body was nude from the waist down.  Around her neck was a silver choke chain, like one used to

43

leash a dog. After rolling the body over, Detective Henderson observed a severe cut to Swanke's throat.

Swanke's shirt, bra, and sweater vest had been sliced through the middle, exposing her upper torso. Her pants were a few feet away and were still zipped and buttoned but had been sliced through along the zipper to the crotch area. Her shoes were scattered further up the hill. Her underpants were also found further up the hill. Based on Detective Henderson's experience, it appeared the body had been there several days.

### (v) The Forensic Evidence

Dr. Katsuyama performed the Swanke autopsy. Swanke's neck wound was large and gaping, extending from behind the right ear downward to the upper portion of the neck and to the left side. The wound cut through the neck muscles around the larynx, the larynx itself, the esophagus, the wind pipe, and the carotid vessels and jugular veins on both sides of the neck. Cutting marks penetrated the cervical vertebrae and the connective tissue holding the backbone together. Based on the status of the skin around the wound, there appeared to be at least seven distinct and separate sawing-type cuts on the left side, and at least four separate cuts on the right side of Swanke's neck.

Discolorations and marks on Swanke's neck were consistent with the dog chain having been pulled tightly in an upward direction around her neck. Swanke had an injury to her tongue suggesting that she had bitten it while being choked with the dog chain before her death. Her body also had scrapes, primarily on her buttocks and thighs, as if she had been dragged across the ground or had fallen over rough terrain. Dr. Katsuyama believed that the scratch injuries occurred shortly before or after her death.

Based on the presence of small insect larvae on the trachea, the partial dehydration of the eyes, and the cool weather of the preceding days, Dr. Katsuyama estimated that Swanke had been dead for at least 48 hours and probably longer. However, Dr. Katsuyama could not determine the exact date and time of Swanke's death.

Dr. Katsuyama also took genital swabs for analysis, but tests were unable to confirm the presence of semen.

According to Deputy Frederick Freiberg, Swanke's fingernails had foreign debris consistent with blood and possibly skin, so he clipped the nails and collected them for further analysis. The fingernails were sent to Serological Research Institute (SERI) for testing. Brian Wraxall, a forensic serologist with SERI, analyzed the fingernails, as well as blood samples taken from defendant, his wife, Shannon, Jodie Robertson, and Swanke.

Upon examination, Wraxall noticed blood present on most of the nails clipped from Swanke's left hand. One fingernail, labeled L2, held tissue-like material that stretched out like an accordion from a half-inch to three-quarters of an inch. Blood from that fingernail clipping, and from another labeled L4, tested as type A blood with enzyme protein PGM subtype 2+1+, which was inconsistent with Swanke but consistent with the blood type of defendant.

Wraxall also tested for two genetic markers found in blood — GM and KM (gamma marker and kappa marker) antibodies. Two other fingernail clippings from Anne Swanke, one from each hand, labeled L1 and R4, tested positive for GM allotype genetic markers that were consistent with a mix of Swanke's and defendant's blood. KM analysis of the fingernails was inconclusive.

Based on the blood characteristics in the fingernail clippings R4, L1, L2, and L4, which matched defendant, Wraxall stated that blood from only

45

approximately 1 in 69 Caucasians, 1 in 547 Blacks, and 1 in 197 Hispanic/Native Americans would share the same characteristics.

After a search and seizure of items from defendant's truck, criminalist Charles Merritt tested a bloodstain found on the passenger side of a sheepskin seat cover. The stain tested as type O blood, which was the same blood type as Swanke, but different from defendant and his wife, who were both type A.

Marilyn Fink of the San Diego County Sheriff's Department ran further tests on the sheepskin bloodstain searching for certain blood proteins. Tests done at SERI verified Fink's results and tested for additional proteins and genetic markers. The blood proteins and genetic markers in Swanke's blood were consistent with the tests of the sheepskin bloodstain. Those results were inconsistent with the blood of defendant, his wife, and Jodie Robertson. According to Wraxall, the blood characteristics derived from the bloodstained sheepskin occur in only approximately 1 in 4,794 Caucasians, 1 in 5,875 Blacks, and 1 in 444 Hispanic/Native Americans.

### (vi) Other Evidence

Pursuant to a search warrant, sheriffs searched defendant's house and recovered several items related to hunting knives. One of the items was a sheath for a model 112 Buck folding knife with a 4 1/4-inch blade, and the sheath had significant signs of wear. Sheriffs also located a box labeled "Buck Knife, Special Model 119." In addition, they recovered a Buck fixed-blade knife and sheath. From a tool box found in defendant's truck bed, they also recovered a fillet knife used to skin fish. None of those items had evidence of blood.

In December 1984, San Diego County Sheriff's Detective Craig Henderson interviewed defendant's wife, Shannon Lucas. Deputy Henderson showed Shannon Lucas the dog choke chain that had been around Swanke's neck. Upon

seeing the dog collar, Shannon Lucas appeared visibly shaken and said that it belonged to the couple's recently deceased dog.[24]

At the time of defendant's arrest on December 16, 1984, nearly a month after Swanke's abduction, Detective Henderson noticed healed scratches on defendant's face. He had a photograph taken of defendant's face to document the injuries.

### b) Defense Evidence

#### (i) The Forensic Evidence

Hermann Schmitter, an expert in forensic serology from the Bundeskriminalamt (the German equivalent of the FBI), challenged the state's serological evidence concerning the sheepskin bloodstain and the victim's fingernails. According to Schmitter, criminalist Charles Merritt's and SERI's ABO testing of the sheepskin stain was unreliable. He criticized Merritt for failing to document what technical procedures, if any, Merritt used to test the stain. In Schmitter's opinion, Merritt and SERI should have tested the sample twice and reported only consistent results.

Schmitter challenged SERI's ABO testing of the fingernails, also believing that duplicate testing was required to verify the results. Schmitter reviewed the photos of the gel slabs SERI used to identify the presence of various blood proteins and genetic markers in this case. He believed there were no reportable results in the GM and KM genetic marker tests. He disagreed with some of SERI's interpretations of the blood protein results for the samples taken from Swanke, Shannon Lucas, and defendant.

---

[24] Shannon Lucas died unexpectedly before defendant's trial. The jury heard this small portion of Shannon's taped interview with Detective Henderson.

47

The parties stipulated that FBI Special Agent William Eubanks would testify that all FBI serology examiners must have at a minimum a bachelor's degree from a four-year college with a major in chemistry or biochemistry. Eubanks would testify that the FBI required the use of controls and duplicate testing for the kind of serology testing employed in this case. In addition, the results must be interpreted by a second examiner, and, if there is disagreement, the result is deemed inconclusive.

Two criminal defense attorneys who had worked with Brian Wraxall (the head of SERI) in another capital case testified that they believed Wraxall was not honest.

Criminalist Charles Merritt found two foreign pubic hairs on Swanke's body, one from a pubic combing and one from her left hip. They did not match her hair or defendant's hair. John Simms, the San Diego Police Department criminalist and hair comparison expert, reached similar conclusions, and he further concluded that the hairs did not match samples from Swanke's boyfriend.

None of the latent fingerprints found on the windows of Swanke's vehicle, the gas tank flap, or the gas can matched defendant's. The identifiable latent prints were made by Swanke or Michael Quinn of the La Mesa Police Department.

*(ii)  The Dog Chain*

James Boyd, general manager for Hartz Mountain pet supplies, examined the dog chain found around Swanke's neck. He recognized it as a chain Hartz would distribute to pet stores and supermarkets. According to his company's business records, in 1982, 34,468 chains of similar type were sold in California in three lengths. In 1983, 36,870 were sold and in 1984, another 33,833 were sold. Boyd also testified that several other companies sold similar types of dog chains.

48

Kevin Chess, a private investigator, went to various stores and supermarkets in San Diego County. He found several chains similar to the one found around Swanke's neck.

### (iii) Other Evidence

Vicky and William Johnson lived at defendant's residence in November 1984. On the morning following Swanke's disappearance, neither noticed any scratches on defendant's face, but the following day, which was the day before Thanksgiving, they noticed scratches on his face, which defendant claimed were caused by a fight in a bar.

To contest the prosecution's evidence regarding Swanke's time of death, the defense presented the testimony of Robert Martin, a security guard for the U.S. Elevator Company plant, which was located at the bottom of the hill near where Swanke's body was discovered. On November 22, 1984, three nights after Swanke's disappearance, Martin was working his midnight shift at the company. As he made his rounds, he heard dogs in the neighborhood barking and howling louder than usual. He also noticed the lights of an automobile at the top of the hill.

## B. Penalty Phase

### 1. Prosecution Case

The prosecution presented the record of defendant's August 16, 1973 conviction for the crime of forcible rape, in violation of section 261, including the finding that defendant was armed with a knife in the commission of the offense. This prior conviction was offered under aggravating factors (b) (prior violent criminal conduct) and (c) (prior felony conviction) of section 190.3.

49

## 2. Defense Case

### a) Defendant's Family and Friends

Defendant was born in the Philippines, where his father, Clarence Lucas, was stationed in the Navy at the time. Defendant had problems with bedwetting and suffered from asthma from an early age. Defendant's father was described as a cold man who used to pick on defendant and his siblings when they were young. Defendant's father had a temper, which he exhibited in front of defendant and the other children, at times putting holes in the walls out of anger. Defendant's father would hit them not only with his fists, but also sometimes with a belt or telephone cord. One time, defendant's father forced his sister Cathy to re-eat the salad she had just vomited onto her plate. The father was especially hard on defendant, who often received the worst treatment. The abuse continued until defendant's parents separated when he was about 15 years old. Despite the prior abuse, defendant asked his mother to give his father another chance. The mother agreed but later divorced him.

Defendant's younger brother, Don, thought of defendant as a good friend and a father figure. When Don was unemployed, there were a number of times when defendant bought groceries for his family. Defendant once took Don and his family into his home. Defendant often advised Don about preparing for his future. Don explained that defendant had the most "civil head" of anyone he knew. Don recounted an incident in which his father was cleaning the garage with gasoline and the hot water heater ignited the gas. Defendant pulled Don out of the garage as it was engulfed in flames. Don trusted defendant with his children and asked that defendant be sentenced to life imprisonment.

Cathy Lucas McEvoy, defendant's sister, was one year older than him. Cathy testified that she talked to defendant about everything and that he took care of her when she was younger. When neighborhood bullies picked on Cathy, he

50

defended her. When defendant was arrested in 1984, Cathy visited him in jail, wrote to him, and talked to him by phone every day. Cathy asked the jury to spare her brother and testified that his execution would hurt her children and family.

Cathy's ex-husband, Jim Graves, testified that when he and Cathy got into arguments, defendant helped Graves "sort out" his feelings. Defendant was a good friend to Graves and maintained a good relationship with him and his children even after Graves remarried.

Cathy's current spouse, Mark McEvoy, first met defendant in about 1981. Sometimes defendant helped McEvoy with projects, such as working on McEvoy's truck. They also went to baseball games together. McEvoy considered defendant someone with initiative for business. McEvoy felt defendant was a human being worth saving, that his death would only compound tragedy upon tragedy, and that defendant's family would be devastated if he were sentenced to death.

Defendant's niece, Trisha McEvoy, and nephew, Timmy Graves, testified on defendant's behalf. Trisha told the jury she got along well with defendant, she listened to his advice, and he was a good influence on her. Defendant paid for her modeling school and was always available to talk to her about her problems. Trisha testified that defendant bought food for her and her little brother when her parents were going through a divorce. Trisha wished her uncle to live. Timmy testified that defendant is a good uncle who did nice things for him, like taking him fishing, going on car rides, and playing games and watching television with him. Timmy thought the appropriate punishment for his uncle would be life in prison.

Many of defendant's friends and family testified that defendant was kind, caring, helpful and generous, and good with children. All of defendant's friends and family asked that defendant be given a life imprisonment sentence.

### b)  1973 Rape Case

Attorney George Anthony Gilham represented defendant in the 1973 rape case.  Gilham believed that defendant was not guilty of the rape charge.  Gilham also believed that defendant should be sentenced to life imprisonment.  In Gilham's opinion, defendant is a hard-working individual who could be a benefit to society if he were to receive such a sentence.

### c)  Expert Testimony

Clinical and forensic psychologist Alvin Marks diagnosed appellant as having "personality disorder."  Dr. Marks indicated defendant's early life problems included a severely dysfunctional family.  Dr. Marks testified that defendant picked up his father's hatred of women.  But Dr. Marks believed defendant also loved women and was in pursuit of the perfect woman.  Defendant had a great fear of men and distrust of authority because of his father, but defendant was able to get along with men in an institutional setting.  Defendant had difficulty expressing his feelings, but expressed sadness over the death of his wife, felt bad about the fact that he had difficulty in seeing his family, and expressed remorse for the family of the victims (without admitting to his guilt).

Craig Haney, professor of psychology at the University of California at Santa Cruz testified regarding his studies of the prison environment concerning the sentence of life imprisonment without possibility of parole (LWOP).  Haney described security conditions in California prisons that held LWOP prisoners as being the highest level of security in the state.  He explained that living conditions for LWOP prisoners were heavily monitored, but that prison society was such that inmates could find meaningful ways of making contributions to the institution and people around them.  Haney described prison rules and punishment, as well as factors important to an inmate's prison adjustment.

Louis Nelson, a retired San Quentin Prison warden, testified that wardens prefer life prisoners because they settle down, help mentor new and younger inmates, and perform valuable work assignments. Nelson described the security at San Quentin, the cells occupied by inmates, the "lifer's club," and the inmate council — a group that facilitates communication between the inmates and the administration. He maintained that the best indicator of how an inmate will perform is past prison conduct.

### 3. Prosecution Rebuttal

#### a) Spousal Abuse

Laura Stewart lived next door to defendant and his wife for more than a year. In Stewart's opinion, defendant and his wife, Shannon, had a violent, tumultuous relationship. She observed them constantly fighting outside in the yard and saw defendant hit Shannon numerous times.

Stewart recalled one instance in which she was awakened by yelling and screeching tires. Stewart heard defendant say, "Go get the chain." She heard defendant and Shannon arguing, with defendant using much profanity. Eventually, Stewart saw Shannon drive defendant's truck into a pole, and saw defendant open the truck door and drag Shannon out by her hair.

#### b) Conduct in Jail

When in custody in this matter, deputy sheriffs repeatedly found "pruno," a homemade alcoholic beverage, in defendant's jail cell. Deputy Sheriff Barletta testified defendant's possession of pruno was a major jail rule violation.

On February 23, 1989, Deputy Sheriff Mark Profeta searched defendant's jail cell. When Profeta entered, he found a broomstick with a tapered end leaning against the bars and the wall. Inmates were not allowed to have sharpened broomsticks because they posed a security risk for other inmates and the staff.

53

*4. Defense Surrebuttal*

In January 1989, Sonny Lee was housed with defendant in tank 5F in the central jail. Lee testified that the item Deputy Profeta referred to as a broomstick was actually an attachment for a scrub brush. Lee also testified that the stick was used to reach the television from the cell in order to change channels or adjust the volume because that was the only way the television could be adjusted.

## II. PRETRIAL ISSUES

### A. Consolidation and Cross-admissibility Issues

Defendant makes numerous arguments related to the consolidation of his cases. He claims that each incident was not admissible to prove identity for each of the other killings because they were not so unusual and distinctive, nor so similar, so as to reflect the "signature" of a single perpetrator. He argues that because the crimes were not cross-admissible, a joint trial of all the charges prejudiced his guilt and penalty phase verdicts.

*1. Background and Procedural History*

Following his arrest in December 1984, defendant was arraigned for the crimes against Robertson, Strang, Fisher, and Swanke in case No. CR 73093. Investigators, however, believed defendant was also linked to the Jacobs and Garcia murders, and, in March 1985, defendant was arraigned for those murders in case No. CR 75195. In December 1986, the prosecution filed a motion to consolidate the cases. In the course of pretrial proceedings, the trial court heard evidence concerning the nature of the homicides, the victims, and the characteristics of the inflicted wounds. The court also considered evidence of all known homicide cases in San Diego County from the prior 20 years that involved cutting injuries to the victim's throat. For the purpose of its determination of whether evidence would be cross-admissible for each incident, the court ruled that

the evidence would be limited to that put forth by the prosecution and denied the defense request to present its own witnesses to oppose the motion to consolidate.

In June 1988, the trial court granted the motion to consolidate and made detailed findings in support of consolidation. The court noted that all of the victims were vulnerable, that the women were all in their 20s or early 30s, pretty, and had brown hair, that all but one incident involved the victim being attacked while secluded in a house, that there was no apparent motive for the murders, no evidence of sex assault or items stolen, and that each victim had an ear-to-ear throat slashing wound that extended to the backbone — with this injury being the only major wound in all of the cases, except for Suzanne Jacobs. The court also noted that the coroner's office had seen relatively few throat-slashing homicides and that records for the prior 20 years identified only about three dozen murder cases involving cuts to the throat. The court further explained that it had reviewed the coroner's reports for these other throat-wound homicides and they were all distinguishable largely because of other wounds to the bodies that did not involve the neck. The court did note that two other prior cases were similar to the charged cases in that the neck was the only part wounded, but it noted that both cases involved slashes to only the right side of the victim's neck, and not ear to ear, and that both involved neck injuries that were lower on the neck than in the charged cases. Finally, the court rejected the defense claim that the probative value of cross-admissibility was outweighed by any prejudicial effects.

### 2. *Cross-admissibility to Prove Identity*

According to section 954: "An accusatory pleading may charge . . . two or more different offenses of the same class of crimes or offenses, under separate counts . . . provided, that the court in which a case is triable, in the interests of

55

justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately . . . ."

"Because consolidation ordinarily promotes efficiency, the law prefers it." (*People v. Ochoa* (1998) 19 Cal.4th 353, 409; accord, *People v. Soper* (2009) 45 Cal.4th 759, 772.) Accordingly, if the charged offenses are of the same class, such as the murders charged here, joinder is proper under section 954. (*People v. Kraft* (2000) 23 Cal.4th 978, 1030.) Under such circumstances, it is defendant's burden to show error in allowing a joint trial of the charged offenses and relief will obtain only on a clear showing of prejudice to establish the trial court's abuse of discretion. (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220.)

An abuse of discretion can occur " ' "where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a 'weak' case has been joined with a 'strong' case, or with another 'weak' case, so that the 'spillover' effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case." ' " (*People v. Kraft*, *supra*, 23 Cal.4th at p. 1030, quoting *People v. Bradford* (1997) 15 Cal.4th 1229, 1315.)

First, we examine whether defendant was prejudiced because of joinder by determining if each of the joined charges would have been admissible in separate trials on the others.[25] "If so, any inference of prejudice is dispelled." (*People v. Kraft*, *supra*, 23 Cal.4th at p. 1030.)

---

[25] Section 954.1 states that "where two or more accusatory pleadings charging offenses of the same class of crimes or offenses have been consolidated, evidence concerning one offense or offenses need not be admissible as to the other offense

*(Footnote continued on next page.)*

56

Whether the other crimes would have been admissible in separate trials on the others is governed by Evidence Code section 1101, subdivision (b), which permits admission of other uncharged acts when offered as evidence of a defendant's motive, common scheme or plan, preparation, intent, knowledge, identity, or absence of mistake or accident in the charged crimes. In this case, the prosecutor argued, and the trial court found, that evidence of each incident would have been cross-admissible in a separate trial of the charge relating to the other incidents because the incidents disclosed a distinctive modus operandi tending to establish the killer's identity. We have held that to prove identity through other uncharged acts, the similarities between the charged and uncharged offenses must be so unusual and distinctive as to be akin to a signature. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403.)

In this matter, there were five incidents all involving slim, attractive Caucasian women with brown hair in their 20s or 30s. To the extent that two of these incidents also involved the killing of young children, it appears that the children were not the primary targets, but were instead killed to eliminate potential witnesses to the adult killings. None of the incidents disclosed any motive for the killings, with no conclusive evidence of sexual assault, larceny, or obvious motive for retribution.

---

*(Footnote continued from previous page.)*

or offenses before the jointly charged offenses may be tried together before the same trier of fact." But because defendant was tried prior to the effective date of this statute, as adopted by the California voters through Proposition 115 in June 1990 (see Cal. Const., art. I, § 30, subd. (a)), we apply the law predating its enactment. (*People v. Ramirez* (2006) 39 Cal.4th 398, 437, fn. 6.)

But the most important similarity in all the incidents was the characteristics of the inflicted throat wounds.  All of the victims in this case had severe slashing throat wounds that spanned nearly ear to ear and cut deeply through the tissues of the throat either at or above the thyroid cartilage.  The wounds themselves were distinctive based on how they invaded each victim's throat in terms of depth, height, and length.  The extent and nature of all of these injuries indicated that they were not the result of stab wounds, but rather a slashing and sawing type of action that required multiple sawing motions to accomplish the extent of the injuries.  The throat wounds also were the primary cause of death for each victim.

The uniqueness of the throat wounds in the present case becomes starkly evident when compared to the more than three dozen San Diego County homicide cases involving throat wounds in the prior two decades before defendant's trial. Virtually all of the other cases involved stabbing, not slashing, wounds to the neck and involved significant slashing or stabbing wounds to other parts of the victim's body.  As the trial court pointed out, only two of the other killings were similar to those in the present matter in that each of those female victims had a slashing throat wound as the sole major wound, but in those cases the wounds did not extend across the entire neck and involved only the right side.  Moreover, one of those two victims had been strangled to death *before* her neck was wounded and items had been stolen from her home.  The other victim's throat wound extended well below the thyroid cartilage and into the lower neck vertebrae.

Thus, in addition to the targeted victims' gender, race, age, and appearance and the lack of apparent motive for the killings, all of the victims' wounds shared characteristics that were unlike anything the San Diego coroner had observed in the more than 20 years preceding defendant's trial.  Several doctors from the coroner's office testified concerning the general rarity of throat-slashing

homicides. And the neck wounds here were unique in that they were virtually the only offensive wounds present on each victim.[26]

Accordingly, we conclude that the trial court did not abuse its discretion when it ruled that each incident displayed a pattern so unusual and distinctive as to support an inference that the same person committed all of the killings and that such evidence, therefore, was relevant on the issue of identity.[27] In separate trials, evidence of the other four incidents would have been admissible in each trial. Any inference of prejudice is dispelled. (*People v. Bradford*, *supra*, 15 Cal.4th at p. 1316.)

Moreover, none of the other factors relevant to assessing prejudice from joinder support defendant's claim that the trial court abused its discretion in allowing consolidation.

As to whether some of the charges were likely to unusually inflame the jury against defendant, all of the charges were certainly aggravated by the brutal nature of the inflicted neck wounds, especially given that two of the incidents involved

---

[26] Although Suzanne Jacobs had three stab wounds that were not associated with her neck, of the five charged incidents, her crime scene was the only scene that showed evidence of a prolonged struggle between the victim and her killer. Moreover, nearly all of the other more than three dozen San Diego County throat-wound murder cases involved victims who suffered numerous stabbing and/or slashing wounds on other parts of the body as well as multiple sites of blunt force trauma. In this respect, the injuries to Suzanne Jacobs were much more similar to the other four charged incidents than to the other throat-wound murders that had occurred in the county prior to defendant's trial.

[27] Defendant also claims the trial court abused its discretion by considering the offenses as a whole rather than determining cross-admissibility on a case-by-case basis. But nothing in the record suggests that the court blurred together the facts of each case. Instead, the court's ruling clearly focused on not only the factual circumstances of the five charged incidents but also on dozens of other homicides involving throat injuries.

59

three-year-old children. But considered as a whole, the circumstances of each of the five incidents were " 'similar in nature and equally gruesome.' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1155.)

Regarding whether a weak case had been joined with a strong case or with another weak case so that the total evidence unfairly may have altered the outcome of some or all of the charges, the jury's verdicts contradict such a contention. The fact that the jury acquitted defendant of Garcia's murder and could not reach a verdict as to the murders of Strang and Fisher strongly suggests that the jury was capable of weighing the evidence and differentiating among defendant's various charges. Concerning the Jacobs murders, there was compelling independent evidence connecting defendant to those murders. Defendant had no alibi for that day, a bloodied note with his handwriting was found at the scene, a vehicle matching his mother's car was in the Jacobses' driveway that morning, and bloody footprints at the scene were consistent with the sole pattern of the boots defendant wore at work. Defendant has not shown that there was a " 'spillover' " effect where evidentiary gaps in an allegedly weak case were filled by joinder with a stronger case.[28] (*People v. Ruiz* (1988) 44 Cal.3d 589, 606.)

Finally, we consider whether any one of the charged crimes carries the death penalty or whether joinder of the charged crimes turns the matter into a capital case. (*People v. Kraft*, *supra*, 23 Cal.4th at p. 1030.) Although joinder did not convert the Jacobs murders or the Strang and Fisher murders into capital cases

---

[28] Defendant also argues that the trial court assumed defendant was guilty of each murder in deciding cross-admissibility, thereby improperly "bootstrapping" the cross-admissibility rulings by interdependently relying on the validity of the other cases without that validity having been independently established. But we note that the court specifically concluded that "there are *independent* factors about each of the crimes which link [defendant] to each crime."

60

because both alone satisfied the multiple-murder special-circumstance statute, joinder did have the effect of converting the Garcia and Swanke murders into capital cases. This raises a concern that joinder could produce a conviction that would not otherwise be obtainable on the evidence at separate trials because "joinder should never be a vehicle for bolstering either one or two weak cases against one defendant, particularly where conviction in both will give rise to a possible death sentence." (*Williams v. Superior Court* (1984) 36 Cal.3d 441, 454.) The jury, however, acquitted defendant of the Garcia murder and hung on the Strang and Fisher murders, and the evidence of defendant's role in the Swanke murder was particularly strong. Therefore, even if the Jacobs murders and Swanke murder had been tried separately, defendant still would have been subject to the multiple-murder special-circumstance statute.

We conclude that defendant has failed in carrying his burden of making a clear showing of prejudice to establish that the trial court abused its discretion in granting the prosecution's motion to consolidate the five charged incidents.

### 3. Defense Evidence on Cross-admissibility and Consolidation

Defendant claims the trial court violated his constitutional rights to due process, to present a defense, and against cruel and unusual punishment by rejecting his offer to present 136 defense witnesses at the hearing on the prosecution's motion to consolidate defendant's cases in order to contest the issue of cross-admissibility and consolidation of the crimes for trial. Specifically, defendant argues that he should have been allowed to present evidence challenging the accuracy and reliability of the state's forensic evidence, evidence of Massingale's confession, evidence of foreign pubic hair found on Swanke, his alibis for the Robertson and Garcia cases, evidence of third party guilt in the Strang and Fisher killings, and expert evidence about the ability of jurors to follow

61

limiting instructions concerning evidence of other crimes. Defendant claims that, without consideration of this defense evidence, the court abused its discretion in ruling on cross-admissibility and joinder. The court allowed the defense to fully cross-examine any prosecution witnesses in rebutting the state's evidence or raising the question of a defense, but it noted that it would be burdensome for the court to hear all of the same evidence the jury would hear during trial for purposes of deciding the motion to consolidate. We conclude there was no error.

Preliminarily, we note that defendant cites no authority for the proposition that the trial court must essentially preview the defense's anticipated trial evidence in order to adequately rule on matters of cross-admissibility and joinder or that the presentation of such evidence is constitutionally required. Moreover, we conclude defendant's claim fails for several reasons.

First, under Evidence Code section 1101, subdivision (b), our courts have recognized that the existence of defendant's other criminal conduct "and defendant's connection to it are preliminary factual issues which must be decided before the prior misconduct can be deemed admissible" and that the proponent of such evidence must establish, by a preponderance, the existence of the prior crime and the defendant's connection to it. (*People v. Garelick* (2008) 161 Cal.App.4th 1107, 1115, citing *People v. Simon* (1986) 184 Cal.App.3d 125, 129-130; Evid. Code, § 403, subd. (a) ["The proponent of the proffered evidence has the burden of producing evidence as to the existence of the preliminary fact"].) Accordingly, in arguing in favor of consolidation, it was the prosecution's burden to make a showing of cross-admissibility, including establishing preliminary facts linking defendant to the killings.

The prosecution met its burden. As discussed above, the prosecution's evidence concerning the throat wounds supported the preliminary factual determination that the wounds were sufficiently similar such that the same person

62

likely inflicted them. This determination alone satisfied the prosecution's burden. Defendant's proffered evidence did not challenge this preliminary factual determination, but instead challenged some of the other forensic evidence or offered evidence of alibi or third party culpability.

Second, concerning the admissibility of other crimes evidence under Evidence Code section 1101, subdivision (b), "[o]rdinarily, determining the relevance of proffered 'other act' evidence presents solely a question of law for the court because the defendant does not dispute the fact of the prior act but merely argues its legal inadmissibility." (*People v. Simon, supra,* 184 Cal.App.3d at p. 129.) But if a defendant claims he did not commit the other acts at issue, this ultimately presents a question of fact "which must be resolved by the jury before it can draw any inference regarding defendant's commission of the charged offense." (*Id*. at p. 130.) Here, the trial court properly determined the cross-admissibility of the murders as a question of law, based on the evidence regarding the similarity of the killings. As to defendant's arguments that he did not commit the other murders, the court properly left those factual questions for the jury to decide.

Third, although some of defendant's proffered evidence may have been relevant to a pretrial determination of whether the prosecution sought to join relatively weak cases with strong ones, any presumed error at this pretrial stage could not have harmed defendant. Defendant had the opportunity to renew his motion to sever after the presentation of evidence at trial, including after the defense phase. (*People v. Ervin* (2000) 22 Cal.4th 48, 68 ["If further developments occur during trial that a defendant believes justify severance, he must renew his motion to sever"].) Defendant renewed his motion to sever after the prosecution presented its case-in-chief to the jury, and the trial court denied the motion. He did not renew this motion after the defense presented its case. Thus,

to the extent defendant argues that the court's pretrial consideration of defense evidence was relevant to show that a weak case was being joined with a strong one to his prejudice, that claim is forfeited because defendant passed on the opportunity to renew such a claim after presenting his evidence at trial.

We also reject defendant's further claim that the trial court deprived him of a full and fair hearing on the issue of consolidation because the court excluded expert evidence about the ability of jurors to follow limiting instructions concerning evidence of other crimes. The court heard the defense's extensive offer of proof on this subject by considering the testimony of defense expert Dr. Stephen Penrod, an associate professor of psychology at the University of Wisconsin. Although Dr. Penrod had used mock trials to study the effect of joinder of unrelated charges on jury decisionmaking, the court properly found his studies to be irrelevant. None of Dr. Penrod's studies involved cases in which the crimes were cross-admissible and none of them involved full trials with 12-member juries. In particular, the very nature of cross-admissibility dictates that consolidation is proper because the other crimes are relevant to ascertain guilt in the charged crime. The studies were, therefore, irrelevant regarding whether joinder was proper in the present case.

In any event, cross-admissibility ordinarily dispels any inference of prejudice. (*People v. Arias* (1996) 13 Cal.4th 92, 126.) Moreover, our review of the record of trial, including the defense evidence, reveals no " ' "gross unfairness" ' " that deprived defendant of a fair trial. (*People v. Ervin, supra,* 22 Cal.4th at p. 69.)

### 4. *Denial of a Hearing Regarding a Claim of Vindictive Prosecution*

Defendant claims the trial court failed to hold an evidentiary hearing to explore whether the prosecutor had vindictively moved to consolidate his two

64

cases after defendant had successfully obtained an appellate order for a speedy trial in the Jacobs and Garcia matters. He argues that the denial of such a hearing violated his due process rights and his right to present evidence under the state and federal Constitutions. But the trial court correctly concluded that both sides had engaged in "very technical use of the law" to assert their respective preferences for the order in which defendant's cases would be tried, and that the prosecution's motions were not "legally improper" and did not impair any of defendant's rights.

"Where the defendant shows that the prosecution has *increased* the charges in apparent response to the defendant's exercise of a procedural right, the defendant has made an initial showing of an appearance of vindictiveness." (*Twiggs v. Superior Court* (1983) 34 Cal.3d 360, 371, italics added.) Here, the prosecution sought to consolidate two preexisting cases, and the proposed consolidation did not expose defendant to additional charges or an increased sentence. Consequently, defendant failed to make an initial showing of vindictiveness. The trial court correctly denied defendant's request for a hearing and his motion to dismiss based on prosecutorial vindictiveness.

## B. Pretrial Evidentiary Rulings[29]

### 1. *Failure to Preserve Fingerprint Evidence on the Love Insurance Note*

Defendant contends the destruction of a partial fingerprint on the Love Insurance note rendered the note inadmissible by violating his due process rights under *California v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*) and *Arizona v. Youngblood* (1988) 488 U.S. 51 (*Youngblood*). We disagree.

The constitutional due process rights of a defendant may be implicated when he or she is denied access to favorable evidence in the prosecution's possession. (*Brady v. Maryland* (1963) 373 U.S. 83.) *Trombetta* outlines how the state's failure to preserve evidence may violate those rights. In *Trombetta*, the high court limited the state's affirmative duty to preserve evidence to that which "might be expected to play a significant role in the suspect's defense." (*Trombetta, supra,* 467 U.S. at p. 488.) This standard of "constitutional materiality" imposes two requirements that a defendant must meet in order to show a due process violation. As an initial matter, the evidence must "possess an exculpatory value that was apparent before [it] was destroyed." (*Id.* at p. 489.)

---

**29** The following claims were the subject of lengthy, heavily litigated pretrial hearings. Many of the pretrial hearings involved the admissibility of specific types of evidence. Because the court's rulings and defendant's objections were sufficiently clear and express, we conclude, unless otherwise noted, that defendant's in limine motions were sufficient to preserve his objections on appeal. (*People v. Morris* (1991) 53 Cal.3d 152, 190 [a contemporaneous objection at trial is not required if an in limine motion sufficiently preserved an objection for appeal when "(1) a specific legal ground for exclusion is advanced and subsequently raised on appeal; (2) the motion is directed to a particular, identifiable body of evidence; and (3) the motion is made at a time before or during trial when the trial judge can determine the evidentiary question in its appropriate context"].)

Additionally, it must "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Ibid.*)

Contrary to defendant's claim here, the fingerprint on the Love Insurance note does not meet the "constitutional materiality" standard outlined in *Trombetta*. Although the fingerprint in this case was partial, it could have been used to exclude potential suspects. But there is no indication that the print would have exculpated defendant, who was not even a suspect when law enforcement inadvertently failed to preserve the print. Indeed, our conclusion here is consistent with previous cases, in which we have rejected *Trombetta* claims based on the destruction of fingerprints when the state had no reason to know that the prints might exculpate a particular defendant. (*People v. Roybal* (1998) 19 Cal.4th 481, 509; *People v. Medina* (1990) 51 Cal.3d 870, 893.)

Destroyed evidence with only potential, rather than apparent, exculpatory value is without remedy under *Trombetta*, but *Youngblood* provides a limited remedy when the state has acted in bad faith in failing to preserve the evidence. In *Youngblood*, police obtained semen samples from a rape kit and several items of clothing, but could not definitively establish the identity of the assailant through their initial tests. (*Youngblood, supra,* 488 U.S. at pp. 52-54.) The police subsequently failed to take measures necessary to preserve those samples, such as refrigerating the clothing. (*Id.* at p. 54.) Although properly preserved samples could have exculpated the defendant in that case, that evidence was only "potentially useful" (*id.* at p. 58) to the defense and not " 'potentially exculpatory' " at the time it was allowed to deteriorate. (*Id.* at pp. 57-58.) The court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." (*Id.* at p. 58.) Although *Youngblood* was decided after the commencement of defendant's initial trial here, its rule applies retroactively.

67

(*People v. Huston* (1989) 210 Cal.App.3d 192, 212-213.) As we have explained, the partial fingerprint was only potentially useful to defendant's case and not apparently exculpatory. But defendant has neither alleged nor shown any bad faith in law enforcement's handling of the partial fingerprint on the Love Insurance note. Consequently, his claim also fails under *Youngblood*.

Defendant alternatively argues that even if the note was admissible, the jury should have been given one of several instructions requested by the defense. In effect, the instructions would have informed the jurors that they could find the note to be insufficiently authenticated if they found its potentially exculpatory value was lost and that they were allowed to assume that the lost evidence would have exonerated defendant. Although a jury instruction may be a viable response to a due process violation, the trial court is under no obligation to so instruct the jury when there is no violation. (*People v. Cooper* (1991) 53 Cal.3d 771, 811.) We have found no error here and the trial court's refusal to give defendant's proffered instructions was not an abuse of discretion.

Last, we reject defendant's claim that the requirements of *Trombetta* and *Youngblood* should be relaxed in light of the asserted heightened capital-case reliability requirements of the Eighth and Fourteenth Amendments to the federal Constitution. (*People v. Alexander* (2010) 49 Cal.4th 846, 877-879 [discussing evidence challenged by a capital defendant under *Trombetta* without performing a heightened reliability analysis]; *People v. Holt* (1997) 15 Cal.4th 619, 664 [denying capital defendant's request that materials otherwise admissible under *Trombetta* and *Youngblood* be excluded and noting that "the fact that a particular

68

procedure might enhance reliability does not make it one that is constitutionally mandated"].)[30]

### 2. *Challenges to Handwriting Comparison Evidence*

#### a) *Failure to Hold a* Kelly *Hearing*

Defendant argues the trial court erred and violated his state and federal rights to due process, right to present a defense, and his right of confrontation in denying his request for a *Kelly* hearing concerning the admissibility of the prosecution's comparative handwriting analysis. This claim relies on the premise that handwriting comparison is a new or novel scientific method or process that requires an analysis under the test established in *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*). Defendant states that handwriting comparison should be treated as a scientific method because an analyst's conclusions carry an aura of certainty that a jury is unable to critically question. Defendant also claims that recent legal and

---

[30] We also reject defendant's similar claims regarding the failure to fully preserve hair evidence found in Suzanne Jacobs's hand. Defendant claims that the state impermissibly failed to refrigerate the hairs after collection to preserve their roots for later serological testing. But at the time of their collection at the crime scene, electrophoretic analysis of serological evidence was a nascent field and refrigeration of hair samples was not standard practice. The exculpatory value of the hairs was not immediately apparent at the time of their collection because defendant was not yet a suspect, and defendant cannot otherwise show bad faith in the state's failure to preserve the hair roots. Moreover, it is questionable whether the evidence has been "destroyed" for purposes of *Trombetta* and *Youngblood*. Defendant fails to recognize that modern forensic techniques are now available to determine whether the hairs have exculpatory value despite the absence of preserved roots. (See *Wagner v. State* (Md.Ct.Spec. App. 2005) 864 A.2d 1037, 1045, fn. 5 ["mtDNA analysis can be used on material without a nucleus, such as a bone sample or a piece of hair without a root segment"]; *People v. Stevey* (2012) 209 Cal.App.4th 1400, 1412 ["Y-STR testing and its female counterpart, mtDNA (mitochondrial DNA) testing, have been generally accepted by the scientific community"].)

scientific challenges to the accuracy of the method underlying this analysis dictate that we treat it as we would a novel or unfamiliar theory. Finally, he suggests that we consider recent studies that express doubts about the reliability of handwriting comparison. We disagree with defendant's contention that the handwriting comparison in this case is sufficiently "scientific" to qualify for a *Kelly* hearing.

The *Kelly* standard provides a framework within which courts can analyze the reliability of expert testimony based on new or novel scientific methods or techniques.[31] As we have acknowledged, there is no clear definition of science under this test. (*People v. Stoll* (1989) 49 Cal.3d 1136, 1155.) Accordingly, the application of that term is guided by resort to the "narrow 'common sense' purpose" behind the rule: "to protect the jury from techniques which . . . convey a ' "misleading aura of certainty." ' " (*Id.* at pp. 1155-1156, quoting *Kelly*, *supra*, 17 Cal.3d at pp. 30-32.) The danger of a false aura of certainty is acute where the "technique or procedure appears in both name and description to provide some definitive truth which the expert need only accurately recognize and relay to the jury," such that a lay jury might treat the procedure as "objective and infallible." (*Stoll*, *supra*, at p. 1156.) The analysis is designed to address "scientific evidence or technology that is so foreign to everyday experience as to be unusually difficult for laypersons to evaluate." (*People v. Venegas* (1998) 18 Cal.4th 47, 80.)

---

[31] In *Kelly*, *supra*, 17 Cal.3d 24, we adopted a three-pronged test to establish the reliability of scientific testing and its scientific basis to determine its admissibility in pretrial hearings. "The first prong requires proof that the technique is generally accepted as reliable in the relevant scientific community. [Citation.] The second prong requires proof that the witness testifying about the technique and its application is a properly qualified expert on the subject. [Citation.] The third prong requires proof that the person performing the test in the particular case used correct scientific procedures." (*People v. Bolden* (2002) 29 Cal.4th 515, 544-545, citing *Kelly*, *supra*, at p. 30.)

In contrast, when an expert's methods are based on everyday processes of observation and analysis, we trust jurors to "rely on their own common sense and good judgment in evaluating the weight of the evidence presented to them." (*People v. Venegas*, *supra*, 18 Cal.4th at p. 80; see *People v. McDonald* (1984) 37 Cal.3d 351, 372 (*McDonald*) ["[w]hen a witness gives his personal opinion on the stand — even if he qualifies as an expert — the jurors may temper their acceptance of his testimony with a healthy skepticism born of their knowledge that all human beings are fallible"].)

For more than 100 years, we have recognized that expert handwriting comparisons have evidentiary value and that juries should "form their own conclusion in reference to such similarity or resemblance." (*People v. Storke* (1900) 128 Cal. 486, 488.) In addition, the Legislature has affirmed the value of handwriting comparisons to authenticate a writing. (Evid. Code, §§ 1415, 1418.) The Evidence Code endorses the use of expert testimony in handwriting comparison and further allows jurors to make their own comparisons of handwriting. (Evid. Code, §§ 1417, 1418.)

Although our courts, to date, have not directly ruled on the applicability of *Kelly* to expert handwriting comparison, they have frequently held that the *Kelly* framework does not apply to comparisons that focus on physical evidence "whose existence, appearance, nature, and meaning are obvious to the senses of a layperson." (*People v. Webb* (1993) 6 Cal.4th 494, 524.) Under these circumstances, "the reliability of the process in producing that result is equally apparent and need not be debated under the standards of *Kelly, supra,* 17 Cal.3d 24." (*Ibid*.)

In *People v. Webb*, we held that the use of a laser to generate a more accurate photographic image of a latent fingerprint did not implicate the concerns addressed by *Kelly*. We explained that, because the technology merely

71

illuminated existing latent fingerprints, it was "unreasonable for defendant to suggest that the process might somehow have captured a fingerprint which did not exist, transformed some other image into a fingerprint, or changed the fingerprint of another person into one which matched defendant's." (*People v. Webb*, *supra*, 6 Cal.4th at p. 524.) Therefore, no hearing pursuant to *Kelly* was required.

Similarly, in *People v. Ayala* (2000) 24 Cal.4th 243, we held that an expert's method of comparing readily apparent features of physical evidence was not sufficiently "scientific" to require a hearing under *Kelly*. In that case, a radiologist taped bullets to the victim's skin and then used an X-ray machine to compare those bullets to a bullet lodged inside him. (*Id.* at p. 281.) Quoting our decision in *People v. Webb*, *supra*, 6 Cal.4th 494, 524, we noted that this evidence could be meaningfully evaluated by the jury because it " 'isolate[d] physical evidence whose existence, appearance, nature and meaning are obvious to the senses of a layperson.' " (*People v. Ayala, supra,* at p. 281.)

In this case, the trial court held that the method of handwriting comparison offered by the prosecution was not sufficiently "scientific" to require a hearing under *Kelly*. We agree with the trial court's determination. The handwriting comparison utilized here merely isolated, and carefully compared, readily observable aspects of physical evidence through simple magnification. The simple visual magnification employed here was less sophisticated than the laser fingerprint imaging in *Webb* and the X-ray bullet analysis in *Ayala*. Jurors could compare the handwriting on the Love Insurance note directly with the exemplars provided by defendant and were provided enlarged versions of both that were over three times their original size. Jurors are equipped to make those evaluations and draw their own conclusions based on their independent observations of the evidence. Indeed, as previously explained, a jury's competence in performing this very analysis is recognized in Evidence Code section 1417. The magnification

72

employed here was not a highly technical test that would hold undue sway over jurors.

Additionally, the expert in this case stated that it was his "opinion with reasonable certainty" that the author of defendant's exemplars was also the author of the handwriting on the Love Insurance note, even though he admitted that he employed no standardized number of similarities or differences in the comparison before reaching that opinion. The expert further admitted that "there is a lot of handwriting similarity in the general population" and that "some people write alike" such that he may "not have the ability to distinguish between them." This testimony, therefore, was not presented as a "definitive truth," but rather as an informed opinion based on the witness's transparently subjective techniques. Because this method of analysis is not sufficiently "scientific" under *Kelly*, we need not reach the other *Kelly* issues raised by defendant.

### b) Failure to Consider Pretrial Defense Evidence Regarding the Reliability of Handwriting Comparison Evidence

Defendant argues that the trial court abused its discretion and violated his state and federal rights to due process, right to present a defense, right of confrontation, and compulsory process by refusing (1) to allow proffered defense expert testimony about handwriting comparison; (2) to take judicial notice of handwriting comparison proficiency studies; or (3) to allow an in-court test of the prosecution's handwriting analysis expert, Dr. Harris. He also challenges these rulings as erroneous under Evidence Code sections 352 and 1418.[32] All of this

---

[32] "The genuiness of writing, or the lack thereof, may be proved by a comparison made by an expert witness with writing (a) which the court finds was admitted or treated as genuine by the party against whom the evidence is offered or (b) otherwise proved to be genuine to the satisfaction of the court." (Evid. Code, § 1418.)

evidence was proffered by defendant during pretrial proceedings in an attempt to cast doubt upon the accuracy — and, by implication, the probity and relevance — of the handwriting analysis that linked him to the handwriting on the Love Insurance note. We find no error in excluding this evidence from the pretrial proceedings.

"In determining the admissibility of evidence, the trial court has broad discretion." (*People v. Williams* (1997) 16 Cal.4th 153, 196.) In particular, a trial court's decision on the admissibility of expert testimony is reviewed for an abuse of discretion. (*People v. Smith* (2003) 30 Cal.4th 581, 627.)

It was not an abuse of discretion for the trial court to exclude the expert testimony and the proficiency studies offered by defendant. Dr. Saks was offered by the defense as an expert witness in social science, research, and research methodology. The trial court refused to hear Dr. Saks's testimony because he was neither a practitioner nor a researcher of handwriting comparison. Instead, Dr. Saks was merely prepared to discuss several proficiency studies that he had read concerning handwriting comparison. The court expressed its concern that, because Dr. Saks was not a handwriting expert, the studies were inadmissible hearsay without a showing that they were the kind of studies that handwriting experts would reasonably rely upon. The court also observed that Dr. Saks had not personally performed the studies on which he was relying, and, consequently, he could not adequately account for the base of information underlying his opinion. Defendant misinterprets this ruling to state that only the direct practitioner of a technique can testify regarding the reliability of that technique. On the contrary, the trial court merely held that Dr. Saks's lack of personal experience with both handwriting comparison and studies measuring the reliability of that analysis precluded him from having a sufficient basis for him to opine on the accuracy or reliability of that analysis generally. (See *People v. Watson* (2008)

74

43 Cal.4th 652, 692 [although the offered witness had educational background in criminal justice and was experienced in noncapital sentencing alternatives, the trial court properly concluded he was not qualified to testify about the psychological impact of defendant's upbringing on his ability to adjust to life in prison].)

Because the trial court reasonably determined that Dr. Saks's testimony lacked the necessary foundation to be relevant regarding the reliability of the prosecution's handwriting comparison, defendant's related claim that the court abused its discretion under Evidence Code section 352 also fails. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070 [Evid. Code, § 352 rulings are reversible on appeal only on a clear showing of abuse of discretion].) A trial court may exclude an expert's opinion testimony if that expert lacks an adequate basis in formulating it. (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770; *People v. Ramos* (1997) 15 Cal.4th 1133, 1174-1176.) Additionally, there is no due process right to present factually unfounded evidence. (*People v. Mincey* (1992) 2 Cal.4th 408, 442.) Consequently, defendant's due process claim is equally unavailing. Finally, the trial court also reasonably exercised its discretion by refusing to take judicial notice because such studies are not matters subject to judicial notice under Evidence Code section 452.

Defendant further argues that the trial court committed prejudicial error by refusing to allow the defense to "test" Dr. Harris's handwriting identification abilities in court during the pretrial hearings concerning the admissibility of the state's handwriting comparison evidence. When cross-examining Dr. Harris, defendant sought to introduce additional writing samples from another individual and have Dr. Harris analyze them for purposes of undermining the admissibility of the state's handwriting comparison evidence. He avers that the court prevented him from fully confronting and cross-examining a key prosecution witness in violation of his state and federal constitutional rights. The court held that the

proposed experiment lacked foundation and was outside the scope of cross-examination.

Proposing to cross-examine an expert through an in-court experiment implicates several considerations. Generally, the scope of cross-examination of expert witnesses can be broad and may include additional facts bearing on the grounds and reliability of the expert's opinion. (Evid. Code, § 721; *People v. Loker* (2008) 44 Cal.4th 691, 739.) This contemplates significant latitude to test the accuracy and credibility of tests relied on by an expert. (*People v. Smithey* (1999) 20 Cal.4th 936, 967.) The trial court has wide discretion in determining the appropriate scope of cross-examination. (*People v. Lancaster* (2007) 41 Cal.4th 50, 102.) On the other hand, experimental evidence is admissible only when the party offering it proves (1) that it is relevant; (2) that it was conducted under conditions substantially similar to the original occurrence tested; (3) that presenting the evidence of the experiment will not consume undue time, confuse the issues, or mislead the trier of fact; and (4) that the expert testifying about the experiment is qualified to do so. (*People v. Turner* (1994) 8 Cal.4th 137, 198.)

The trial court did not abuse its discretion by prohibiting an in-court "test" of Dr. Harris because, even if it was within the proper scope of cross-examination, the proposed test did not meet the minimum standards for admitting experimental evidence. Defendant failed to show that the proposed test was substantially similar to the prior handwriting comparison performed by Dr. Harris. Harris's analysis of defendant's handwriting involved numerous samples, including both those created in controlled conditions and his past writings. These samples were observed under an illuminated magnifier. Defendant's proposed experiment would have asked Dr. Harris to identify whether one particular piece of writing "matched" the handwriting on the Love Insurance note, without the benefit of a large sample or any magnifying technology. These major differences undermined

76

the proposed test's relevance in terms of challenging the accuracy, credibility, and admissibility of Harris's original analysis. Also, the court reasonably determined that an in-court performance of the testing methods would consume undue time for purposes of the pretrial hearings. The court correctly noted that these in-court experiments lacked foundation and that defendant would need to independently conduct a test with Dr. Harris and then establish a foundation for its relevance at the pretrial hearings. Defendant did not take these further steps. On this record, we see no basis for reversing the court's reasonable resolution of this issue.

### c) Admissibility of the Prosecution's Expert Testimony on Handwriting

Defendant asserts two additional non-*Kelly* challenges to the admission of testimony from the prosecution's handwriting analysis expert, Dr. Harris.

First, he contends that the trial court impermissibly shifted the burden to the defense on its Evidence Code section 352 objection to this testimony at the pretrial hearings to determine the admissibility of the state's handwriting comparison evidence. Defendant quotes the trial judge's statement that handwriting comparison is generally considered reliable and the defense would "bear the burden of showing the court otherwise."[33] Defendant argues that this alleged

---

[33]    The trial judge's exact statement was as follows: "Then you're attacking the — probably the most well-received, most oft-received piece of expert testimony that's ever, ever been in a courthouse. So it seems to me the burden is going to be on you to bring your expert in and convince the court otherwise, that handwriting experts are not the case. I would suggest that you bring your expert down because you're going to bear the burden. The reality is — I've read the Points and Authorit[ies], and you're just attacking something so often received and so generally accepted that I think the defense is ultimately going to bear the burden of showing the court otherwise . . . . [¶] I can look back at just case law in this area on the use of expert witnesses on handwriting. And without even having an expert testify as to its reliability, it seems to me that it is so well known and so

*(Footnote continued on next page.)*

77

burden shifting prevented the court from properly exercising its discretion when considering whether — and to what extent — the handwriting comparison testimony was relevant and admissible. There was no erroneous burden shifting.

Relevant evidence is that which has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Relevance is established when the evidence tends " ' " 'logically, naturally, and by reasonable inference' " ' " to establish material facts, such as motive, intent, or identity. (*People v. Heard* (2003) 31 Cal.4th 946, 973.) When the relevance of proffered evidence depends on the existence of a disputed material fact or facts, the proponent of that evidence bears the burden of establishing all preliminary facts pertinent to the question of relevance. (Evid. Code, § 403, subd. (a)(1); *People v. Kaurish* (1990) 52 Cal.3d 648, 693.) The disputed evidence is inadmissible unless the court finds evidence sufficient to sustain a finding that those pertinent preliminary facts exist. (Evid. Code, § 403.) The trial court is accorded broad discretion in determining the relevance of evidence. (*People v. Jones* (2011) 51 Cal.4th 346, 373.)

Here, the handwriting comparison testimony was relevant to prove that defendant wrote the note found at the crime scene. This evidence relied on the preliminary fact that, in the absence of new or novel scientific techniques, handwriting comparison in general is a reliable method of identifying or excluding the author of a writing. (See Evid. Code, §§ 1417, 1418.) The trial judge's statement that defendant cites in support of his challenge merely recognized that

---

*(Footnote continued from previous page.)*

often received that it is one of those areas that simply passes to the defense immediately, without going through these machinations that we all know about."

the case law on the issue of handwriting comparison, and its pervasive use in courts, was sufficient to sustain a finding that it was reliable. This was the judge's manner of expressing that the court found the prosecution's burden was met with respect to the handwriting comparison offered. This did not relieve the prosecution of the burden of proving Dr. Harris's specific credentials and establishing that he practiced reliable methods, both of which would go to the question of whether his particular comparison was sufficiently reliable and relevant to the case. The burden, therefore, was not impermissibly shifted to the defense on this issue.

Second, defendant claims that the trial court erred by allowing Dr. Harris to testify at the pretrial hearings that in his opinion, defendant was the author of the handwriting on the Love Insurance note. He claims this expert opinion improperly influenced the trial court's decision to admit the Love Insurance note and the state's handwriting comparison evidence. According to defendant, the probative value of this opinion was low because lay persons could compare the similarities between handwritings. He also argues that the probity of this opinion testimony was further undermined by the small sample of handwritten letters on the original note, the possibility that he may have been handcuffed when providing handwriting exemplars, the fact that the handwritten letters were not written in cursive, which is purportedly more distinctive, and the unavailability of the original document for comparison. Defendant alleges that these factors combine to make the handwriting evidence so unreliable that it was an abuse of discretion not to exclude it under sections 352 and 1418 of the Evidence Code and the federal and state constitutional due process clauses. We conclude that the trial court did not abuse its discretion in admitting and considering Dr. Harris's opinion about the note's authorship.

An expert witness may offer an opinion relating to a subject sufficiently beyond common experience when that opinion would assist the trier of fact. (Evid. Code, § 801.) Moreover, the Evidence Code specifically codifies the use of expert testimony in handwriting comparison. (Evid. Code, § 1418.) We have stated that a fact finder " 'need not be wholly ignorant of the subject matter' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299) covered in an expert's opinion and that the opinion should be excluded only " 'when it would add nothing at all to' " the fact finder's common knowledge. (*Id.* at p. 1300.)

Dr. Harris's opinion in this case was well within the bounds of acceptable expert testimony. Dr. Harris described himself as a full-time examiner of "questioned documents" for 38 years. He was certified by the American Board of Forensic Document Examiners, which he cofounded and served as its president for three years. Dr. Harris had qualified as a handwriting expert more than 1,000 times in his career. Clearly, Dr. Harris's expertise, experience, and opinion in examining questioned documents was useful to the trial court in assessing the authorship of the handwriting on the Love Insurance note and the note's admissibility.

Defendant also fails to show sufficient prejudice under Evidence Code section 352 to require the exclusion of Dr. Harris's opinion. Broadly speaking, evidence tends to be more prejudicial than probative when it poses an intolerable risk to the fairness of the proceedings or reliability of the outcome. (*People v. Dement* (2011) 53 Cal.4th 1, 36.) Additionally, an expert should not be permitted to provide an opinion based on assumptions of fact without evidentiary support or based on mere speculation or conjecture. (*Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 530.) Although defendant cites legitimate factors that could undermine the reliability of the handwriting comparison, such as the small sample size, those concerns attach to the weight of the evidence, and do not require its

80

exclusion. We find no abuse of discretion in the admission of the expert's opinion.

#### d) *The Reliability of Handwriting Comparison from a Photograph*

Defendant argues that our decision in *Spottiswood v. Weir* (1885) 66 Cal. 525 forecloses a handwriting comparison based on a photograph of the original writing. In *Spottiswood*, decided more than a century ago, we held that a handwriting expert could not testify to the genuineness of a disputed writing based on a "press copy" of that writing.[34] (*Spottiswood,* at p. 529.) In that case, no excuse was provided for the missing original writing and the genuineness of the "press copy" was disputed. (*Ibid.*) This court opined that it would be " 'dangerous' " to compare genuine samples with a press copy if its authenticity was in doubt. (*Ibid.*)

The present case is distinguishable. First, unlike in *Spottiswood*, there is no dispute about the genuineness of the copy in this case. Defendant does not contest that the photograph depicts the original Love Insurance note. Second, the handwriting comparison in this case was based on a photograph, not a "press copy."

We have previously held a photographic negative to be admissible for the purpose of a handwriting comparison. (*People v. McKenna* (1938) 11 Cal.2d

---

[34] The United States Supreme Court described a press copy as a copy of the original made on " 'tissue paper' ": "after a letter has been written on ordinary paper, it is placed between the leaves of a book filled with this kind of paper, the pages upon which the copy is desired being usually dampened somewhat for that purpose, after which such book is subject to great pressure by means of a hand or other press. One or more impressions may thus be made of the written matter upon the leaves of this tissue paper." (*Lawrence v. Merritt* (1888) 127 U.S. 113, 114-115.)

327.) In *McKenna*, we reasoned that the jury could properly weigh the resulting handwriting comparison testimony because the expert readily admitted that certain details could have been lost from the original. (*Id.* at pp. 337-338.) Similarly, in this case defendant was free to elicit — through cross-examination or otherwise — evidence of any inaccuracy or uncertainty generated by comparing a photographic copy rather than the original note. Under these circumstances, the photograph was properly admitted as the basis of the handwriting comparison, and *Spottiswood* does not apply.

### e) Exclusion at Trial of Defense Evidence Concerning the Unreliability of Handwriting Comparison Evidence

Defendant argues that the trial court's assertedly erroneous pretrial rulings also had the effect of foreclosing his ability to present *at trial* the testimony of his defense witnesses, Dr. Saks or another purported handwriting expert, law professor Dr. Mark Denbeaux, or to allow in-court testing of Dr. Harris during cross-examination at trial. As discussed, *ante*, at pages 73-77, the court excluded Dr. Saks and any in-court handwriting testing in connection with defendant's challenge to the admissibility of the prosecution's handwriting evidence during in limine proceedings. Defendant claims that the in limine rulings precluded him from effectively contesting the reliability of the state's handwriting expert at trial, thereby violating his state and federal constitutional rights to due process, compulsory process, confrontation, trial by jury and to present a defense. But defendant has forfeited this claim because he did not offer the contemplated witnesses or evidence for purposes of challenging the credibility of the state's handwriting expert at trial. (*People v. Valdez* (2004) 32 Cal.4th 73, 108.) Accordingly, at trial the trial court was not presented with these issues and never made any ruling prohibiting the presentation of this evidence.

An erroneous exclusion of evidence will constitute grounds for setting aside a finding or a verdict only when it has resulted in a miscarriage of justice and it appears on the record that the "substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means." (Evid. Code, § 354, subd. (a).) Defendant argues that the trial court's prior in limine rulings and comments regarding the admissibility of his experts and in-court handwriting testing rendered futile any attempt to reraise the same evidence for trial. (See Evid. Code, § 354, subd. (b) [failure to object is excused when "[t]he rulings of the court made compliance with subdivision (a) futile"].)

But, as explained, *ante*, at pages 73-81, the trial court ruled under Evidence Code section 352 that the proffered defense evidence did not render *inadmissible* the testimony of the state's handwriting expert. The court's comment that the *admissibility* of expert testimony concerning a handwriting match was "unassailable" did not address whether the defense evidence could be used to weaken the strength of such an expert's conclusion later at trial. Instead, the court merely concluded that the proffered defense evidence was not useful in determining whether the state's expert should be precluded from presenting his opinion of a match. In fact, the court remarked that it would be "open" to consider admitting some of the defense's handwriting evidence at trial if defendant made a sufficient offer of proof. But defendant never made such an offer. (*People v. Valdez*, *supra*, 32 Cal.4th at p. 108 [to preserve on appeal a claim concerning the improper exclusion of evidence, the defense must make an offer of proof to inform the judge's ruling].)

In any event, the trial court permitted defendant to present David Oleksow, a handwriting expert for the San Diego County Sheriff's Department crime laboratory, who questioned the state expert's methodology in reaching his

83

conclusion of a match. Unlike Dr. Saks and Dr. Denbeaux, Oleksow was a qualified handwriting expert. Under these circumstances, defendant cannot complain of error.

### 3. *Opportunity to Challenge Robertson's Identifications*

Defendant claims various deficiencies in the state's evidence and errors in the trial court's pretrial rulings conspired to deny him a fair opportunity to prove that Jodie Santiago Robertson's identifications of him and his house were constitutionally tainted. He claims these errors and deficiencies violated his state and federal constitutional rights to due process, to a fair trial by jury, to compulsory process, to present a defense, to effective assistance of counsel and equal protection, and to fair and reliable capital guilt and sentencing determinations. These claims are forfeited, and, in any event, they are meritless.

Specifically, defendant contends that Robertson's memory was affected by posttrauma mental impairments; law enforcement failed to adequately document various contacts with her concerning her identification of defendant and his residence; and the officers failed to preserve the original pool of photos from which they created the six-pack photo lineup. Defendant also complains that the trial court refused to permit him to solicit the testimony of the prosecutor, who had witnessed some of the identification procedures, and refused to consider the testimony of an identification expert.

With the exception of calling the prosecutor as a witness, defendant complained of none of these alleged circumstances during pretrial proceedings litigating the admissibility of Robertson's identifications. Accordingly, nearly all of his claims are forfeited. (*People v. Cunningham* (2001) 25 Cal.4th 926, 989.) On their merits, his claims also fail.

84

Defendant faults law enforcement for inadequate documentation concerning Robertson's interviews and identifications. Defendant argues that the record of Robertson's first two communicative interviews while she was in the hospital was inadequate because the officers did not write their reports of these interviews until six months later. But defendant ignores the fact that, because Robertson could not talk during these first two interviews, they were conducted on paper — and those written original questions and answers had been preserved for trial. Defendant also complains that Robertson's first composite sketch session with a detective was not properly documented, but he fails to note how this alleged deficiency is relevant given that Robertson was dissatisfied with the final version of the sketch. Defendant further claims that Robertson's identification of defendant's house was not adequately documented, and notes that officers who were in the patrol vehicle gave conflicting accounts of her identification. But defendant cites no authority supporting the duty of law enforcement to document such an identification procedure with greater precision.

To the extent defendant appears to further argue that law enforcement's alleged inadequate documentation of Robertson's identifications violated his due process rights by the alleged failure to preserve favorable defense evidence under *Trombetta*, *supra*, 467 U.S. 479, defendant fails to make an adequate showing of materiality. Even assuming without deciding that *Trombetta* applies in the context of a photo lineup identification or a driveby identification of a residence, as explained above, defendant has not shown how any alleged deficiency deprived him of material evidence. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." (*United States v. Agurs* (1976) 427 U.S. 97, 109-110.)

Defendant contends evidence conflicts concerning how quickly Robertson selected defendant's photo in the six-pack lineup, whether she was told that she had identified defendant, and whether she and the detectives had a drink at the hotel bar after her identification. Defendant references articles concerning eyewitness recollection in support of the proposition that an accurate recording of these circumstances would permit the assessment of any undue postidentification reinforcement placed on Robertson. But because none of these articles were presented, or even available, at the time of trial and are not part of this record, this proposition is without foundation.

Additionally, defendant assigns as error the trial court's refusal to allow him to call at a pretrial hearing the prosecutor as a witness regarding the admissibility of Robertson's identifications. Two years earlier, the prosecutor had given testimony on these exact issues, and the court reviewed that testimony in assessing admissibility. Under these circumstances, the court properly denied defendant's request to question the prosecutor again, especially when the prosecutor admitted that his recollection of Robertson's identifications was worse than when he testified two years prior.

Finally, defendant claims that the trial court refused to consider the testimony of his expert witness at the pretrial hearing. However, the court permitted the defense expert to testify over the prosecutor's objection, and there is nothing in the record suggesting that the court refused to consider that testimony in determining the admissibility of Robertson's identifications.

Defendant was not denied a fair opportunity to challenge the admissibility of Robertson's identifications.

## 4. *Robertson's Identification of Defendant in a Photo Lineup*

Defendant contends that Robertson's pretrial and trial identifications of defendant were based on a photo lineup that originated from suggestive and unreliable identification procedures. He argues that the trial court erred by failing to suppress Robertson's identification of him and that the error violated his constitutional rights to due process and the reliability of his sentence determination under the Eighth Amendment. The court did not err.

"In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification." (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 989.) It is defendant's burden to demonstrate the existence of an unreliable identification procedure. (*Ibid*.) "We review deferentially the trial court's findings of historical fact, especially those that turn on credibility determinations, but we independently review the trial court's ruling regarding whether, under those facts, a pretrial identification procedure was unduly suggestive." (*People v. Gonzalez* (2006) 38 Cal.4th 932, 943.)

Defendant claims that, prior to Robertson being shown the photo lineup, several circumstances unduly influenced her and predisposed her to identify him in the six-photo lineup. He claims that Robertson's memory was affected because of her injuries; she had an emotional need to have her attacker be brought to justice; her participation in making the composite sketches may have tainted her

memory; and that the process of questioning her was suggestive. He also argues that law enforcement may have strongly suggested to her that the suspect would be in the lineup by informing her that they had a suspect, flying her down immediately from Seattle, and being present as she viewed the lineup. But these assertions are speculative, and defendant fails to reveal that the identification procedures were in fact actually unduly suggestive.

We note that at the time of the hearing on defendant's motion to suppress Robertson's identification there was evidence that Robertson's memory had ceased at the point when she was being choked — but she retained the memory of her abduction and subsequent drive to the residence where she was assaulted. During that earlier period, she had a lengthy opportunity to view her kidnapper. Accordingly, defendant has not shown that the aforementioned circumstances were unduly suggestive causing Robertson's identification of defendant's photo to be unreliable.

Defendant articulates a number of specific criticisms about the photo lineup itself. He claims that none of the other five photos featured a person with bulging eyes; none of the other photos featured a person with unparted "feathered" hair; the mustaches among the six photos were inconsistent in that two photos showed mustaches extending below the lip (inconsistent with Robertson's description); the man in the third photo was muscular and tanned (also inconsistent with Robertson's description); defendant was the only person wearing the same shirt color as described by Robertson; and defendant's photo was slightly larger than the others and centrally placed in the top row of the lineup.

In denying defendant's motion, the trial court aptly stated: "On the issue of the photo lineup, the law does not require a perfect lineup, only that it be a lineup that is a fair one, and that it not be impermissibly suggestive. . . . The lineup here is a good one. All the young men that were in the photos were of the same general

88

type. They were all blondish, they all had moustaches, they were the same type of individual, approximately the same age. To the extent that defendant has focused on certain aspects of differences in treatment between Mr. Lucas's photo and the others, such as the fact that Mr. Lucas's photo was larger, or his face was larger within the photo, that it occupied the top center position. . . . I find that these [were] small factors of difference between them — and they did not constitute impermissibly suggestive factors within the lineup."

The trial court's observations are fully supported upon examination of the actual photo lineup. Although law enforcement should make efforts to minimize such discrepancies, defendant's face is only slightly larger than the faces shown in the other photos. Moreover, the six photos also all bear a fair resemblance to the second composite sketch prepared by the police sketch artist. In this light, any differences concerning the clothing, mustaches, and build of the persons in the lineup are minor. In any event, we have recognized that " '[b]ecause human beings do not look exactly alike, differences are inevitable' " and the primary concern " 'is whether anything caused defendant to "stand out" from the others in a way that would suggest the witness should select him.' " (*People v. Gonzalez, supra,* 38 Cal.4th at p. 943, quoting *People v. Carpenter* (1997) 15 Cal.4th 312, 367.) Although defendant's photo does display eyes that are somewhat more "bulging" than the men in the other photos, " 'it would be virtually impossible to find five others who had' . . . similar eye[s] 'and who also sufficiently resembled defendant in other respects.' " (*People v. Gonzalez, supra,* at p. 943.)

Defendant argues that certain protective measures were necessary to minimize the possibility of suggestiveness, but, as we explain, his claims are forfeited and not required by due process. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1256 [if "the challenged procedure was not unduly suggestive, our inquiry into the due process claim ends"].)

89

Defendant claims the admonition that police gave to Robertson before she looked at the photo lineup — that she "should not infer anything from the fact that the photographs are being shown to you or that we have a suspect in custody at this time" — was insufficient. Defendant argues that Robertson should also have been told that the suspect may not be in the lineup, that the suspect's head and facial hair could have changed since the crimes, and that an equally important purpose of a lineup is to clear innocent persons and not just identify guilty ones. Defendant further claims that the police should have shown Robertson the photographic lineup using a "double blind" procedure in which the administrator of the lineup procedure is also unaware of which photo depicts the suspect.

Defendant made no such arguments in challenging the admissibility of Robertson's identification. Forfeiture aside, we have never required that certain pre-lineup admonitions be given before a victim views a photographic lineup or that it be administered in a double blind procedure. The due process inquiry focuses on circumstances that are unduly suggestive. (*People v. Virgil*, *supra*, 51 Cal.4th at p. 1256.) As discussed above, there was no undue suggestiveness in the procedures actually employed in Robertson's identification.

### 5. *Robertson's Identification of Defendant's Residence and Seat Covers*

Defendant contends the trial court erred by refusing to determine whether Robertson's identifications of defendant's residence and seat covers were the result of undue suggestiveness and that these identifications should have been suppressed. He claims the errors violated his state and federal constitutional rights to a fair jury trial and to due process and his Eighth Amendment right to a reliable determination of both his guilt and penalty. The trial court did not err.

Defendant theorizes that Robertson's identifications of defendant's residence and seat covers should have been subjected to the same due process

90

scrutiny applicable to photographic and live lineups in determining admissibility. Neither the United States Supreme Court nor this court has addressed whether the due process protections necessary for identification of a suspect is equally applicable to the identification of inanimate objects. Nearly every jurisdiction that has addressed the issue, however, has concluded that "any suggestiveness in the identification of inanimate objects is relevant to the weight, not the admissibility, of the evidence." (*People v. Miller* (Mich. 1995) 535 N.W.2d 518, 523; see *Johnson v. Sublett* (9th Cir. 1995) 63 F.3d 926, 932 ["There is no authority holding that a defendant's due process right to reliable identification procedures extends beyond normal authenticity and identification procedures for physical evidence offered by the prosecution"]; *United States v. Zenone* (4th Cir. 1998) 153 F.3d 725; *Johnson v. Ross* (2d Cir. 1992) 955 F.2d 178; *Commonwealth v. Cole* (Pa. 2005) 889 A.2d 501; *State v. Crannell* (Vt. 2000) 750 A.2d 1002; *Hughes v. State* (Miss. 1999) 735 So.2d 238; *Brooks v. State* (Ind. 1990) 560 N.E.2d 49, 57-58; *State v. Roscoe* (Ariz. 1984) 700 P.2d 1312; *State v. Cyr* (N.H. 1982) 453 A.2d 1315, 1317-1318; *State v. King* (Wash. 1982) 639 P.2d 809, 811-812; *State v. Bruns* (Iowa 1981) 304 N.W.2d 217; *Commonwealth v. Simmons* (Mass. 1981) 417 N.E.2d 1193; *People v. Coston* (Colo. 1977) 576 P.2d 182, 185; *Inge v. Commonwealth* (Va. 1976) 228 S.E.2d 563, 567; but see *Dennis v. State* (Fla. 2002) 817 So.2d 741, 760 ["The factors to be considered in the determination of whether the identification of the vehicle was reliable are all comparable to factors considered in a witness's identification of a suspect"].)

But we need not decide this issue. Even assuming that identification procedures of inanimate objects should be subject to the same due process scrutiny applicable to photographic and live lineups in determining admissibility, that circumstance would bear no significance here. Robertson never identified the seat covers as being the same covers used in the vehicle she was abducted in. Instead,

she only identified them as being similar. As to her identification of defendant's residence, there was some conflicting evidence as to whether one of the officers may have pointed out the house after the police vehicle had made a U-turn and before Robertson had identified it. But Robertson testified that she had already recognized the house before asking the officers to make the U-turn. Thus, any suggestiveness did not affect her identification. The evidence was properly admitted.

### 6. Exclusion of Impeachment Evidence Against Detectives Involved in the Robertson Case

Defendant claims the trial court committed prejudicial error in excluding evidence, during pretrial hearings, that two detectives involved in the Robertson investigation gave false and/or misleading testimony and violated a criminal suspect's *Miranda* rights in an unrelated matter, *People v. Cavanaugh*, San Diego County Superior Court No. CRN 10868 (*Cavanaugh*). Defendant argues that this evidence of perjury and other professional misconduct was admissible as proof of specific instances of the detectives' dishonesty and willingness to lie under oath in order to secure a criminal conviction. He contends this evidence was relevant for purposes of both defendant's in limine rulings concerning the Robertson case and for impeachment use at trial. He claims the court's refusal to admit evidence from the *Cavanaugh* matter violated his state and federal constitutional rights to due process, a fair jury trial and compulsory process under the Sixth and Fourteenth Amendments. We disagree.

The defendant sought to present various impeachment evidence against Detectives Henderson and Fullmer from the *Cavanaugh* matter: (1) The detectives allegedly violated the murder suspect's *Miranda* rights in *Cavanaugh;* (2) Henderson allegedly gave misleading testimony about the *Miranda* violation; (3) Fullmer allegedly provided false testimony about seeing a tape recorder in the

suspect's purse at the crime scene; and (4) Fullmer allegedly gave false testimony about seeing a red light on the tape recorder, indicating that it was recording, when he moved the purse.

In assessing the relevance of this evidence, the trial court noted that it was familiar with the materials associated with the *Cavanaugh* investigation and had considered that evidence when it took testimony from Detectives Henderson and Fullmer during in limine hearings. Concerning the admissibility of this evidence at trial, the court found that here, the detectives were "not the prime prosecution witnesses," but merely "tangential witnesses," and that evidence corroborated Robertson's description of her attacker prior to defendant's becoming a suspect. The court, therefore, concluded that the minimal probative value of the evidence was substantially outweighed by the undue consumption of time required to present it.

At the outset, we reject the contention that the trial court failed to consider the *Cavanaugh* evidence in assessing defendant's various in limine motions concerning the reliability of Robertson's description of her attacker and her identification of defendant and his residence. The court previously had reviewed the materials from the *Cavanaugh* case and clearly stated it had that evidence in mind when Detectives Henderson and Fullmer testified during the in limine proceedings. The court further emphasized that it had scrutinized their testimony in light of the *Cavanaugh* evidence. Therefore, we reject defendant's claim that the court did not consider this impeachment evidence in deciding in limine rulings concerning the Robertson case.

Furthermore, we also reject defendant's contention that the *Cavanaugh* matter contained vital impeachment evidence that should have been presented to the jury.

93

We previously have noted that "impeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present." (*People v. Wheeler* (1992) 4 Cal.4th 284, 296.) Courts should, under Evidence Code section 352, "consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value." (*People v. Wheeler*, *supra*, at pp. 296-297.) "A trial court's ruling to admit or exclude evidence offered for impeachment is reviewed for abuse of discretion and will be upheld unless the trial court 'exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 705, quoting *People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.) Applying this standard, we conclude there was no abuse of discretion.

Defendant argues that the detectives were key trial witnesses whose credibility was "crucial" in resolving discrepancies in the evidence regarding Robertson's identification of defendant and his home. But Detective Henderson was not present in the car during the drive-by when Robertson identified the house, undercutting defendant's contention that Henderson was a "crucial" witness. Moreover, Detective Fullmer testified as a *defense* witness that someone in the car said "this house" or "what about this house" as Fullmer drove Robertson past defendant's home. To support the defense theory that the procedure was suggestive, it would have been in the defendant's interest that Fullmer be believed and not be impeached by the *Cavanaugh* evidence.

Additionally, any doubt concerning Robertson's identification of defendant's home was convincingly negated by her sketch of the exterior and interior layout of his home. Robertson made this sketch before she positively identified defendant's home, and she correctly identified it as having a circular

driveway with stepping stones leading to a porch. Furthermore, her drawing of the interior layout of the home was a near-perfect match of the actual layout of defendant's home. Defendant provides no explanation of how the detectives could have improperly influenced Robertson's sketch when the detectives themselves could not have known the interior layout of defendant's home at that point in the investigation.

Regarding Robertson's identification of defendant as her assailant, evidence corroborated her description of him before defendant became a suspect, which tends to negate defendant's claim that the detectives conspired to improperly influence her to identify him as the attacker. A week after her abduction, Robertson described the assailant's car as "brown, two-door, possibly a 280Z." She described her attacker as blond haired and blue eyed. On December 4, 1984, when Henderson and Fullmer visited Robertson in Seattle and before seeing any photo lineup, she described the attacker's eyes as distinctively "bugged out" and his hair as "feathered." Concerning the attacker's car, she stated that the seat covers were sheepskin. All of these details could be corroborated independently of any testimony that Detectives Henderson and Fullmer could provide. Defendant claims the truthfulness of Fullmer and Henderson's testimony about their visit to Seattle and the subsequent photo lineup was "crucial," but he fails to note any contradictory evidence regarding these aspects of the investigation.

Defendant further argues that the detectives' credibility was "crucial" in evaluating contradictory evidence concerning when the defendant became a suspect in the case, a hospital nurse's statement about Robertson identifying the defendant's car as a brown Colt, and how quickly Robertson identified defendant from the photo lineup. Although the detectives' credibility may have been probative on these issues, because much of this contradictory evidence was

95

explored in pretrial hearings and was never offered by defendant at trial, defendant fails to show how any additional impeachment evidence would have helped the jury assess these issues at trial.

Defendant also contends that the evidence of perjury and misconduct would have been highly probative concerning whether the detectives intentionally constructed the photo lineup in a suggestive manner. However, the admissibility of the lineup had been determined before trial. And, in any event, the trial court found it possible for the jury to objectively evaluate the suggestiveness of the lineup independent of considerations about the detectives' intent, noting that "[i]f it wasn't fair and if it suggested to her the wrong person, then it wasn't fair, and it doesn't matter what [the detectives] did."

Finally, in light of the amount of evidence defendant had proposed to present on this collateral matter, the trial court did not abuse its discretion by ruling that the *Cavanaugh* materials would "take weeks" to put on and that the probative value of such evidence did not substantially outweigh the contemplated undue consumption of time. The *Cavanaugh* materials consisted of at least "two volumes of files" from the "long, lengthy [Sheriff's] investigation," as well as "several hundred pages" of transcripts from the case hearing. In addition, defendant indicated his intent to present interrogation tapes, photos, and investigation reports from the *Cavanaugh* case to prove Fullmer and Henderson's specific acts. The court could have reasonably foreseen that the admission of this evidence would lead to "nitpicking wars of attrition over collateral credibility issues." (*People v. Wheeler*, *supra*, 4 Cal.4th at p. 296.) The amount of evidence was also likely to lead to jury confusion. Evidence Code section 352 gives the trial court wide latitude in preventing such occurrences. (*People v. Quartermain* (1997) 16 Cal.4th 600, 624.) Thus, we find no error.

Even assuming there was error, it would be harmless under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) [constitutional error must be assessed for prejudice under the harmless beyond a reasonable doubt standard]; *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) [error is harmless under state law unless it is reasonably probable that a result more favorable to defendant would have occurred absent error].) It is highly unlikely that the absence of the *Cavanaugh* evidence caused the jury to find that the defendant was guilty of attempting to kill Robertson. Although the evidence could have discounted the credibility of the detectives, the record contains ample uncontested evidence to support the jury's conclusion concerning defendant's guilt, including Robertson's descriptions of her attacker, which was fully corroborated before the detectives focused on defendant as a suspect.

### 7. Robertson's Prior Sexual Conduct

Defendant assigns error to the trial court's decision to exclude evidence of Robertson's prior sexual conduct — specifically that she had met a man at a bar and spent the night with him on the night before her assault. Defendant argues that this excluded evidence was relevant to impeach Robertson's memory of leaving the bar alone on the night of the crimes. Defendant claims the court's ruling violated his state and federal rights to present a defense, due process, compulsory process, confrontation, and effective representation of counsel. The court properly excluded the evidence as irrelevant.

During pretrial proceedings, Robertson testified that she had gone to a restaurant with her brother on the night before her abduction. At that restaurant she met a man, Neil Reynolds, and went dancing with him. Robertson spent that night with Reynolds at his apartment. Seizing on Robertson's alleged memory problems, the defense argued that Robertson may have had gaps in her memory

97

about the attack and that she had filled in that gap with the story of being abducted by someone who drove a sports car. The defense argued that her prior sexual encounter was relevant to show that Robertson was the kind of person who met men at bars and that she may have done the same with her assailant on the night of the crimes.

The trial court acknowledged that Robertson's prior sexual encounter might be relevant to explain the presence of semen found on Robertson's vaginal swab because Reynolds also could have been a contributor to the ABO factor on the swab. The court, however, further explained that the prior sexual encounter was not relevant to prove that Robertson left the bar with someone on the night of her attack. Moreover, it stated that, even if the evidence had some minor probative value, under Evidence Code section 352, it would be substantially outweighed by its prejudicial effects. The court, nevertheless, made clear that the defense could present evidence of Robertson's sexual encounter with Reynolds in challenging whether there was evidence she had been raped.

On appeal, defendant appears to make an argument different from what he advanced below. Before the trial court, the defense essentially argued that the prior sexual encounter reflected evidence of Robertson's character and that she may have acted consistent with that character on the night of her attack.[35] On appeal, however, defendant now confusingly argues that the prior sexual encounter was evidence of Robertson's character and relevant to impeach Robertson's memory on the night of the crimes, but that it was not relevant to prove her conduct on the night in question. Regardless, defendant's claim is forfeited because he did not argue this reasoning before the trial court. (*People v. Benson*

---

[35] The defense cited no authority in support of this argument.

(1990) 52 Cal.3d 754, 786, fn. 7.) Furthermore, the claim is without merit. As previously discussed, a trial court's decision to exclude impeachment evidence under Evidence Code section 352 is reviewed for an abuse of discretion. (*People v. Ledesma*, *supra*, 39 Cal.4th at p. 705.) Evidence of Robertson's single sexual encounter prior to the murder did little to establish her character and added nothing to impeach the reliability of her memory. To the contrary, her recollection of defendant, his sports car, and his home established that her memory was quite accurate. Accordingly, the trial court did not act "in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice" by excluding this evidence. (*People v. Rodriguez*, *supra*, 20 Cal.4th at pp. 9-10.)

### 8. *Admissibility of the Swanke Blood Evidence*

In *People v. Kelly*, *supra*, 17 Cal.3d 24, we adopted a three-pronged test to establish the reliability of scientific testing and its scientific basis to determine its admissibility. "The first prong requires proof that the technique is generally accepted as reliable in the relevant scientific community. [Citation.] The second prong requires proof that the witness testifying about the technique and its application is a properly qualified expert on the subject. [Citation.] The third prong requires proof that the person performing the test in the particular case used correct scientific procedures." (*People v. Bolden*, *supra*, 29 Cal.4th at pp. 544-545, citing *Kelly*, *supra*, 17 Cal.3d at p. 30.)

Defendant argues the trial court erred in rulings during in limine proceedings regarding the admissibility of the blood-testing evidence derived from Anne Swanke's fingernails, which tested consistent with defendant's blood type, and the blood evidence tested from defendant's sheepskin seat cover, which tested consistent with Swanke's blood type. Specifically, defendant argues that both the GM and KM antibody blood testing failed prongs one and three, and that the ABO

99

and electrophoretic blood testing failed prong three.  He claims the erroneous admission of the Swanke blood analysis evidence deprived him of a fair and reliable trial proceeding and violated his rights under the Sixth, Eighth and Fourteenth Amendments.  The trial court properly rejected these challenges.

### a)  *First-prong and Third-prong* Kelly *Challenges to GM and KM Antibody Testing*

Defendant's first-prong *Kelly* challenge concerning the admissibility of the GM and KM antibody genetic testing fails because proof of a scientific technique's general acceptance in the relevant scientific community is no longer required once a published appellate decision affirms a trial court's ruling admitting evidence obtained by that scientific technique.  (*People v. Bolden*, *supra*, 29 Cal.4th at p. 545.)  Subsequent to defendant's trial, this court and several Courts of Appeal have upheld the admissibility of GM and KM testing using the same techniques employed here.  (*People v. Riel* (2000) 22 Cal.4th 1153, 1192 [concluding that the agglutination inhibition technique used to test for GM and KM genetic markers is generally accepted in the relevant scientific community]; see *People v. Yorba* (1989) 209 Cal.App.3d 1017; *People v. Morganti* (1996) 43 Cal.App.4th 643.)  Although this published case law postdates defendant's trial, "that circumstance does not cause us to doubt the scientific reliability of the testing."[36]  (*People v. Riel*, *supra*, at p. 1192.)

---

[36]     Defendant also attacks the first prong of *Kelly* itself, claiming that this aspect of our analysis violates federal due process by undermining the trial court's gatekeeping function and barring relevant evidence at the pretrial stage. Essentially, defendant argues that the first prong of *Kelly* improperly relies upon what the scientific community accepts as to the reliability of a technique, thereby supplanting the trial court's independent determination of reliability as required by *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579.  But we have previously rejected such claims, and defendant offers no persuasive reason for reconsideration of our conclusion.  (*People v. Leahy* (1994) 8 Cal.4th 587, 593-

*(Footnote continued on next page.)*

Defendant's third-prong *Kelly* challenge to the admissibility of the GM and KM antibody genetic testing also fails.  He claims that the SERI laboratory's GM and KM testing of the material recovered from Swanke's fingernails was improper because the lab did not use procedural controls and did not photograph the test results.  But defendant fails to point to any evidence showing that the failure to use controls or to photograph the results violated generally accepted procedural practices or that their omissions rendered the test results unreliable.  (*People v. Fierro* (1991) 1 Cal.4th 173, 215.)

### b)  *Third-prong* Kelly *Challenge to ABO Blood Testing*

Defendant further argues that the third prong of *Kelly* was not satisfied because the San Diego County Sheriff's Department laboratory notes did not state its protocols for ABO testing, because SERI's ABO results were not confirmed by other tests, and because SERI used a different procedure for the ABO control test.  Defendant calls this different procedure a "mixed standard," but his terminology is confusing.  More precisely, defendant refers to control testing in which the analyst confirms the presence of antiserum for each of the main blood types — A, B, AB, and O.  In one standard form of such testing, there are separate controls for each of the main blood types.  In an alternative standard, to which defendant objects, the analyst can use just two controls, AB and O, to determine the type of antiserum present in the control sample.

---

*(Footnote continued from previous page.)*

604 [holding that the *Kelly* prongs survived *Daubert* in this state].)  In addition, our opinion in *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 did not, by using the term "gatekeeper," indicate any move away from the *Kelly* test toward the federal *Daubert* standard.  (*Sargon Enterprises, Inc. v. University of Southern California*, *supra*, 55 Cal.4th 747, 772, fn. 9.)

The lack of written documentation in the San Diego County Sheriff's Department crime laboratory does not prove that incorrect procedures governed that facility's ABO testing of the evidence. To the contrary, criminalist Charles Merritt testified at the *Kelly* hearing, explaining his ABO testing of the evidence. During his testimony, defendant cross-examined Merritt extensively about the procedures he employed, but defendant raised no specific faults relevant to a third-prong challenge concerning Merritt's described procedures at trial nor does he do so here on appeal.

Defendant complains that SERI's ABO testing did not comply with generally accepted testing procedures in the scientific community because the lab conducted no other testing to confirm the results. But none of the testifying experts stated that there was a consensus in the scientific community regarding whether a second, confirming test is required concerning forensic blood work. One expert testified that confirming tests are general practice for blood donations made at blood banks, but offered no opinion concerning forensic work. The other experts testified merely that confirming testing is used at some laboratories, and each acknowledged that the use of confirmatory tests was an evolving trend in ABO testing. None of the experts, however, established that confirmatory testing was an established procedure that reflected the consensus of the scientific community.

Finally, defendant also complains that SERI's ABO testing did not comply with generally accepted testing procedures because the lab used an alternative procedure for the ABO control tests by using two controls instead of three. His claim is contradicted by the record. Mark Stolorow, a forensic scientist from the Division of Forenic Sciences of the Illinois State Police, testified repeatedly that SERI's alternative procedure for its ABO control testing was merely a matter of preference for the analyst and that the method produces valid results.

*c) Third-prong* Kelly *Challenge to Electrophoretic Testing*

Defendant additionally argues that the third prong of *Kelly* was not satisfied because SERI's electrophoretic blood testing was not verified by a second reader. He also alleges that a photograph of the electrophoretic results was not an adequate substitute for "double-reader concurrence," in which a second analyst must independently review the test results and agree with the first analyst's conclusions. Defendant further claims that the test result was unreliable because it was based on the subjective interpretation of the reader and not objectively verifiable scientific standards. We have previously rejected similar claims, recognizing that "these matters were appropriately presented to the trier of fact to consider in weighing the accuracy of" of the test results and did not affect their admissibility. (*People v. Cook* (2007) 40 Cal.4th 1334, 1347.) Defense counsel presented these criticisms at the appropriate stage — at trial in front of the jury.

Defendant additionally argues that test results requiring any level of subjective interpretation violates the constitutional guarantees of due process, and a jury trial, as well as the need for heightened reliability in a capital case. Again, however, defense counsel at trial vigorously cross-examined the state's expert witness regarding the tests, and the jury was allowed to assess for itself whether the test results were reliable. Defendant's rights concerning this evidence were fully protected by those circumstances. (*People v. Stoll, supra,* 49 Cal.3d at p. 1159 ["issues of test reliability and validity may be thoroughly explored on cross-examination at trial"].)

*d) The Right to Counsel During the Electrophoretic Testing*

Defendant next argues, as he did below, that he had a constitutional right, under the Sixth Amendment and the state Constitution, to be notified of the

electrophoretic testing and to have his counsel present during the testing in order to help ensure the test's reliability.[37]  Neither we nor the high court has ever imposed a duty on the prosecution to invite a defendant, through counsel, to participate in investigatory forensic testing.

Forensic testing is not recognized as a critical stage of the proceedings at which an accused has the right to counsel.  " '[S]ystematized or scientific analyzing of the accused's fingerprints, *blood sample*, clothing, hair, and the like . . . [involve] differences which preclude such stages being characterized as critical stages at which the accused has the right to the presence of his counsel. Knowledge of the techniques of science and technology is sufficiently available, and the variables in techniques few enough, that the accused has the opportunity for a meaningful confrontation of the Government's case at trial through the ordinary processes of cross-examination of the Government's expert witnesses and the presentation of the evidence of his own experts. *The denial of a right to have his counsel present at such analyses does not therefore violate the Sixth Amendment*; they are not critical stages since there is minimal risk that his counsel's absence at such stages might derogate from his right to a fair trial.' " (*Ent v. Department of Motor Vehicles* (1968) 265 Cal.App.2d 936, 939-940, quoting *United States v. Wade* (1967) 388 U.S. 218, 227-228; see *People v. Cooper*, *supra*, 53 Cal.3d at p. 816 ["The prosecution and court *allowed* the defense to participate in the [blood] testing on condition that the prosecution learn the results," and "[t]he defense could choose to accept the condition or not

---

[37]    "Electrophoresis allows typing of individual blood proteins and enzymes found in a blood sample by a method that separates electrically charged molecules." (*People v. Morris, supra,* 53 Cal.3d at p. 206.)

participate in the testing," but "[f]orcing such a choice does not violate the Constitution or any other provision of law"].)

Consequently, there was no violation of defendant's right to counsel or his right of confrontation concerning the electrophoretic blood testing.

### 9. *Shannon Lucas's Statements Concerning the Dog Collar*

Defendant contends the trial court erred by ruling on an in limine motion to admit at trial his deceased wife's statement that the dog choke-chain found around Anne Swanke's neck was that of the couple's dog, Duke. He claims the admission of this statement violated several provisions of the Evidence Code because it did not qualify as a spontaneous statement under the hearsay rule, constituted inadmissible opinion evidence, violated the marital privilege, and should not have been admitted under Evidence Code section 352. Defendant further contends the asserted error violated his rights to confrontation and due process and deprived him of his Eighth and Fourteenth Amendment rights to fair and reliable guilt, death eligibility and sentencing determinations. We agree that the admission of the statement violated defendant's confrontation rights, but the error was harmless.

The trial court explored the admissibility of this evidence in pretrial hearings. On the day of defendant's arrest, Detective Craig Henderson interviewed defendant's wife, Shannon Lucas, at the sheriff's office, where their conversation was tape-recorded. In the course of the interview, Shannon described the couple's pets and Detective Henderson opened a bag that contained the choke chain found around Swanke's neck and showed it to her. Shannon audibly gasped, and, according to Detective Henderson, she sat back, opened her eyes wider, and appeared stunned. Shannon then stated, "That's, um, one of Duke's. We had — the kids used to — my son and my sister's daughter used to play with that and they half choked Duke to death."

105

Shannon refused to testify against defendant at the preliminary hearing by asserting the marital privilege under Evidence Code section 970. After she died unexpectedly before trial, the prosecution argued that her interview statement was admissible as a spontaneous utterance. Over the defense's numerous objections, including on confrontation grounds, the trial court concluded that this statement qualified as a spontaneous utterance, finding that it was a "response to something that shocked her." This was the only portion of Shannon's statement admitted at trial.

Defendant claims that the admission of Shannon's statement violated his right to confront the witnesses against him because she was unavailable for cross-examination at trial. The admission of testimonial statements offered against a defendant violates the Sixth Amendment confrontation clause unless the witness who made the statement is unavailable at trial *and* the defendant had a prior opportunity for cross-examination. (*Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).) After her husband's arrest, Shannon made her statement to a law enforcement officer while being questioned at a police station. Testimonial statements can comprise those " 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " (*Id*. at p. 52.)

It seems apparent that Shannon's statement was testimonial for confrontation purposes. More importantly, her unavailability at trial rendered her statement inadmissible because defendant had no prior opportunity to cross-examine her at the preliminary hearing as a result of her assertion of the marital privilege. In *Crawford* itself, statements to the police by the defendant's wife were held to be inadmissible, because the defendant was unable to cross-examine

106

her due to the marital privilege.[38] (*Crawford*, *supra*, 541 U.S. at pp. 40, 68.) We conclude that the admission of Shannon's statement violated defendant's right of confrontation. Accordingly, we need not decide defendant's other contentions concerning the admissibility of this statement.

But the error was harmless beyond a reasonable doubt. (*Chapman*, *supra*, 386 U.S. at p. 24; *People v. Geier* (2007) 41 Cal.4th 555, 608.) Shannon's recognition of the dog collar found around Swanke's neck was just one small part of the confluence of circumstantial evidence linking defendant to Swanke's abduction. The evidence established that defendant left his friend's home around the same time Swanke had become stranded on the side of the road. An eyewitness actually saw the abduction and remembered an unusual personalized license plate at the scene that was remarkably close to the license plate on defendant's vehicle. Blood evidence found in that vehicle was consistent with Swanke. Tissue and blood recovered from under Swanke's fingernails were consistent with defendant's blood characteristics. Lastly, several witnesses testified that defendant had severe and long facial scratches the day after Swanke's abduction, and a significant length of skin tissue was found crumpled under one of Swanke's fingernails. Given that the defense also presented significant evidence

---

[38] In *Crawford*, Washington state law forbid the defendant's spouse from testifying without the defendant-husband's consent, which he refused to give. (*Crawford*, *supra*, 541 U.S. at p. 40.) The high court expressly stated that it was not addressing whether the defendant had waived his confrontation rights by invoking the marital privilege. (*Id.* at p. 42, fn. 1.) Here, however, our state's marital privilege does not afford the other spouse a "veto" over the spouse's decision to testify. (Evid. Code, § 970.) Thus, it was solely Shannon Lucas's decision not to testify against defendant at the preliminary hearing, and her right to assert that privilege is distinct from defendant's right of confrontation even though the assertion benefitted defendant.

concerning the commonality of the type of dog chain recovered from Swanke's neck, Shannon's statement was not a decisive part of the evidence against defendant.

## C. Motion to Recuse the Prosecutor's Office

Defendant contends the trial court prejudicially erred in denying his motion to recuse the office of the San Diego County District Attorney because of an alleged conflict of interest arising from the prior abandoned prosecution of John Massingale for the Jacobs killings. The trial court did not abuse its discretion.

After the district attorney dropped charges against Massingale for the Jacobs homicides and charged defendant with those crimes instead, Massingale obtained a finding of factual innocence under section 851.8. Massingale then filed a civil lawsuit in federal court against the City and County of San Diego and those responsible for his police interrogations regarding the Jacobs murders. In defendant's motion to recuse the entire district attorney's office, defendant alleged a conflict of interest because the office argued inconsistently in the civil suit that law enforcement had not improperly obtained Massingale's confession, but argued in defendant's criminal case that Massingale's confession was involuntary.

According to section 1424, which governs motions to disqualify the prosecutor: "The motion may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." We have explained that a conflict " ' "exists whenever the circumstances of a case evidence a reasonable possibility that the DA's office may not exercise its discretionary function in an evenhanded manner," ' " and that such conflict may disqualify the office " 'only if it is "so grave as to render it unlikely that defendant will receive fair treatment." ' " (*Hambarian v. Superior Court*

108

(2002) 27 Cal.4th 826, 833, quoting *People v. Eubanks* (1996) 14 Cal.4th 580, 592, 594.)

Assuming the prosecutor took conflicting positions in different forums on the voluntariness of Massingale's confessions, defendant fails to show how such a conflict was "so grave" that it rendered his trial unfair. He does not explain how the conflict may have altered any trial testimony to his detriment. If anything, the prosecutor's assertion in the civil case that Massingale's confession was voluntary would have encouraged those who interrogated him to describe Massingale's confession as uncoerced, and this circumstance would have assisted defendant in his third-party culpability defense. The trial court properly denied the motion.

## D.  Asserted Errors During Jury Selection

### 1.  Challenge to Jury Venire

Defendant claims he made a preliminary showing that the panels from which the trial court selected his jurors underrepresented Hispanics and young persons. Therefore, according to defendant, the court erred in denying his motion for discovery of jury composition information, which in turn denied him a fair opportunity to challenge the composition of his jury panels. He asserts the errors denied him a jury selected from a fair cross-section of the community in violation of his rights to due process and equal protection under the United States Constitution. We conclude that the court properly denied defendant's discovery request and that defendant failed to show that his jury was selected from an unfair cross-section of the community.

### a)  The Requests for Discovery

Before the prosecutions of the Robertson, Strang, Fisher, and Swanke homicides and the Jacobs and Garcia homicides were consolidated into a single case, defendant successfully obtained discovery orders from each trial court

109

directing the San Diego County jury commissioner to provide him access to the commissioner's qualified jurors list, summons collected from prospective jurors on the list, written excuses received from prospective jurors on the list, the names and addresses of jurors who provided written excuses, and the names and addresses of jurors who did not appear. These orders also permitted defendant to distribute questionnaires to prospective jurors who did appear, asking them about their age, residence, ethnicity, income, prior jury experience, gender, and whether they would receive their regular salary during jury service. As a result of these orders, defendant was able to survey a total of nine panels of prospective jurors who appeared on three dates in August 1985, three dates in December 1985, and three dates in January 1986. In total, defendant surveyed 1,734 prospective jurors who appeared for service.

In June 1986, defendant successfully obtained a third discovery order, from the trial court assigned to the Jacobs and Garcia murders, for the commissioner to provide defendant with a qualified jurors list, certified jurors lists, and juror pay cards for the preceding 12 months.

In September 1986, defendant filed a fourth and fifth discovery motion (one for each of defendant's cases), which initially requested 33 items. It was later modified at a subsequent hearing, to request the following five items from the jury commissioner for the preceding year: 1) the qualified jury lists or the weekly or monthly list of persons to whom jury summons are sent; 2) the list of those persons who reported for service for each period described above; 3) the list of those persons excused or excluded on the basis of those who responded to the written summons and the reasons for each such exclusion; 4) the commissioner's procedures or policies for the preparation of the master jury list; and 5) the name and designation of the computer program used to implement jury selection in San Diego County. In this motion, defendant's counsel alleged that the 1980 census

110

revealed that approximately 14.8 percent of residents in San Diego County were Hispanic, but the approximate representation of Hispanics who sat on juries in the county was 8 percent. Counsel also declared that he consulted with an expert in the field of jury composition research, Dr. Edgar Butler of the University of California at Riverside, and that Dr. Butler described the requested information as relevant in ascertaining any bias in how prospective jurors are impanelled. The prosecution opposed the motion as duplicative of the prior motions, burdensome to the jury commissioner, and based upon an insufficient showing of disparity concerning the representation of Hispanics.

Argument concerning the fourth discovery motion took place before Judge Franklin Orfield, who then was presiding over the Robertson, Strang, Fisher, and Swanke murders. At that hearing, the jury coordinator, Geraldine Stevens, testified, as did defense expert witnesses, Dr. Butler and Dr. Oscar Kaplan, a professor at San Diego State University. Based on her analysis of the prior two defense surveys, Stevens calculated that 9 percent of the surveyed prospective jurors who appeared for service were Hispanic. According to Dr. Butler, the 1980 census showed that Hispanics constituted 14.74 percent of the San Diego County population, and he estimated that the 1985 Hispanic population had risen to 17.25 percent. Similarly, Dr. Kaplan estimated that the Hispanic population for San Diego County was nearing 15 percent. But neither defense expert had any data revealing the 1985 jury-eligible Hispanic population, and both conceded that the 1980 census figure would be higher than the population actually eligible for jury service at that time.

On cross-examination, Dr. Butler conceded that he had participated in an Orange County case in which he was able to calculate the jury-eligible Hispanic population. According to Dr. Butler, based on 1980 census data, Orange County had a 14.8 percent Hispanic population, nearly identical to San Diego County's

111

1980 census data. Based on 1980 data compiled by the Center for Continuing Study of the California Economy, the percentage of Hispanic persons in Orange County who were 18 years of age or older, citizens, and English speaking was 8.4 percent. Relying on 1985 projections of the Hispanic population being between 15.77 and 19.3 percent, Dr. Butler projected that between 9.07 and 11.16 percent of Hispanic persons in Orange County were jury eligible in 1985. Dr. Butler admitted that similar 1980 jury-eligible data for San Diego County existed (presumably from the Center for Continuing Study of the California Economy) and could be obtained with "some effort," but he did not have such data at the time.

Judge Orfield denied defendant's discovery motion, noting that despite the three prior orders of discovery, "nothing has been shown in any of the studies which would indicate that [a] further and deeper study should be made." The court noted that the jury commissioner's office had expended "a very substantial amount of work" to comply with the previously ordered discovery and that the new request was even more burdensome. The court concluded that "[i]t's been made to appear that the representation of Hispanics is proper in San Diego County with respect to the Hispanic population." The court observed that Dr. Butler could not state with any certainty the reasons for his recommendations and stated that Dr. Kaplan's statistical estimates appeared unreliable.

A few weeks later, Judge William Kennedy, who was presiding over the Jacobs and Garcia murders, denied defendant's fifth discovery motion, refusing to reconsider the matter in light of Judge Orfield's ruling on the similar fourth discovery motion. Defendant, however, argued that the results of his prior surveys were out of date, and Judge Kennedy granted defendant's additional request to submit questionnaires to prospective jurors who appeared for jury duty on five

112

dates in November and December 1986. Of the 817 prospective jurors surveyed, 9.5 percent identified themselves as Hispanic.

### b) *The Motion to Quash the Venire*

In December 1986, defendant filed a motion to challenge the composition of San Diego County juries and to quash all of its available jury panels. The motion provided no statistical data to support its allegation that the county's jury selection process was defective but the defense stated it would provide such evidence at the hearing on this motion. The prosecution opposed the motion.

In March 1987, after both cases were consolidated and assigned to Judge Laura Palmer Hammes, defendant, for the sixth time, moved for discovery of jury composition information and to distribute questionnaires for surveying additional prospective jurors. Judge Hammes denied discovery of additional prospective juror information, relying on the prior rulings of Judges Orfield and Kennedy, but permitted questionnaires to be given to prospective jurors on seven dates in March through April 1987. In addition to race and ethnicity, these questionnaires also probed the prospective jurors' age and income. Judge Hammes told defense counsel that if they found something that could persuade the court to order more discovery, defendant could renew his request for prospective juror information.

As a result of this round of surveys, defendant collected data from 1,213 prospective jurors. In this group, 8.1 percent identified themselves as Hispanic.

Later that year, defendant filed another motion to compel the jury commissioner to distribute questionnaires to prospective jurors who arrived for jury service on seven dates in September 1987. The trial court denied the motion, noting that the defendant had the opportunity to survey 1,200 prospective jurors recently and hundreds prior to that. The court denied defendant's motion without prejudice to renewal if a new jury pool was created the following year.

Eventually, the court allowed defendant to survey additional prospective jurors in January and February of 1988. In those surveys, 10.7 percent of the prospective jurors who arrived for jury service identified themselves as Hispanic.

In June 1988, the court held a hearing on defendant's renewed motion to challenge the composition of San Diego County juries and to quash all of its available jury panels. In support of having a full hearing on the motion to challenge the composition of the jury, defendant made offers of proof regarding the alleged underrepresentation of Hispanics and young adults aged between 18 and 24.

Concerning the representation of Hispanics, defendant made the following offer of proof: (1) Using a computer program that identifies Hispanic surnames, 16.4 percent of the San Diego County master jury list contained individuals with Spanish surnames, which was probably consistent with the then-existing Hispanic population in the county over the age of 18; (2) after written and call-in excuses in response to the initial juror summons were taken into account, the percentage of Hispanics dropped to 14 percent; and (3) only 10.7 percent of individuals who appeared for jury service self-identified as Hispanic.

Regarding the representation of young adults aged between 18 and 24, defendant made the following offer of proof: (1) Based on data gathered in another, unrelated case, young adults in San Diego County comprise approximately 22 percent of the total eligible jurors; (2) only 9.1 percent of young adults appeared for jury service; (3) this disparity could not be fully accounted for based on young adults relocating due to military or college commitments; and (4) young adults are a cognizable group for purposes of jury selection representation because they have attitudes and beliefs unique from other groups.

The trial court denied the requested evidentiary hearing and the related motion. The court concluded that the statistics presented by defendant constituted

114

an insufficient offer of proof and did not suggest that Hispanics were being underrepresented because "the court cannot tell what caused the difference" between the 14 percent who responded to the initial juror summonses and the 10.7 percent who actually appeared for jury service. The court stated that "a good inference could be drawn that at least a certain percentage of that [difference] would be based on others who did not speak English or are aliens and who did not call, but who did not show up for those reasons." Concerning young adults, the court admitted that there was a large disparity between their prevalence in the population and their prevalence in the appearing jury pools, but concluded that defendant's survey of this age group did not demonstrate any homogeneity as to whether "young people are less apt to convict than older people," and, therefore, young adults were not a cognizable group.

### c) Analysis

Under the federal and state Constitutions, a defendant is entitled to a jury drawn from a representative cross-section of the community. (U.S. Const., Sixth Amend.; Cal. Const., art. I, § 16; *Duren v. Missouri* (1979) 439 U.S. 357, 358-367; *People v. Howard* (1992) 1 Cal.4th 1132, 1159.) This guarantee mandates that courts select juries from pools that do not systematically exclude distinctive groups in the community. (*People v. Burney* (2009) 47 Cal.4th 203, 225.)

In order to investigate whether the court has failed to draw a jury from a representative cross-section of the community, we have recognized that a defendant has certain rights to discovery. In such a circumstance, "we consider not whether defendant has made a prima facie case [of underrepresentation], but the prior question of whether defendant was wrongly denied the discovery of information necessary to make such a case." (*People v. Jackson* (1996) 13 Cal.4th 1164, 1194.) Accordingly, instead of making a prima facie case of

115

underrepresentation, a defendant need only make "a particularized showing supporting a *reasonable belief* that underrepresentation in the jury pool or the venire exists as the result of practices of systematic exclusion." (*Ibid*., italics added.) Upon such a showing, "the court must make a reasonable effort to accommodate the defendant's relevant requests for information designed to verify the existence of such underrepresentation and document its nature and extent." (*Ibid*.) As explained below, defendant failed to make a particularized showing supporting a reasonable belief that his jury was selected from an unfair cross-section of the community. The trial court, therefore, properly denied defendant's discovery request.

At the outset, we have held that young persons are not a cognizable group for purposes of an equal protection challenge to a jury's composition. (*People v. Lewis* (2008) 43 Cal.4th 415, 482; see *People v. Ayala*, *supra*, 23 Cal.4th at p. 256.) Hispanics, however, are a cognizable group for purposes of such challenges. (See *Castaneda v. Partida* (1977) 430 U.S. 482, 495.)

In assessing defendant's fourth discovery motion to probe the composition of the venire, Judge Orfield correctly concluded that defendant had failed to make a particularized showing supporting a reasonable belief concerning underrepresentation of Hispanics in the jury pool to justify further discovery.[39] Even though his own expert asserted it was available, defendant failed to provide the most relevant statistic to support his discovery request — demographic data showing the percentage of Hispanics who are presumptively eligible for jury service. Instead, defendant presented general population data concerning

---

[39] Accordingly, Judge Hammes did not err in relying on this prior ruling to deny defendant's additional discovery requests.

116

Hispanics in San Diego County and compared that percentage with the number of Hispanic persons who appeared for jury service. In *People v. Harris* (1984) 36 Cal.3d 36, 54 (*Harris*), we recognized that such a comparison is problematic because general population data do not identify how many in the class are actually qualified for jury service; therefore, "a showing that that class' representation in the jury pool is less than the group's percentage of the general population does not necessarily show that the group is underrepresented." Although we recognized that it might be difficult for a defendant to obtain precise data concerning the number of persons qualified to serve, we noted that "more refined statistics would be preferable if available, [but] when they are not, it is sufficient for the defendant to show a significant disparity based on the use of total population figures."[40] (*Harris, supra,* at p. 54.)

Here, the more relevant and precise statistic was available with "some effort" according to the defense expert. Indeed, the same defense expert had previously obtained similar data for Orange County. Yet, the defense relied on the general population statistic, which would obviously portray a greater statistical disparity when compared with the percentage of Hispanics who appeared for jury service. Given the amount of effort the jury commissioner expended in complying

---

[40] This portion of the opinion in *Harris* was endorsed by only a three-justice plurality of this court. We later recognized that census data regarding *adult* populations were readily available, and we subsequently clarified that, for purposes of making a prima facie showing of underrepresentation, henceforward "a defendant who has access to census or other demographic data that reflect adult population figures must base his challenge on that data." (*People v. Bell* (1989) 49 Cal.3d 502, 526, fn. 12.) At the time of defendant's trial, *Harris* was the controlling case, but *Harris* did not address the threshold showing required for a discovery request and did not concern a scenario in which the defense expert admitted that a more relevant statistic, the percentage of adult Hispanics who could speak English, was available but not obtained.

with defendant's three prior requests for discovery and given that defendant had access to the key statistical data relevant to the existence or nonexistence of any disparity, it was not unreasonable to expect defendant to make a more precise showing before granting his additional, and largely repetitive, discovery requests.

Moreover, we note that the defense expert's testimony concerning the adjoining jurisdiction, Orange County, strongly suggested that the percentage of Hispanic persons who appeared for jury service in San Diego County was consistent with the jury eligibility of Hispanics in the San Diego County population. According to Dr. Butler, Orange and San Diego Counties had nearly identical 1980 census data concerning the percentage of its Hispanic population, and the percentage of Hispanic persons in Orange County who were 18 years of age or older, citizens, and English speaking was 8.4 percent. Dr. Butler projected that the 1985 population in Orange County contained between 9.07 and 11.16 percent who were jury eligible and Hispanic. This projection was roughly consistent with the 9 percent calculation made by the jury coordinator in San Diego County after defendant surveyed more than 1,700 prospective jurors. Absent any showing by defendant that the demographics of Orange and San Diego Counties were not comparable, it was not unreasonable for the trial court to conclude that defendant failed to show that a "further and deeper study should be made." Defendant made no particularized showing supporting a reasonable belief of underrepresentation in the San Diego County jury pool that would justify further discovery.

Defendant also failed to make a prima facie showing of underrepresentation of Hispanics for purposes of challenging the San Diego County venire. To establish a prima facie violation of the fair cross-section requirement, defendant must show (1) that the group excluded was "distinctive"; (2) representation of the group in venires is not fair and reasonable in relation to community; and (3) this

118

underrepresentation is due to systematic exclusion. (*People v. Ayala, supra,* 23 Cal.4th at p. 256.) By the time the trial court heard defendant's motion to quash the venire, defendant had surveyed literally thousands of prospective jurors over a period of less than three years. The surveys showed that between 8.1 and 10.7 percent of prospective jurors who appeared for service identified themselves as Hispanic. As previously explained, defendant had access to statistics that could have more precisely described the percentage of the county population who were Hispanic and jury eligible, but he failed to present them during the nearly three years he litigated his fair cross-section claim. Additionally, the statistics that defendant did present appeared consistent with the defense expert's projections in adjoining Orange County, which had a comparable proportion of Hispanic residents.

But even assuming, for the sake of argument, that defendant's statistics did reveal an underrepresentation of Hispanics, defendant's claim still fails because he made no showing that any alleged underrepresentation was the result of systematic exclusion. In fact, defendant's own offer of proof revealed that the county's master jury list contained a fair cross-section of the Hispanic community, 16.4 percent, which he admitted was probably consistent with the then existing Hispanic population in the county over the age of 18. Therefore, any disparity arose only after summoned prospective jurors mailed or telephoned excuses or simply did not respond to the summons. Defendant failed to explain how this apparently neutral excusal system was "an improper feature of the jury-selection process." (*People v. Howard*, *supra*, 1 Cal.4th at p. 1160.) Indeed, it appears that "[t]he foregoing method does not discriminate on the basis of ethnicity or national origin." (*People v. Ayala*, *supra*, 23 Cal.4th at p. 256.) Accordingly, the trial court was correct in noting that defendant had not explained "what caused the difference" between the 14 percent who remained in the venire after responses to

119

the juror summonses and the 10.7 percent who actually appeared for jury service. The additional data defendant collected as the result of his later discovery motions were roughly consistent with the previous data defendant collected, but that data also failed to show any systematic exclusion.

### 2. *Voir Dire Concerning Defendant's Prior Rape Conviction*

Defendant claims the trial court erred by precluding his counsel from asking prospective jurors during voir dire about the effect of defendant's prior rape conviction on their ability to fairly judge defendant's penalty.  He contends this violated his state and federal rights to due process and trial by a fair jury and violated his Eighth Amendment right to a reliable, fair, and impartial sentencing trial.  We conclude the trial court did not abuse its discretion in limiting fact-specific questions concerning defendant's 1973 rape conviction.

" '[D]eath-qualification voir dire must avoid two extremes.  On the one hand, it must not be so abstract that it fails to identify those jurors whose death penalty views would prevent or substantially impair the performance of their duties as jurors in the case being tried.  On the other hand, it must not be so specific that it requires prospective jurors to prejudge the penalty issue based on a summary of the mitigating and aggravating evidence likely to be presented. [Citation.]  In deciding where to strike the balance in a particular case, trial courts have considerable discretion.' " (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1120-1121, quoting *People v. Cash* (2002) 28 Cal.4th 703, 721-722.)  Regarding the limits of this discretion, "the court's refusal to allow inquiry into such facts is improper only if it is '*categorical*' [citation] and denies *all* 'opportunity' to ascertain juror views about these facts." (*People v. Carasi* (2008) 44 Cal.4th 1263, 1286, quoting *People v. Vieira* (2005) 35 Cal.4th 264, 286-287.)

As defendant concedes, the trial court told defense counsel that he could "certainly explore how strongly they [prospective jurors] feel about rape and whether that's ever touched their lives and whether they would be very, very, very prejudiced against somebody who did such a thing." The court observed that such inquiry would "give you an indication that that's the person who will take that one aggravating factor and vote death . . . ." The trial court repeatedly clarified that such open-ended questions about rape were permissible. Therefore, although the trial court prohibited specific questions about defendant's 1973 rape conviction, the court did not abuse its discretion because it did not categorically bar questions concerning rape as an aggravating factor.

### 3. Challenge for Cause

Defendant contends the trial court erred and violated his constitutional right to an impartial jury by denying a defense challenge for cause against Prospective Juror S.B., who eventually sat on defendant's jury. Defendant concedes that he had 11 available peremptory challenges when his jury panel was sworn in but did not challenge S.B.

By failing to use one of his remaining 11 peremptory challenges to remove Prospective Juror S.B., defendant forfeited his claim. (*People v. Davis* (2009) 46 Cal.4th 539, 582.) Defendant suggests several reasons why we should reconsider the application of forfeiture under these circumstances, but none of them address the obvious, long-recognized maxim that " ' "errors committed in overruling challenges for cause are not grounds of reversal, unless it be shown an objectionable juror was forced upon the challenging party after he had exhausted his peremptory challenges; if his peremptory challenges remain unexhausted, so that he might have excluded the objectionable juror by that means he has no ground of complaint." ' " (*People v. Schafer* (1911) 161 Cal. 573, 577, quoting

121

*People v. Durrant* (1897) 116 Cal. 179, 196-197.)  Defendant further argues that, in capital trials, forfeiture should not apply in this circumstance unless the defendant personally waives his right to an impartial jury.  But even in capital cases the scope of counsel's authority "extends to matters such as deciding what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or reject, what motions to make, and most other strategic and tactical determinations."  (*People v. McKenzie* (1983) 34 Cal.3d 616, 631.)

Moreover, defendant's argument assumes he was tried by an unfair juror. He was not.  Although Prospective Juror S.B. acknowledged during questioning that she categorized the murder of a child as a heinous crime that would cause her to lean substantially in favor of a death sentence and that she would require proof that a sentence of life should be imposed instead, she also clarified that she would "listen to the mitigating circumstances and things of that nature before [she] could make a definite judgment."  When presented with a hypothetical child-murder in which the defendant presents no mitigating evidence at the penalty phase, S.B. stated she would be willing to openly discuss alternative penalties because a fellow juror may have interpreted something from the guilt phase as mitigating. Finally, when asked why she could consider a life sentence instead of a death sentence for someone guilty of murdering six persons, including two children, S.B. responded:  "I think I have compassion."

Because these statements indicated that Prospective Juror S.B. had not prejudged defendant's penalty but remained open to considering the evidence and consulting her compassion in deciding the appropriate penalty, the trial court properly denied the challenge for cause.  (*People v. Mason* (1991) 52 Cal.3d 909, 953-954 [challenge for cause properly denied when prospective juror stated she would always vote for death for murder of a fellow inmate, but later clarified that

122

she would consider the evidence and could see herself realistically voting for a life sentence].)

### 4. *Publication of Juror Information*

Defendant contends the trial court erred by denying his request, made before jury selection, to withhold from the press the names of the jurors or prospective jurors, and he claims this error violated his state and federal constitutional rights to due process, a fair trial by jury, and reliable guilt and penalty verdicts. We disagree.

Defendant filed a motion to prohibit the media from photographing jurors, contacting jurors prior to the completion of the trial, and from publishing the names of jurors. Various local media outlets opposed the motion. Defendant offered no evidence, other than the nature of the case itself, explaining why a protective order was needed to ensure the fairness of defendant's trial. The trial court ordered the media not to videotape or photograph any of the jurors or prospective jurors and prohibited any interviews inside the courtroom. The court denied defendant's motion to prohibit the media from publishing the names of jurors.

Our courts have noted that "[p]rior restraints are 'one of the most extraordinary remedies known to our jurisprudence' [citation] and carry a heavy burden against constitutional validity." (*South Coast Newspapers, Inc. v. Superior Court* (2000) 85 Cal.App.4th 866, 870, quoting *Nebraska Press Assn. v. Stuart* (1976) 427 U.S. 539, 562.) Most are invalid, but "prior restraints may be imposed under some extraordinary circumstances." (*Wilson v. Superior Court* (1975) 13 Cal.3d 652, 661.) According to the high court, the trial court must examine the evidence before it to determine "(a) the nature and extent of pretrial news coverage; (b) whether other measures would be likely to mitigate the effects of

123

unrestrained pre-trial publicity; and (c) how effectively a restraining order would operate to prevent the threatened danger." (*Nebraska Press Assn. v. Stuart*, *supra*, at p. 562.) In *NBC Subsidiary (KNBC-TV), Inc. v. Superior Court* (1999) 20 Cal.4th 1178, 1217-1218, we stated that, before a prior restraint can be upheld, "a trial court must hold a hearing and expressly find that (i) there exists an overriding interest supporting closure and/or sealing; (ii) there is a substantial probability that the interest will be prejudiced absent closure and/or sealing; (iii) the proposed closure and/or sealing is narrowly tailored to serve the overriding interest; and (iv) there is no less restrictive means of achieving the overriding interest." (Fns. omitted.)

Although defendant asserted generally that public disclosure of jurors' names would interfere with his right to a fair trial, he offered no evidence supporting the proposition that prejudice to that interest was substantially probable without the prior restraint. There was no evidence that the media sought to identify the jurors publicly either before or during trial or that there was a clear danger that jurors would be pressured if publicly identified. As evidence of prejudice, defendant refers to a juror who, in an abundance of caution, reported to the court that she had received a threat on her answering machine during the trial, but the juror herself believed that it "surely had nothing to do with this trial." Because defendant advanced only an abstract argument concerning the danger of infringement on his right to a fair trial, the trial court properly exercised its discretion and concluded that it had no choice but to deny his motion. (See *South Coast Newspapers, Inc. v. Superior Court, supra,* 85 Cal.App.4th at pp. 873-874.)

124

### III. GUILT PHASE ISSUES

### A. Evidentiary Issues — Asserted Errors

#### 1. Admissibility of the Love Insurance Note

##### a) Failure to Authenticate the Love Insurance Note

Defendant argues that the trial judge erred and violated his state and federal rights to due process by failing to subject the photographs of the front and back of the handwriting on the Love Insurance note to an authentication process under Evidence Code sections 1400 and 1401. Under defendant's theory, the judge was obligated to make a preliminary finding that these photographs were authentic "writings." He also claims that the trial court committed prejudicial error by not instructing the jury to determine the note's authenticity. These contentions are not persuasive.

A writing must be authenticated before being admitted into evidence or before secondary evidence of its contents is received. (Evid. Code, § 1401.) A writing is admissible if a finding of authentication is supported by a preponderance of the evidence. (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 321.) The proponent of a writing satisfies the requirement of authentication when he or she introduces evidence sufficient to sustain a finding that the writing is what it is purports to be. (Evid. Code, § 1400.) Even if conflicting inferences can be drawn from the evidence supporting authentication, that consideration goes to the weight of the evidence and not to its admissibility. (*Jazayeri v. Mao*, *supra*, at p. 321.)

The record indicates that the trial court did consider and rule on the issue of authentication. In a portion of a pretrial motion, the defense raised the authentication issue in detail. When the prosecution sought admission of various Polaroid photos of the Love Insurance note at trial, the court asked whether defendant had any objection, and defendant requested leave to cross-examine the

witness first, which the court granted. The next day, after cross-examination, the prosecution once again moved to admit the same three photographs of the note. Defense counsel stated that there were "existing objections on the record" and that he was renewing them. The court replied: "[The objections] are noted. [The photographs] are admitted at this time." When the prosecutor asked if he was permitted to show the photos to the jury, the court responded that he was. The trial judge was briefed on the authentication issue and, by admitting them into evidence, impliedly found the photographs to be authentic.

We reject defendant's claim that the evidence was insufficient to support a finding that the photographs were authentically what the prosecution claimed them to be — accurate depictions of the note found on the Jacobses' bathroom rug. Detective Gleason testified that the photographs accurately depicted how the note was found folded and how it appeared on both sides after being unfolded. Stewart, the police lab technician, also testified that he took the photographs and that they represented the note. This testimony provides sufficient evidence that the photographs accurately depicted the two sides of the note.[41]

---

[41] Defendant, for the first time on appeal, also advances a certification challenge, arguing that the note's admission did not comply with Evidence Code sections 1531 and 1551, which, together, allow a photographic copy of a destroyed original writing to be admitted as if it were the original writing so long as the person who created the photographic copy attaches a certification attesting that the photo is a correct copy of the original. Defendant forfeited any challenge under Evidence Code sections 1531 and 1551 by failing to object on these grounds below. (*Quality Wash Group V Ltd. v. Hallak* (1996) 50 Cal.App.4th 1687, 1698.) In any event, the testimony of Stewart precludes any possible prejudice in failing to strictly comply with the provisions of Evidence Code sections 1531 and 1551. (*People v. Skiles* (2011) 51 Cal.4th 1178, 1186 [certification establishes only "a presumption of authenticity and is not the sine qua non of admissibility"].)

126

Defendant also contends that the court erred in failing to instruct on contested authentication, as required by Evidence Code section 403, subdivision (c)(1). The Attorney General does not dispute this claim. Under that section, when a court accepts evidence of a document's authenticity but that authenticity remains contested, it "[m]ay, and on request shall, instruct the jury to determine whether the preliminary fact exists and to disregard the proffered evidence unless the jury finds that the preliminary fact does exist." (Evid. Code, § 403, subd. (c)(1).) Because defendant contested the authenticity of the photographs and requested such an instruction, the trial court erred by failing to give the instruction.

Still, the error was harmless. First, defendant contends that this error violated his federal constitutional rights under the Sixth and Fourteenth Amendments by preventing the jury from deciding all relevant issues of fact and weighing the credibility of the evidence. We examine "the nature of the evidence presented to determine whether it was likely the omitted instructions affected the jury's evaluation of the evidence." (*People v. Moon* (2005) 37 Cal.4th 1, 38.) The instructions in this case did not advise the jurors to assume the photographs were authentic, but rather failed to advise them to consider the authenticity of the photos before relying on them. This did not rise to the level of a federal constitutional violation, and state law error in admitting evidence is subject to harmless error analysis under *Watson*. (*People v. Partida* (2005) 37 Cal.4th 428, 439.) Under *Watson*, defendant must demonstrate a reasonable probability that a result more favorable to defendant would have been reached absent the error. (*Watson*, *supra*, 46 Cal.2d at p. 836.) Here there was no reasonable likelihood that the jury would have found the photographs to be inaccurate representations of the note while simultaneously relying on those photographs to place defendant at the crime scene. (See Assem. Com. on Judiciary com., reprinted at 29B pt. 1B West's Ann. Evid. Code (2011 ed.) foll. § 403, p. 21 (West's Annotated Evidence Code) [stating that

an instruction on conditional relevancy is often not necessary, giving the example of a contested deed — "[n]o rational jury could find the deed to be spurious and, yet, to be still effective to transfer title from the purported grantor"].)

### b) Failure to Comply with the Best Evidence Rule

Defendant argues that the photograph of the Love Insurance note should not have been admitted in light of the "best evidence rule."[42]  Defendant contends that the note was admitted to prove its contents because the prosecution relied on the name of the insurance company and its contact information as circumstantial evidence linking defendant to the crime scene.  Additionally, defendant avers that the prosecution's comparative handwriting analysis relied on the contents of the note by examining the "shape, formation and style of each letter and numeral." According to defendant, the original note should have been offered to prove its contents and the photograph was not an admissible substitute.  We disagree.

We will consider a claim of erroneously admitted evidence only when the original objection to the evidence was both timely and specific.  (Evid. Code, § 353, subd. (a); *People v. Abel* (2012) 53 Cal.4th 891, 924.)  Further, the objection must be specific enough as to "fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling."  (*People v. Partida*, *supra*, 37 Cal.4th at p. 435.)

---

[42]     The so-called best evidence rule was codified as Evidence Code former section 1500 et seq.  Effective January 1, 1999, it was renumbered and retitled, and is now called the secondary evidence rule.  (See Evid. Code, § 1520 et seq.) We apply the rule as it existed at the time of defendant's trial.

In this case, defendant never made a specific best evidence rule objection at the time the photographs of the Love Insurance note were introduced into evidence. He objected to the photographs, citing merely "existing objections on the record," but we have found no "best evidence" objection in the record. In pretrial briefing, defendant claimed that folds in the original paper affected the handwritten letters, causing the potential loss of writing material for purposes of handwriting comparison, but he did not make reference to the best evidence rule.[43] Instead, the specific best evidence rule objection to the note was raised, and rejected, nearly five months later in connection with arguments concerning jury instructions. Defendant forfeited this claim by failing to make a specific best evidence rule objection at the time the photographs were introduced into evidence. (See *People v. Boyette* (2002) 29 Cal.4th 381, 423-424 [defendant's objection to admission of photographs was not preserved on appeal when he failed to object when they were used in questioning witnesses but then objected at a later stage when the prosecution entered them into evidence].)

In any event, the claim lacks merit. The former best evidence rule (see *ante*, fn. 42) codified in Evidence Code section 1500, provided, in pertinent part, that "no evidence other than the writing itself is admissible to prove the content of a writing." (Stats. 1965, ch. 299, § 2, pp. 1297, 1350.) But under this former provision, a copy of a writing was not made inadmissible when " 'the writing is lost or has been destroyed without fraudulent intent on the part of the proponent of

---

[43]     We also reject defendant's contention that there may have been some relevant differences between the original note and the photographs because of content possibly lost within the folds of the paper. The prosecution presented large, blown-up copies of the photograph of the note in which any creasing in the note can be readily examined. Any missing detail is not so severe as to render any significant portion of it hidden or illegible.

the evidence.' " (*People v. Morris, supra,* 53 Cal.3d at p. 205, italics omitted; see *Guardianship of Levy* (1955) 137 Cal.App.2d 237, 249-250 [admitting secondary evidence of a writing when the original was intentionally destroyed in good faith].) Defendant has failed to show fraudulent intent in the destruction of the original Love Insurance note. Consequently, the photographs were admissible even if they otherwise qualified for exclusion under the former version of the best evidence rule.

### 2. Admission of Lay Opinion Evidence Concerning the Handwriting on the Love Insurance Note

Defendant asserts several challenges to the admission of a lay opinion that the handwriting on the Love Insurance note looked like defendant's handwriting. Specifically, Frank Clark, defendant's long-time work colleague, testified that he believed defendant wrote the letters and numbers on the paper. In overruling defendant's various objections to this evidence, the trial court found adequate foundation to allow Clark's opinion on this subject because he had seen a number of numerals and letters written by defendant over the course of their working relationship. According to the trial court, that extensive exposure to defendant's writing allowed Clark to provide an opinion "as to whether or not the writing on the Love Insurance note appears to be consistent with Mr. Lucas's writing."

Defendant now challenges the admission of this testimony on three bases. First, he argues that Clark's statement that defendant authored the note did not meet the requirements for lay opinion testimony. Second, he contends that the prosecution failed to establish, as a foundational matter, that handwriting is sufficiently unique to enable identification of a particular person's writing. Finally, he states that Clark's opinion about the note should have been excluded under Evidence Code section 352. Defendant's contentions fail.

Opinion evidence given by a lay witness is admissible "as is permitted by law," including, but not limited to, an opinion that is: "(a) [r]ationally based on the perception of the witness; and [¶] (b) [h]elpful to a clear understanding of his [or her] testimony." (Evid. Code, § 800.) The California Law Revision Commission's comment to Evidence Code section 800 clarifies that it "does not make inadmissible an opinion that is admissible under existing law," even if that opinion does not meet the two factors in section 800. (Cal. Law Revision Com. com., reprinted at 29B pt. 3A West's Ann. Evid. Code (2009 ed.) foll. § 800, p. 3.) In other words, Evidence Code section 800 does not render a lay opinion inadmissible that would have otherwise been admissible under another section.

Evidence Code section 1416 provides a specific statutory basis under which a lay opinion is admissible regarding handwriting. Under section 1416, a lay witness may state his or her opinion concerning whether a document reflects the handwriting of a particular person if the court finds that he or she has "personal knowledge of the handwriting of the supposed writer."[44] If Clark's opinion

---

[44] Evidence Code section 1416 provides in full: "A witness who is not otherwise qualified to testify as an expert may state his opinion whether a writing is in the handwriting of a supposed writer if the court finds that he has personal knowledge of the handwriting of the supposed writer. Such personal knowledge may be acquired from: [¶] (a) Having seen the supposed writer write; [¶] (b) Having seen a writing purporting to be in the handwriting of the supposed writer and upon which the supposed writer has acted or been charged; [¶] (c) Having received letters in the due course of mail purporting to be from the supposed writer in response to letters duly addressed and mailed by him to the supposed writer; or [¶] (d) Any other means of obtaining personal knowledge of the handwriting of the supposed writer."

This kind of opinion testimony was already permitted under Code of Civil Procedure former section 1943 when the Evidence Code was enacted in 1965. (Stats. 1901, ch. 102, § 481, p. 247, repealed by Stats. 1965, ch. 299, § 100, p. 1362, on enactment of the Evid. Code.)

testimony properly qualified under section 1416, it need not be analyzed under section 800.

Clark's opinion did qualify under Evidence Code section 1416. He had sufficient personal knowledge of defendant's writing, having known and worked with defendant for several years. In that capacity, he saw various documents containing letters and numerals written by defendant, including a number of documents that he identified in court. The court reasonably held that this gave Clark sufficient personal knowledge to opine about whether defendant authored the note.

Defendant advances several unpersuasive arguments to the contrary. He asserts that Evidence Code section 1416 should not apply to the handwriting on the Love Insurance note because the note contains "handprinting" rather than "handwriting." He quotes the comment to Evidence Code section 1418, the statute providing for the admissibility of expert testimony about handwriting, stating that it applies "to any form of writing, not just handwriting." (Cal. Law Revision Com. com., reprinted at 29B pt. 4 West's Ann. Evid. Code (1995 ed.) foll. § 1418, at p. 469.) He reasons that because "writing" means something beyond "handwriting" in section 1418, section 1416 must be intended to apply to cursive handwriting only. We disagree.

First, the comment quoted by defendant is intended to clarify that expert witnesses may provide opinions comparing *typewriting* under that section. (Cal. Law Revision Com. com., reprinted at 29B pt. 4 West's Ann. Evid. Code, *supra*, foll. § 1418 at p. 469 [explaining that the section "applies to any form of writing, not just handwriting" because "experts can now compare typewriting specimens"].) Second, defendant points to no court or other authority that has applied different standards to cursive and printed letters. (See Evid. Code, § 250 [making no distinction between printing and cursive styles in definition of a

132

"writing"]; Black's Law Dict. (9th ed. 2009) p. 783, col. 1 [defining handwriting as "the cast or form of writing peculiar to a person, including the size, shape, and style of letters, and whatever gives individuality to one's writing" and "[something] written by hand" and making no distinction between cursive writing and printing].)  Moreover, the extent to which a distinction between cursive handwriting and handprinting might affect the relevance of an opinion concerning authorship can properly be elicited through cross-examination.  Defendant's further contention that the opinion here was not "helpful" under Evidence Code section 800 seems dubious, but in any event, as noted above it was admissible under another existing law, Evidence Code section 1416.

Defendant also challenges the foundation of Clark's opinion testimony. First, he argues that the prosecution was required to establish that a unique identification could be made based on the small sample of letters and numerals present in the Love Insurance note.  Evidence Code section 1416 imposes no such restriction.  Second, defendant asserts that the prosecution failed to make a foundational showing that Clark could specifically make this identification for the following reasons:  Clark had never seen defendant write the exact content of the note; the content of the note was limited; Clark did not compare exemplars; and Clark's comparison was not based on defendant's contemporaneous writings.  As stated above, the court did not abuse its discretion by finding an adequate foundation for Clark's opinion regarding the authorship of the writing under Evidence Code section 1416.  All of the factors that defendant mentions could be explored on cross-examination and considered by the jury in weighing the evidence, but they do not go to the opinion's admissibility.

Defendant insists that the court, nevertheless, committed prejudicial error by not providing a requested jury instruction requiring the jury to determine, as a foundational matter, whether the handwriting on the note was sufficiently unique.

133

Contrary to defendant's claim, this jury instruction was not required under Evidence Code section 403, because Clark's qualification to state his opinion under 1416 was a determination for the judge, not the jury. (Legis. Com. com., 29B pt. 1B West's Ann. Evid. Code (2011 ed.) foll. § 403 at p. 20 [the qualifications of a lay witness to give an opinion under Evid. Code, § 1416 is decided by the judge under Evid. Code, § 405]; Legis. Com. com., reprinted at 29B pt. 1B West's Ann. Evid. Code, *supra*, foll. § 405 at p. 42 [a "witness' qualifications to express such an opinion [under Evid. Code, § 1416] . . . are to be determined by the judge under Section 405 just as the qualifications of other experts are decided by the judge"].) The trial court rightly rejected this erroneous instruction on the required foundational showing.

Alternatively, defendant contends the trial court should have excluded Clark's testimony under Evidence Code section 352 because its probative value was substantially outweighed by the danger of undue prejudice. As we have already noted, an Evidence Code section 352 determination is reviewed by applying an abuse of discretion standard. (*People v. Mills* (2010) 48 Cal.4th 158, 195.) For purposes of a section 352 analysis, evidence is unduly prejudicial if it tends to create an emotional bias against a defendant that could inflame the jury, while also having a negligible bearing on the issues. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1091-1092.) The authorship of the handwriting on the Love Insurance note was far from a negligible issue. It was a crucial element of the case. Clark had personal experience with defendant's handwriting and was qualified, under Evidence Code section 1416, to express his opinion that the note was consistent with that handwriting. His testimony assisted the jury in determining whether defendant wrote the note, and this in turn was directly relevant to the jury's determination whether defendant was present at the Jacobs crime scene. Nor did Clark's opinion tend to create any emotional bias against

134

defendant.  There was no abuse of discretion in admitting Clark's testimony on this basis.

### 3. *Exclusion of Lay Opinion Evidence Concerning the Love Insurance Note*

David Ray Woods was briefly considered a suspect in the Jacobs murders. (See *ante*, fn. 12, p. 17.)  The trial court excluded a statement by Rochelle Coleman, Woods's girlfriend, in which she stated her belief that Woods authored the Love Insurance note.  During a police interview, Coleman was shown a photograph of the Love Insurance note and asked if she recognized the handwriting on the note.  She stated, "that's David's handwriting."  Coleman died prior to trial.  Defendant sought admission of the statement for its truth under the spontaneous utterance exception to the hearsay rule.  He also sought to admit the statement for a variety of nonhearsay purposes.  The court rejected these theories and excluded the statement.

Defendant raises several related claims.  He first challenges the exclusion of this statement by claiming that it should have been allowed under the spontaneous statement exception to the hearsay rule.  He next contends the statement could also have been admissible for the nonhearsay purpose of undermining the expert handwriting evidence presented by the prosecution. Finally, he posits that even if the statement were not otherwise admissible, its exclusion precluded his right to present a defense.  We hold that none of these claims discloses an abuse of discretion in the trial court's decision to exclude Coleman's statement.

As previously described, evidence of a statement is not made inadmissible by the hearsay rule if the statement "(a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶]  (b) Was made spontaneously while the declarant was under the stress of excitement caused by

135

such perception." (Evid. Code, § 1240.) To apply the exception the trial court must determine that " '(1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.' " (*People v. Poggi* (1988) 45 Cal.3d 306, 318, quoting *Showalter v. Western Pacific R. R. Co.* (1940) 16 Cal.2d 460, 468.) This rule mirrors a common law exception based upon the notion that such statements, although not necessarily more reliable or accurate, are more likely to represent " 'the unreflecting and sincere expression of one's actual impressions and belief.' " (*Showalter v. Western Pacific R. R. Co.*, *supra*, at p. 468.) Consequently, the mental state of the declarant — that is, the question of whether he or she was sufficiently under stress so as to dramatically reduce the possibility of deliberation and prevarication — is crucial to determining whether the exception applies. A trial court's decision to exclude a statement as not qualifying as a spontaneous utterance can be reversed only if it amounted to an abuse of the court's discretion. (*People v. Gallegos* (1990) 52 Cal.3d 115, 175.)

The trial court did not abuse its discretion. The court heard testimony from a police officer, Lieutenant Dolores Messick, who was present at the interview, and then the court heard a tape-recording of the interview. In rendering its decision to exclude the statement, the court noted that "[Coleman's] voice was very calm, cool, and modulated throughout" the recording. This tone did not change when she was presented with the photograph. Indeed, Messick also testified that Coleman was calm throughout the interview and did not show any emotion or change in demeanor when presented with the photograph. It was appropriate for the trial court to consider the level of stress or excitement evident

136

in Coleman's voice and through her demeanor.  (See *People v. Brown* (2003) 31 Cal.4th 518, 541 [trial court properly considered that the declarant was "crying, shaking, and visibly upset" when allowing his statement as a spontaneous utterance].)  Because all of the evidence presented at trial suggests that Coleman seemed calm and reflective when giving her statement, we conclude that the trial court did not abuse its discretion in rejecting its admission as a spontaneous utterance.

Nor did the trial court abuse its discretion in concluding that Coleman's statement was inadmissible to undermine or impeach the prosecution's expert testimony about handwriting comparison.  Defendant argues that the statement should have been admitted as nonhearsay evidence that the handwriting on the note was not unique and to impeach the prosecution's expert witness by showing improper bias.  But to provide any such relevancy, one would have to accept as truthful that Coleman actually believed that the handwriting matched David Woods's handwriting.  Therefore, it is difficult to understand how Coleman's statements could constitute evidence of how the handwriting on the Love Insurance note was not unique without it also being offered to prove the truth of Coleman's belief.

Finally, the exclusion of Coleman's statement did not preclude defendant's constitutional right to present a defense or his constitutional rights to due process, and trial by jury, nor did it violate any principle requiring heightened reliability in capital cases.  " 'As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense.' " (*People v. Blacksher* (2011) 52 Cal.4th 769, 821, quoting *People v. Hall* (1986) 41 Cal.3d 826, 834.)  Citing no authority, defendant fails to convince us that the application of these evidentiary rules, designed to exclude unreliable evidence, prejudiced the ability to defend his case or affected his constitutional rights.

### 4. Restriction on the Cross-examination of John Massingale

Defendant contends the trial court violated his statutory and constitutional rights to confront John Massingale by improperly restricting defense counsel's cross-examination of him regarding a federal civil suit Massingale had filed against San Diego authorities, claiming he had been wrongfully arrested and held for the Jacobs murders. Defendant argues that Massingale had a strong financial interest in testifying against defendant, and the trial court's ruling unfairly precluded defense counsel from using this impeachment evidence. We agree that the court erred, but disagree concerning the effect of this error.

" '[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby, "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." ' [Citation.] However, not every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance. [Citations.] California law is in accord. [Citation.] Thus, unless the defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witnesses'] credibility' [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment." (*People v. Frye* (1998) 18 Cal.4th 894, 946, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390.)

The trial court prevented defense counsel from introducing evidence that Massingale had a significant financial interest in helping to convict defendant. At the time of his testimony, Massingale was prosecuting a civil suit against San

Diego authorities claiming approximately $3 million in damages stemming from the circumstances surrounding his earlier arrest and prosecution. The court noted that Massingale already had obtained a finding of factual innocence pursuant to section 851.8 regarding the Jacobs murders. That finding, the court reasoned, was determinative of the civil action because "[o]nce the court has made that determination that he is innocent, then he goes before a civil action [as an] innocent [person]." Therefore, the court concluded, the outcome of defendant's case would not affect Massingale's civil action, and any threat of bias stemming from the civil trial to Massingale's current testimony was nonexistent, because Massingale already had obtained the benefit that defendant purported that he was seeking to gain.

The trial court's ruling rests on the false assumption that Massingale's finding of factual innocence could be admitted into evidence in his civil trial. Section 851.8, subdivision (i)(1), states: "Any finding that an arrestee is factually innocent . . . shall not be admissible as evidence in any action." Contrary to the trial court's ruling, Massingale had not yet obtained the benefit he was purportedly seeking, and consequently, he may have retained a strong incentive to testify against defendant, because defendant's conviction would likely carry a great deal of weight with Massingale's civil jury.

We previously have noted that there may be no stronger witness bias than "a financial interest in the outcome of the litigation contingent upon its terminating favorably for the party for whom [the witness] testified." (*Staley v. State Bar* (1941) 17 Cal.2d 119, 143.) Because the trial court erred in concluding that his section 851.8 determination had preclusive effect in his civil action, Massingale's litigation of his civil suit was relevant to his alleged bias in that he had a financial interest in facilitating defendant's conviction.

139

Nevertheless, the trial court's erroneous ruling did not rise to the level of constitutional error. As previously stated, in order to prove that the error was in violation of the Sixth Amendment's confrontation clause, defendant must demonstrate that the prohibited cross-examination would have produced "a significantly different impression of [the witness's] credibility." (*Delaware v. Van Arsdall*, *supra*, 475 U.S. at p. 680.) The jurors here already knew that Massingale (1) had been arrested for the Jacobs murders, (2) had been held in custody for several years, and (3) had confessed in detail to the Jacobs homicides. The jurors witnessed a very detailed cross-examination and recross-examination of Massingale that spanned approximately 118 transcript pages. His claims of false and coerced confessions, which were central issues in his civil trial, were disputed in *this* trial by a number of defense witnesses, including the law enforcement officers who heard the confessions. Finally, and most importantly, jurors were fully aware that Massingale had a significant incentive, albeit not necessarily financial, to testify against defendant — an interest in avoiding prosecution and the death penalty. Given the jurors' knowledge that Massingale already was actively trying to avoid prosecution for two murders and a potential sentence of death, evidence of his financial interest in defendant's conviction would not have produced a "significantly different impression" of Massingale's credibility. Therefore, the trial court's erroneous ruling did not have the effect of violating defendant's rights under the Sixth Amendment. (*People v. Frye*, *supra*, 18 Cal.4th at p. 947.)

### 5. *Untimely Disclosure of Impeachment Evidence*

Defendant contends the prosecution failed to timely disclose impeachment evidence favorable to him in violation of the due process clause of both the state and federal Constitutions. The evidence at issue was: (1) a police report

140

describing an incident in which prosecution witness John Massingale struck his wife; and (2) four crime scene photographs shown to Massingale during his interrogation by Detectives Ayers and Green.  Although the evidence had impeachment value, we conclude that any erroneous untimely disclosure did not prejudice defendant.

### a)  The Police Report

During defendant's cross-examination of John Massingale at trial, Massingale admitted that he sometimes had a bad temper, but denied that he would ever hit a woman.  Approximately two days after his testimony, the prosecution provided the defense with a police report indicating that Massingale had struck his wife and another woman at a party in late December 1989.  Using this report, defense investigators located three witnesses concerning this incident, and defendant subsequently presented these witnesses during his case-in-chief.

Approximately five months after receiving the police report, defendant filed a motion alleging a discovery violation.  During the hearing on that motion, it was revealed that sometime during or immediately after Massingale's cross-examination, the prosecution first received the police report from a deputy city attorney who was handling aspects of Massingale's civil suit.  The prosecution stated that, upon receiving the report, it was immediately turned over to the defense.  The trial court found no misconduct on the part of the prosecution and no prejudice to defendant.

In *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  (*Id.* at p. 87.)  Moreover, "[t]he high court has since held that

141

the duty to disclose such evidence exists even though there has been no request by the accused [citation], that the duty encompasses impeachment evidence as well as exculpatory evidence [citation], and that the duty extends even to evidence known only to police investigators and not to the prosecutor [citation]." (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042.)

Thus, a true *Brady* violation occurs only when three conditions are met: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." (*Strickler v. Greene* (1999) 527 U.S. 263, 281-282.) Under this standard prejudice focuses on "the materiality of the evidence to the issue of guilt or innocence." (*United States v. Agurs, supra,* 427 U.S. at p. 112, fn. 20.) In the case of impeachment evidence, materiality requires more than a showing that "using the suppressed evidence to discredit a witness's testimony '*might* have changed the outcome of the trial.' [Citation.]" (*People v. Salazar*, *supra*, 35 Cal.4th at p. 1043, italics added.) Rather, the evidence will be held to be material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." (*United States v. Bagley* (1985) 473 U.S. 667, 682.)

With respect to the first prong in the *Brady* analysis, it is evident that the police report was favorable impeachment evidence for the accused.

The record, however, does not support the assertion that the police report was suppressed by the prosecution. It is true that the San Diego Police Department forms part of the "prosecution team," and therefore, the prosecution had constructive possession of the report. Even so, the prosecution's eventual disclosure upon gaining *actual* possession cured any *Brady* violation. "[E]vidence that is presented at trial is not considered suppressed, regardless of whether or not

142

it had previously been disclosed during discovery." (*People v. Morrison* (2004) 34 Cal.4th 698, 715.) Therefore, we find that the second prong of the *Brady* analysis is unsatisfied.

Defendant nevertheless argues the occurrence of a *Brady* violation because the late disclosure meant that defense counsel was unable to catch Massingale in a lie during his cross-examination. But defendant fails to explain how any delay in the disclosure of this police report resulted in prejudice. (See *People v. Carter*, *supra*, 36 Cal.4th at p. 1161; *People v. Cook* (2006) 39 Cal.4th 566, 590.) To the contrary, after having received the police report from the prosecution, defense counsel located and called three witnesses, including a police officer, to provide testimony regarding the evening on which Massingale struck two women. The trial court determined that the three witnesses "thoroughly impeached and discredited" Massingale's testimony. Defense counsel further retained the ability to recall or subpoena Massingale and impeach him directly with the report. That counsel failed to do so suggests a tactical assessment on the part of defense counsel that they had sufficiently impeached Massingale. We find that defendant was able to make effective use of the police report at trial, and therefore, there was no prejudice stemming from its allegedly untimely disclosure.

### b) The Four Photographs

Defendant contends that the prosecution failed to timely disclose the four photographs used by Detectives Ayers and Inspector Green during their initial interrogation of John Massingale. The photographs, which were first introduced during the prosecution's cross-examination of Detective Ayers, were unavailable for defendant's earlier cross-examination of Massingale. The record indicates that both the defense and the prosecution knew of the existence of the photographs throughout the course of the trial, though at the time of their introduction, only the

143

prosecution knew their exact location. Defendant argues that Massingale's cross-examination is the "only time" the evidence could have been used to attack his credibility, and the prosecution's failure to timely disclose the photographs violated his rights to due process. We disagree.

Defendant again fails to explain how any delay in the disclosure of these photographs resulted in prejudice. Defendant argues his intended use of the evidence was to review the photographs with Massingale during cross-examination in order to impeach his testimony that he confessed key details of the Jacobs murders only after seeing them in crime scene photos. Because defendant had the ability to re-call or subpoena Massingale after the introduction of the photographs, we fail to see how the stated purpose was frustrated, even minimally. At the time of disclosure, the evidence could still be put to effective use by the defense, and we find no *Brady* violation on the part of the prosecution.

Furthermore, even were we to find untimely disclosure or actual suppression of the photographs, we would nevertheless conclude that there was no *Brady* violation because the photographs were immaterial. (*United States v. Agurs*, *supra*, 427 U.S. at p. 112.) Presumably, defense counsel sought to use the photographs to impeach Massingale by demonstrating that he could not have obtained all the confessed details of the Jacobs murders by only viewing those four photographs. Massingale himself stated, however, that he was shown *numerous* crime scene photographs by Detective Pace when Detectives Ayers and Green had stepped out of the interrogation room. Therefore, the four photographs would not have impeached Massingale, and thus, we cannot find it reasonably probable that a more favorable outcome would have resulted from their introduction.

144

Because we find no prejudice arising from these alleged discovery violations, we further reject defendant's claim that the asserted errors were cumulatively prejudicial.

### 6. Exclusion of Expert Testimony Concerning Eyewitness Identification

Defendant contends the trial court abused its discretion by excluding the testimony of his proffered experts on eyewitness identification. Defendant argues that the exclusion of this evidence caused the jury to make false assumptions concerning the reliability and strength of Robertson's identification of defendant as her attacker. He claims the error violated his state and federal constitutional rights to present a defense, confrontation, due process, and his Eighth Amendment right to verdict reliability. The trial court did not abuse its discretion.

During pretrial proceedings, the trial court heard the testimony of proposed defense expert Dr. Robert Buckout. Dr. Buckout testified that stress and the presence of a weapon are factors that reduce the accuracy of an eyewitness's identification. He also explained that an eyewitness's confidence in the correctness of his or her identification does not necessarily correlate with the accuracy of that identification. The court excluded Dr. Buckout's testimony, concluding that *McDonald, supra*, 37 Cal.3d 351, requires the admission of expert testimony on eyewitness identification only if there is no other evidence that substantially corroborates the identification and gives it independent reliability. The court explained that Robertson's identification of defendant was corroborated by the other charged crimes and her testimony describing defendant's home and his vehicle.

At trial, the defense again raised the issue and proffered another defense witness, Dr. Elizabeth Loftus, to testify about the reliability of eyewitness identification. After a brief hearing without the jury present, Dr. Loftus gave

145

testimony similar to what Dr. Buckout presented in the pretrial hearings. After screening this testimony, the court concluded that Dr. Loftus's testimony was inadmissible because factors affecting eyewitness identification were a matter of common knowledge; Dr. Loftus had no reliable basis for her opinions, which were based on simulations and not actual crime victims; and the testimony raised the prospect of a "battle of experts" — a battle that the jury would be ill equipped to assess.

In *McDonald*, we described the circumstances in which expert testimony may be useful concerning the reliability of eyewitness identification. We stated that "the decision to admit or exclude expert testimony on psychological factors affecting eyewitness identification remains primarily a matter within the trial court's discretion; . . . 'we do not intend to "open the gates" to a flood of expert evidence on the subject.' [Citation.] We expect that such evidence will not often be needed, and in the usual case the appellate court will continue to defer to the trial court's discretion in this matter. Yet deference is not abdication. When an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability, . . . it will ordinarily be error to exclude that testimony." (*McDonald*, *supra*, 37 Cal.3d at p. 377, fn. omitted.) More recently, we stated that the exclusion of expert testimony on eyewitness identification "is justified only if there is other evidence that substantially corroborates the eyewitness identification and gives it independent reliability." (*People v. Jones* (2003) 30 Cal.4th 1084, 1112.)

The trial court did not abuse its discretion in excluding the proposed expert testimony. As the court noted, Robertson's identification of defendant's house and the make and model of his car independently corroborated her identification of defendant. As we explained above (see *ante*, p. 94), her description and sketch of

146

the interior and exterior of defendant's house were especially compelling. Under these circumstances, the corroborative effect of this evidence was sufficient to give independent reliability to her identification of defendant in the photo lineup and later in court. No expert testimony on the subject of eyewitness identification was required.

### 7. Issues Concerning Robertson's Memory

Defendant claims the trial court erred by refusing to allow his defense experts to testify about the reliability of Robertson's memory. He also argues that the defense was improperly precluded from explaining why its expert had not tested or evaluated Robertson. He contends these errors violated his state and federal rights to present a defense, due process, compulsory process, confrontation, effective representation of counsel, and his Eighth Amendment right to verdict reliability. We disagree.

In pretrial hearings, the trial court denied defendant's motion to subject Robertson to psychological testing.[45] Later at trial, Dr. Wendy Freed, a psychiatrist who treated Robertson, testified that she believed Robertson's memory was intact until the point she was choked to unconsciousness. Defendant

---

[45] Defendant also claims that the trial court erred in refusing to subject Robertson to defense neuropsychological testing, under *Ballard v. Superior Court* (1966) 64 Cal.2d 159 (*Ballard*), to determine her competency to testify. But even assuming Robertson would have consented to such testing and the court was mistaken about this circumstance, defendant had no right to subject the victim to such an examination. In 1980, the Legislature enacted section 1112, which overruled *Ballard* and abolished any discretion a trial court had to order a sex crime victim to submit to defense psychological testing. (*People v. Haskett* (1982) 30 Cal.3d 841.) Moreover, whether or not the subject was the victim of a sex crime, "[t]he use of psychiatric testimony to impeach a witness is generally disfavored." (*People v. Marshall* (1996) 13 Cal.4th 799, 835.)

objected, and the court agreed and struck that testimony. Later, in a conference with only the parties present, the court expressed concern about getting into a "battle of experts" concerning Robertson's memory. The court asked the parties whether they intended to present witnesses concerning Robertson's memory and stated that either "[b]oth sides do it or neither side does it." Defense counsel informed the court that they planned to call an expert on posttraumatic stress disorder to educate the jurors about that condition and its effect on memory. Defense counsel made clear that, because the court had denied the defense motion to subject Robertson to psychological testing, he believed the expert had no basis to give an opinion about whether Robertson suffered from memory problems. The defense expert, Dr. Sheldon Zigelbaum, then testified in front of the jury concerning the effects of posttraumatic stress disorder on memory.

Ultimately, defendant offered no testimony regarding whether Robertson's memory was reliable or why the defense expert did not examine her, and the trial court made no specific ruling precluding defendant from presenting such evidence. Indeed, the court made clear that such evidence could be offered if "[b]oth sides do it." More important, defense counsel explained on the record their reasons for not having their expert speculate about whether Robertson did in fact have memory problems. Instead of having the expert engage in speculation, defense counsel chose instead to have the expert testify about the effects of a medical condition that Robertson indisputably suffered — posttraumatic stress disorder. On appeal, we do not second-guess trial counsel's reasonable tactical decisions. (*People v. Riel, supra,* 22 Cal.4th at p. 1185.)

### 8. *Evidence Concerning the Composition of the Photo Lineup*

Defendant contends the trial court committed prejudicial error by excluding evidence that other less suggestive photographs of defendant were available for

148

use in the photo lineup.  He also argues that the court erred by precluding questioning of Robertson about whether the other photographs in the photo lineup matched her description of her attacker.  Defendant asserts that the court's decision to exclude this evidence as irrelevant under Evidence Code section 352 precluded him from showing that the detectives intentionally created a suggestive lineup and that Robertson's identification of defendant was unreliable.  He claims these rulings violated defendant's state and federal constitutional rights to present a defense, due process, confrontation and compulsory process, and his Eighth Amendment right to a reliable verdict.  The trial court did not err in either ruling.

During trial, defendant sought to introduce photographs of him taken by one of the sheriff's deputies who arrested him.  He argued that these photographs were relevant to show that the photograph ultimately used in Robertson's photo lineup was suggestive by comparison.  Defendant also argued that these other photographs were relevant to show that the photo lineup was designed to be suggestive.[46]  The trial court excluded the evidence on the grounds of irrelevance under Evidence Code section 352.  The court emphasized that the relevant issue before the jury was whether the photographs actually used in the lineup were suggestive and if so how that impacted the credibility of Robertson's identification of defendant.  In excluding the proposed evidence, the court refused to allow the defense to put Detective Fullmer "on trial separately when it [didn't] affect that lineup as far as [Robertson] is concerned."  The court explained that whether the detectives could have used better or less suggestive photos had no bearing on the

---

[46]    The Attorney General argues that defendant did not raise this particular issue before the trial court and, therefore, forfeited this claim on appeal.  But because it appears from the record that defendant articulated this theory, we conclude that he did not forfeit this issue on appeal.

149

suggestiveness of the photos used in the final photo lineup.  It concluded that the lineup's suggestiveness could be evaluated objectively by the jury, independent of considerations about the availability of other photos or the detectives' motivations.

" 'Although completely excluding evidence of an accused's defense theoretically could rise to [the level of a constitutional violation], excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense.' " (*People v. Boyette*, *supra*, 29 Cal.4th at p. 428.)  The trial court correctly applied this precept concerning the availability of other photos of defendant.

Concerning Robertson's opinion about the other persons in the photo lineup, the trial court sustained the prosecution's objection when the defense attempted to ask Robertson whether one of the other persons in the lineup resembled the description she had given to law enforcement after her attack.  The court explained that the answer was irrelevant because the jurors could themselves compare Robertson's previous descriptions with any particular photo in the lineup. Yet, the court further explained, defendant could ask Robertson why she had excluded the other photos and why she picked defendant's photo.

Given that the trial court fully allowed defendant to ask Robertson why she had excluded five other photos and selected defendant's photo, the court's limitation of cross-examination was " 'on a minor or subsidiary point' " and did not impair defendant's rights. (*People v. Boyette*, *supra*, 29 Cal.4th at p. 428.)

### 9.  Evidence of Third Party Culpability in the Swanke Case

Defendant contends the trial court prejudicially erred and violated his state and federal constitutional rights to due process and to present a defense by excluding evidence of third party culpability in the killing of Anne Swanke.  This contention fails.

150

During trial, defense counsel sought to ask Swanke's father about an ex-boyfriend and crank phone calls Anne Swanke had been receiving before her disappearance.  The defense made an offer of proof concerning the ex-boyfriend.  According to the defense, the former boyfriend had made repeated attempts to contact Swanke, and that made her afraid of him.  In the morning after her disappearance, the ex-boyfriend visited the Swanke household wearing dark sunglasses, and he appeared nervous and fidgety.  The ex-boyfriend returned to the household later that evening, and his demeanor was unusual as he refused to look anyone in the eye.  In addition, before her disappearance, Anne Swanke had complained of receiving phone calls from unknown females in which caller would laugh and then hang up.  The trial court ruled that the evidence did not make the former boyfriend a third party suspect and was, therefore, irrelevant, misleading and confusing.

The trial court was correct.  In *People v. Hall, supra,* 41 Cal.3d 826, 833, we explained the applicable standard to determine the admissibility of third party culpability evidence:  "To be admissible, the third-party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt.  At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability.  As this court observed in [*People v.*] *Mendez* [(1924) 193 Cal. 39, 51], evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt:  there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime."

Here, the connection between the former boyfriend and the victim's abduction and killing was speculative with no evidence, either direct or circumstantial, in support.  Anne Swanke's alleged fear of her ex-boyfriend and

151

his attempts to contact her were based on her statements, which are hearsay. Even assuming the offer of proof suggested that the former boyfriend had a motive to hurt Swanke, there was nothing about his conduct that tended to raise a reasonable doubt about defendant's guilt and nothing that connected the former boyfriend to her disappearance. Defendant's offer of proof also failed to connect the harassing phone calls to any conduct by the ex-boyfriend. Under these circumstances, the trial court properly excluded the proffered evidence under Evidence Code section 352.

## B. Jury Instructions — Asserted Errors[47]

### 1. Preliminary Instructions

Defendant contends the trial court erred and violated his state and federal constitutional rights to due process and a fair trial because the preliminary jury instructions at the start of trial allegedly did not properly describe the jury's duty, and failed to include instruction on the presumption of innocence and the prosecution's burden of proof. He asserts that these alleged errors influenced the jury in favor of the prosecution. We disagree.

Defendant claims the trial court misstated the jury's duty in ascertaining the facts of the case by preinstructing the jury that: "you will, in essence, be judges because you will be the judges of the facts and I will be the judge of the law. And

---

[47] Defendant raises numerous claims of instructional error for both the guilt and penalty phases. For many of these claims, defendant argues certain instructions required further amplification or clarification. If defendant did not seek such amplification or clarification at trial, we conclude that the claim is forfeited. (*People v. Moon, supra,* 37 Cal.4th 1, 29 [the "failure to seek 'amplification or explanation' of the instruction precludes relief on appeal"].) For those claims of instructional error that challenge a given instruction more generally or as a whole, we review his claim of error "to the extent his substantial rights were affected." (*People v. Rundle* (2008) 43 Cal.4th 76, 151, citing § 1259.)

at the conclusion of this case I will instruct you as to the law that is to be applied in this case." Defendant claims that this instruction misstated the jurors' duty by encouraging them to ascertain which version of the facts comports with the truth, instead of determining whether the prosecution had proved defendant's guilt beyond a reasonable doubt. He also argues that the jury pamphlet given to prospective jurors further mischaracterized the jury's duty by stating that its function was to "find, from the evidence and stipulations, what actually happened."

But nothing in the complained-of instruction nor in the juror pamphlet misleadingly described the role of the jury. To the contrary, "where the trial is by jury: [¶] (a) All questions of fact are to be decided by the jury. [¶] (b) Subject to the control of the court, the jury is to determine the effect and value of the evidence addressed to it, including the credibility of witnesses and hearsay declarants." (Evid. Code, § 312.) The trial court's preliminary instruction concerning the jury's duty was proper.

Regarding his claims concerning the trial court's asserted failure to preinstruct the jury on the presumption of innocence and the prosecution's burden of proof, defendant points to no binding authority requiring such preinstruction at the beginning of trial. By statute, a trial court must give the jury certain preinstructions involving "its basic functions, duties, and conduct," and "[t]he instructions shall include, among other matters," admonitions that the jurors shall not discuss the case, conduct their own research, read media reports about the case, investigate the locations involved, or receive any payment in exchange for information regarding the trial. (§ 1122, subd. (a).) Nothing in this statute specifically requires preinstruction concerning the presumption of innocence or the prosecution's burden of proof. Furthermore, the statute that governs the order of trial proceedings, section 1093, allows the trial court to instruct the jury about

153

the applicable law after the conclusion of the evidence and closing arguments, but it also allows the court to give such instructions "[a]t the beginning of the trial or from time to time during the trial." (§ 1093, subd. (f).) Nothing in section 1093 requires the jury to be preinstructed regarding the presumption of innocence or the prosecution's burden of proof. (See *People v. Smith* (2008) 168 Cal.App.4th 7, 15-16.)

Therefore, there was no error in the court's preinstructions to the jury.

In any event, claims of instructional error are examined based on a review of the instructions as a whole in light of the entire record. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72; *People v. Castillo* (1997) 16 Cal.4th 1009, 1016.) Throughout the jury selection process, the trial court informed the venire about the presumption of innocence and the state's burden of proving defendant's guilt beyond a reasonable doubt. Moreover, during voir dire the parties actively questioned prospective jurors about their ability to be guided by both. Under these circumstances, the jury had already been well aware of the presumption of innocence and the prosecution's burden of proof at the start of trial.

### 2. *Cross-admissibility Instructions*

Defendant claims the trial court erred by refusing his request to clarify the instructions concerning other crimes evidence and that the alleged error allowed the jury to use the evidence of other crimes without first making a threshold finding concerning whether defendant had committed those other crimes. He also argues that the jury should have been instructed to find that defendant committed the other crimes beyond a reasonable doubt before it was allowed to utilize evidence of those other crimes. He contends the asserted errors violated his rights to a fair trial, due process, and to a reliable determination of penalty under the federal Constitution. We disagree.

154

We have recognized that "evidence of uncharged crimes is admissible to prove, among other things, the identity of the perpetrator of the charged crimes, the existence of a common design or plan, or the intent with which the perpetrator acted in the commission of the charged crimes." (*People v. Kipp* (1998) 18 Cal.4th 349, 369.) "Evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational *inference* of identity, common design or plan, or intent." (*Ibid*., italics added.)

In the present case, the trial court instructed the jury with a modified version of CALJIC No. 2.50.[48] By this instruction, the court advised the jury that

---

[48]   The full instruction read as follows:

"Evidence has been introduced in this case of more than one count of homicide. As you have been instructed, each count charged must be decided separately. However, you may, if you so choose, use evidence from other counts together with any count under consideration for certain limited purposes.

"Other counts evidence may be used by you, if you so choose, for the purpose of determining whether such evidence tends to show the identity of the person committing the crime charged in the count under consideration. You may also consider whether such evidence tends to negate the inference of identity of the person committing the crime charged.

"You may consider whether or not the evidence as to other counts tends to show a characteristic method, plan, or scheme in the commission of criminal acts similar to any method, plan, or scheme used in the commission of the offense in the count then under consideration. Whether or not the evidence shows such a characteristic method, plan, or scheme is a matter solely for your determination.

"If you should find a characteristic method, plan, or scheme, you may also consider whether or not such clear connection exists between the one offense under consideration and the other offense or offenses of which the defendant is accused, that it may be logically concluded that if the defendant committed the other offense or offenses, he also committed the crime under consideration.

"You may also consider other counts evidence together with the count under consideration to determine whether there existed in the mind of the perpetrator an

*(Footnote continued on next page.)*

155

it must decide each count of homicide separately, but that it may consider the other counts for the limited purposes of inferring whether: (1) "such evidence tends to show the identity of the person committing the crime charged in the count under consideration"; (2) such evidence shows "a characteristic method, plan, or scheme in the commission of criminal acts similar to any method, plan, or scheme used in the commission of the offense in the count then under consideration"; (3) "there existed in the mind of the perpetrator an intent which is a necessary element of the count under consideration or whether such intent may have been absent in some or all of the offenses charged"; and (4) "whether there existed any common motive for the crime or crimes charged or whether the evidence established different motives."

---

*(Footnote continued from previous page.)*

intent which is a necessary element of the count under consideration or whether such intent may have been absent in some or all of the offenses charged.

"You may also consider other counts evidence together under the count under consideration to determine whether there existed any common motive for the crime or crimes charged or whether the evidence established different motives.

"Other counts evidence is a form of circumstantial evidence. Therefore, you must weigh such evidence in the same manner and subject to the same rules as I previously provided to you regarding circumstantial evidence. You must decide the weight, if any, to which other crimes evidence is entitled.

"It is a matter solely for your determination as to whether or not any common scheme, plan, or method applies to some, all, or none of the counts. You may find that the other crimes evidence may apply to some of the offenses, but not to others.

"You are cautioned that evidence of other counts cannot be used to prove that the defendant is a person of bad character or that he has a disposition to commit crimes."

Most important, the court further explained that "[o]ther counts evidence is a form of circumstantial evidence" and that the jury "must weigh such evidence in the same manner and subject to the same rules as I previously provided to you regarding circumstantial evidence." The court's earlier instruction on circumstantial evidence explained that "each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt" and that "before an *inference* essential to establish guilt may be found to have been proven beyond a reasonable doubt, *each fact or circumstance upon which such inference* necessarily rests must be proved beyond a reasonable doubt." (Italics added.) The court also gave the standard instruction defining reasonable doubt.

Taking these instructions together, the jury was directed that any inferences generated by the circumstantial evidence of other crimes should be treated the same as circumstantial evidence concerning the count under consideration. Those inferences could be drawn in support of a finding of guilt only if the jury made the threshold finding that the facts or circumstances of the other crimes had been proved beyond a reasonable doubt. Indeed, this was the express understanding of the trial court in discussing the instructions with the parties.

Consequently, defendant's claims fail because the instructions did require the jury to determine whether the facts or circumstances of the other crimes had been proved beyond a reasonable doubt before it could use that evidence to convict defendant.

### 3. Instructing the Jury to Make Various Preliminary Findings

Defendant alleges the trial court erred by refusing various instructions that would have essentially directed the jury to make preliminary findings on various evidentiary issues. We disagree.

157

Defendant complains that the trial court improperly refused his requested instruction directing the jury to disregard expert opinion that was based on speculative or conjectural data.  He also complains that the court improperly refused his proffered instruction requiring the jury, before considering opinion testimony based on a "comparative identification technique," to find "that the items compared are reasonably comparable."  A court may refuse a proposed instruction if it is duplicative of other instructions.  (*People v. Sanders* (1995) 11 Cal.4th 475, 560.)  Here, the court instructed the jury with a modified version of CALJIC No. 2.80, which advised the jury that it is "not bound to accept an expert opinion as conclusive, but should give to it the weight to which you find it to be entitled" and that it "may disregard any such opinion, if you find it to be unreasonable."  The court also instructed the jury with a modified version of CALJIC No. 2.83, which cautioned the jury to "consider the qualifications and believability of the expert witnesses, as well as the reasons for each opinion and the facts and other matters upon which it is based."  Finally, the court further instructed the jury that opinion must be rationally based on perception.  Together, these instructions sufficiently conveyed the concepts of defendant's proposed instructions.

Defendant claims the trial court erroneously rejected his requested instruction that would have allowed the jury to reject physical evidence, and any expert opinion associated with it, if the proponent of the physical evidence failed to establish that "it is reasonably certain that there was no break in the chain of custody, alteration or tampering."  Chain of custody is indeed a necessary showing for physical evidence to be admitted.  But the trial court decides the admissibility of physical evidence based on challenges to the chain of custody, and, once admitted, any minor defects in the chain of custody go to its weight.  (*People v.*

158

*Diaz* (1992) 3 Cal.4th 495, 559.)  Thus, there was no error in refusing the instruction.

Defendant finally claims the trial court improperly refused his proffered instruction advising the jury to reject any opinion testimony based on electrophoretic testing if no photograph depicted the diagnostic bands or if the photograph was inadequate to observe separate and distinct banding patterns.  But, as explained, *ante*, at page 101, the failure to photograph the results of the electrophoretic testing did not render the expert's opinion of the results inadmissible and any difficulty in interpreting photographed electrophoretic testing went to its weight not to its admissibility.  (*People v. Cooper*, *supra*, 53 Cal.3d at pp. 812-813.)

### 4.  Third Party Culpability Instructions

Defendant alleges that the trial court erred in its jury instructions concerning evidence of third party culpability.  He claims the errors deprived him of his state law right to present a defense and his federal constitutional rights to due process, trial by jury, confrontation, compulsory process, representation of counsel, and the reliability of his death verdict under the Eighth Amendment. There was no error.

Defendant first argues that the trial court erred by refusing his modified version of CALJIC No. 2.03, which would have instructed the jury that Massingale's false and misleading statements could be used as evidence of his consciousness of guilt.[49]  The court properly refused this instruction because it

---

[49]    Part of the proposed instruction read as follows:

"If you find that a suspect of a crime made a willfully false or deliberately misleading statement concerning the crime or crimes for which he was suspected, for the purpose of misleading or warding off suspicion, you may consider such

*(Footnote continued on next page.)*

directed the jury to decide a third party's guilt when, instead, the jury's duty was to decide whether defendant's guilt had been proved beyond a reasonable doubt. The jury did not need to ascertain Massingale's guilt in the Jacobs homicides, but needed only to ascertain whether evidence of Massingale's involvement in the homicides generated reasonable doubt as to *defendant's* guilt — a point on which the jury was instructed just as the defense requested. Thus, the proposed version of CALJIC No. 2.03 was not relevant to the jury's determination of defendant's guilt.

Defendant's second complaint is aimed at the very instruction he requested — that evidence of a third party's involvement in each of the killings could generate a reasonable doubt regarding defendant's guilt for each homicide. He complains that the trial court's instruction on this same point improperly assigned the burden to the defendant to prove that a third party's possible involvement in the homicides raised a reasonable doubt concerning defendant's guilt.

Defense counsel submitted a proposed instruction on this issue, which read: "Evidence has been produced in this trial for the purpose of showing that a person other than the defendant committed the crime(s) charged. [¶] The burden is on the prosecution to prove beyond a reasonable doubt that it was the defendant and not another person who committed the charged offenses. [¶] If, after a consideration of all of the circumstances of the case you have a reasonable

---

*(Footnote continued from previous page.)*

statement as a circumstance tending to prove a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, but may strengthen inferences of guilt arising from other facts."

The remainder of the proposed instruction emphasized that the weight of such false and misleading statements was for the jurors to decide and that such evidence was a form of circumstantial evidence.

doubt whether the defendant or some other person committed the crime(s) charged, you must give the defendant the benefit of that doubt and find him not guilty."

Over the defense's clear objection, the trial court stated that it would not give the second sentence of the proposed instruction. The parties and the court then debated the precise language of the remaining portions of the proposed instruction. The court ultimately crafted the following instruction, which was partially patterned on the standard alibi instruction also given in this case, CALJIC 4.50:

"The defendant has presented evidence in this trial for the purpose of showing that a person or persons other than the defendant may have committed a crime or crime charged. [¶] If, after a consideration of the entire case, such third party evidence alone or together with other evidence raises a reasonable doubt whether the defendant committed a crime or crimes charged, you must give the defendant the benefit of that doubt and find him not guilty."

Defendant claims the wording of this instruction imposed a burden on the defense to raise a reasonable doubt regarding his guilt based on third party evidence because the instruction stated that the defense presented such evidence "for the purpose of showing" someone else committed the crime and that defendant was entitled to the benefit of any reasonable doubt "raise[d]" by such evidence. Defendant contends this language improperly imposed a burden of proof on him.

But defendant did not object to this language. He suggested the "for the purpose of showing" language and did not object when the court added the word "raises." Defendant argues that the trial court's reaction to the second sentence of his proposed instruction showed that any further objection or proposed modifications would have been futile. (*People v. Hill* (1998) 17 Cal.4th 800, 820.)

161

However, the court entertained and granted the defense's subsequent request to modify the proposed instruction by replacing "evidence being produced" with "evidence being presented" to achieve clarity and neutrality, according to defense counsel. Consequently, it does not appear that the court would have greeted any further defense objections with hostility. In any event, the failure of the defense to object to asserted instructional error does not preclude appellate review of that error if the substantial rights of the defendant are affected. (§ 1259; *People v. Slaughter* (2002) 27 Cal.4th 1187, 1199.)

On its merits, the claim fails. "In reviewing the purportedly erroneous instructions, 'we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " (*People v. Frye*, *supra*, 18 Cal.4th 894, 957, quoting *Estelle v. McGuire*, *supra*, 502 U.S. at p. 72.) A single instruction is not viewed in isolation, and the ultimate decision on whether a specific jury instruction is correct and adequate is determined by consideration of the entire instructions given to the jury. (*People* v. *Holt*, *supra*, 15 Cal.4th at p. 677.)

There is no reasonable likelihood the jury misapplied the instruction as it relates to the state's burden of proof. Nothing in this instruction specifically assigned an evidentiary burden to defendant, but, instead, asked the jury to neutrally consider "the entire case" and "together with other evidence." More importantly, nothing in this instruction conflicted with the standard instruction given to this jury informing it that prosecution had "the burden of proving [defendant] guilty beyond a reasonable doubt." The jury received a similar instruction concerning the state's burden in proving the truth of the special circumstance. Additionally, yet another instruction made clear that "the burden is on the People to prove beyond a reasonable doubt that the *defendant is the person who committed the crimes* which he is charged." (Italics added.) The jury was

162

also instructed to "consider the instructions as a whole and each in light of all the others" and not to "single out any particular sentence or any individual point or instruction and ignore the others." Under these circumstances, the complained-of instruction could not have misled the jury in the manner defendant contends.

Finally, defendant argues that the trial court erred by refusing to include the second sentence of defendant's proffered instruction about third party culpability: "The burden is on the prosecution to prove beyond a reasonable doubt that it was the defendant and not another person who committed the charged offenses." Defendant claims that the offered language more clearly defined the prosecution's burden of proof concerning third party culpability. But again, the court instructed the jury on defendant's presumed innocence, the prosecution's burden of proving him guilty beyond a reasonable doubt, and that third party culpability evidence can generate reasonable doubt. In rejecting a similar claim that instructions failed to clearly assign the burden of proof as to third party culpability, we have stated that further instruction would be "repetitious of instructions already given." (*People v. Wright* (1988) 45 Cal.3d 1126, 1134.) In this same capacity, we have also stated: "It is hardly a difficult concept for the jury to grasp that acquittal is required if there is reasonable doubt as to whether someone else committed the charged crimes." (*People v. Hartsch* (2010) 49 Cal.4th 472, 504.)

Had the jury entertained a reasonable doubt that someone else committed any homicide it would have acquitted defendant, and, in fact, it did do so in the Garcia murder. Consequently "no special instruction on third party culpability was necessary to apprise the jury of the pertinent legal principles and, contrary to defendant's argument, the instructions given do not suggest he had the burden to prove [a third party] was guilty before he could reap the benefit of the jury's doubt about his own guilt." (*People v. Abilez* (2007) 41 Cal.4th 472, 517.)

163

### 5.  *Miscellaneous Claims of Instructional Error*

It is not error for the prosecution to refer itself as " 'the People' " or to try defendant in the name of " 'the People.' "  (*People v. Thomas* (2012) 53 Cal.4th 771, 816.)

Defendant contends the trial court erred and violated his constitutional rights by failing, on its own motion, to instruct the jury to view the testimony of Massingale with distrust because he was assertedly an accomplice to the Jacobs murders.  But defendant fails to point to any evidence in the record showing that Massingale knew defendant or was his accomplice in the Jacobs murders.  Because there was no known "relationship between the defendant and [Massingale], either by virtue of a conspiracy or by acts aiding and abetting the crime," the standard instruction regarding witness credibility was sufficient for the jury to evaluate Massingale's testimony.  (*People v. Ward* (2005) 36 Cal.4th 186, 212.)

Defendant claims the trial court violated his state and federal constitutional rights by refusing to give his requested instruction advising the jury that a witness's "immunity agreement may constitute a motive for bias" and "may be considered in assessing the witness's believability."  He argues the instruction was necessary for the jury to evaluate the testimony of Frank Clark, who testified for the prosecution under a grant of immunity related to narcotics possession and use.  But the court instructed the jury with CALJIC No. 2.20, which explained that, in determining the believability of a witness, jurors could "consider anything that has a tendency reasonably to prove or disprove the truthfulness of the testimony of the witness," including "[t]he existence or nonexistence of a bias, interest, or other motive."  (CALJIC No. 2.20.)  The jury was aware of Clark's immunity agreement, and nothing in the language of CALJIC No. 2.20 precluded the jury's consideration of Clark's immunity as a type of "bias, interest, or other motive" in

164

judging his credibility. Even assuming the court erred by not giving the requested instruction or by modifying CALJIC No. 2.20 to list a grant of immunity as a factor in judging a witness's credibility (see *People v. Harvey* (1984) 163 Cal.App.3d 90, 112), a more favorable result was not reasonably probable. (*Watson*, *supra*, 46 Cal.2d at p. 836; *People v. Carpenter*, *supra*, 15 Cal.4th at p. 393 ["Mere instructional error under state law regarding how the jury should consider evidence does not violate the United States Constitution"].) In closing statements, defense counsel argued that Clark's credibility should be doubted because of his immunity agreement. In light of the instructions given and closing arguments, any error had no effect.

Defendant complains that it was error for the trial court to allow certain witnesses to be referred to as "experts," because it improperly gave expert witnesses undue importance and weight before the jury. But defendant has forfeited this claim by failing to raise it before the trial court, and, in any event, the court defined who qualified as an expert using CALJIC No. 2.80 and also accepted defendant's proffered instruction that allowed the jury to consider an expert's opinion as no more persuasive than a lay opinion. That defense-requested instruction told the jury that "if you conclude that a witness testifying as an expert is not in fact an expert, his testimony in the form of an opinion is limited to lay opinion that is (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony." In addition to the other instructions cautioning the jury not to accept an expert's opinions as conclusive and to disregard such opinion if not believable or reasonable (see *ante*, at p. 158), there was no danger that the jury would improperly assign greater weight or credibility

to a witness merely if he or she was referred to as an "expert witness" during the proceedings.[50]

Defendant claims the trial court erred by refusing his instruction that would have expanded the definition of "inference" found in CALJIC No. 2.00, which explains that "[a]n inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts established by the evidence."  His requested instruction would have further added that an inference "must be based on a rational connection between the fact proved and the fact to be inferred," that, to make such a rational connection, "there must be a finding with substantial assurance that the fact proved gives rise to the fact to be inferred," and that an inference "cannot be based on suspicion, imagination, speculation, conjecture or guess work" and, if it is, it "must be disregarded."  Defendant cites no authority for why the standard definition of "inference" in CALJIC No. 2.00, which itself is derived from Evidence Code section 600, is insufficient or why his proposed expanded definition was necessary to preserve his rights to due process and a fair trial.

Defendant complains that the trial court gave numerous jury instructions that used the permissive terms "should consider" or "may consider," and he alleges this terminology erroneously permitted the jury not to consider crucial portions of the evidence.  Defendant has forfeited this claim because he failed to request the court to modify the instructions except as to the 1988 version of CALJIC No. 2.83.  The court denied defendant's request to modify CALJIC No. 2.83 to state that in weighing the opinion of one expert against that of another

---

[50]    Because similar instructions were given at the penalty phase, we also reject defendant's forfeited claim that the term "expert" should not have been used at the penalty phase.

166

"you ~~should~~ *must* consider the relative qualifications and credibility of the expert witnesses, as well as the reasons for each opinion and the facts and other matters upon which it is based." But even assuming that "should" is a more permissive term than the word "must," the purpose of CALJIC No. 2.83 is to inform the jury how to resolve conflicting expert opinions and it strongly *suggests* using their respective qualifications, credibility, reasoning, and facts emphasized by witnesses to assess any divergent opinions. The instruction does not inform the jury as to what evidence it *may not* consider in resolving conflicting opinions. Defendant does not explain why or how, in light of this instruction, the jury would disregard the qualifications, credibility, reasoning, and facts emphasized by conflicting experts in assessing their opinions. Nor does defendant explain why these factors "must" be the only ones to be used to assess such conflicts. As to defendant's other forfeited claims concerning permissive language used in various standard instructions,[51] those contentions lack merit for the same reasons.[52] All of these

---

[51] Defendant cites no applicable authority addressing why the use of permissive language in these various instructions constituted error and the instructions appear otherwise to be correct. Therefore, his failure to object to alleged instructional error or to request clarification of the instructions generally forfeits the issue on appeal. (*People v. Catlin* (2001) 26 Cal.4th 81, 149.) Defendant also fails to show that any request to modify the instructions would have been futile, given that the trial court accepted many of his proposed instructions.

[52] Defendant complains that the standard instructions improperly used "should" or "may" to permissively allow the jury to consider factors impacting eyewitness testimony; cognitive impairment regarding a witness's prior statements; prior inconsistent statements as evidence of credibility and the truth; evidence of honesty, truthfulness, and prior convictions in assessing a witness's credibility; the reasons, qualifications, and credibility of an expert for assessing his or her opinion; the credibility, perception, and reasons of lay opinion witnesses in offering their opinions; and factors of similarity or dissimilarity of other offenses in determining a common method, plan, or scheme; and evidence of motive.

instructions list the factors the jury may consider, but they do not direct the jury to reject certain evidence or to limit the factors to those enumerated in the instructions. It is pure speculation to believe the jury ignored certain evidence simply because an instruction advised the jury that it "should" or "may" consider that evidence, instead of commanding the jury to consider that evidence.

Defendant argues that, because expert and lay opinion testimony are a form of circumstantial evidence, the trial court erred by refusing his requested instruction to inform the jury that expert testimony and lay opinion were a form of circumstantial evidence. But the court instructed the jury on circumstantial evidence, which it defined as "evidence that, if found to be true, proves a fact from which an inference of the existence of another fact may be drawn." Because some of the expert testimony and much of the lay opinion testimony in this case fit this description, this instruction was sufficient. Defendant fails to cite any case requiring an instruction expressly stating that expert opinion and lay opinion are a form of circumstantial evidence.

Defendant contends the trial court erroneously denied his motion to delete the titles from the written jury instructions given to it during its deliberations, but we have previously rejected such an argument. (*People v. Bloyd* (1987) 43 Cal.3d 333, 355-356.)

Defendant argues that the trial court improperly coerced the jury to reach a unanimous verdict by instructing it with a version of CALJIC No. 1.00, which states that the parties "have a right to expect that you will conscientiously consider and weigh the evidence, apply the law, and reach a just verdict regardless of the consequences." Defendant claims this instruction forced the jury to believe that it must reach a verdict because the parties and the court expected it to do so. But as defendant points out, another standard instruction, CALJIC No. 17.40, told the jurors that "the People and the defendant are entitled to the individual opinion of

168

each juror," that "[e]ach of you must consider the evidence for the purpose of reaching a verdict, *if you can do so*," and that "each of you must decide the case for yourself . . . ." (Italics added.) That same instruction also informed the jurors not to "decide any question any particular way because a majority of the jurors or any of them favor such a decision." Considering the instructions as a whole (*Estelle v. McGuire*, *supra*, 502 U.S. at p. 72; *People v. Castillo*, *supra*, 16 Cal.4th at p. 1016), the jury could not have been improperly coerced in the manner defendant contends. Moreover, the circumstances of the jury's having hung on defendant's guilt concerning the killings of Rhonda Strang and Amber Fisher belie defendant's claim of coercion.

### 6. *Other Asserted Deficiencies in the Jury Instructions*

Defendant identifies a number of alleged instructional error claims, primarily concerning witness credibility instructions, and further argues that the cumulative effect of these asserted errors requires reversal of his judgment. We reject all of these claims.

Defendant first argues that those instructions suggesting that the jury must decide between the defendant's "guilt" or "innocence" lessened the prosecution's burden of proof by implying that the issue was one of guilt or innocence instead of guilt beyond a reasonable doubt. We have previously rejected identical arguments. (*People v. Crew* (2003) 31 Cal.4th 822, 847-848.)

Defendant also complains that the trial court failed to define, on its own motion, the word "material," as used in CALJIC No. 2.21.2, which allows the jury to reject a witness's entire testimony if the witness was willfully false on a "material part" or a "material point" during his or her testimony. But commonly used words that have no technical meaning peculiar to the law impose no obligation on the court to provide definition in the absence of a request. (*People v.*

169

*Rowland* (1992) 4 Cal.4th 238, 270-271.)  Because the word "material," as used in CALJIC No. 2.21.2, is within its ordinary meaning of " 'substantial, essential, relevant or pertinent,' " the court did not err by failing to define it.  (*People v. Wade* (1995) 39 Cal.App.4th 1487, 1496.)

Also in connection with CALJIC No. 2.21.2, defendant contends the instruction diluted the reasonable doubt standard because it allowed jurors to accept the testimony of witnesses, including prosecution witnesses, after finding a mere "probability of truth."  The court instructed the jury that it may reject a witness's entire testimony if he or she willfully testified falsely on a material point unless it "believe[s] the probability of truth favors his or her testimony in other particulars."  (CALJIC No. 2.21.2.)  We have repeatedly rejected similar challenges to this instruction.  (*People v. Solomon* (2010) 49 Cal.4th 792, 827; *People v. Nakahara* (2003) 30 Cal.4th 705, 714.)

Defendant argues the trial court erred by not modifying the standard instruction on the credibility of witness testimony, CALJIC No. 2.20, to inform the jury that the same principles apply to ascertaining the credibility of out-of-court statements of persons who did not testify.  He claims that this alleged error caused the jury to accept the credibility of out-of-court statements at face value and without assessing their credibility or reliability.  We have previously held, under similar circumstances, that no reasonable jurors would interpret these instructions so "as to preclude their applying the relevant portions of CALJIC No. 2.20 to their evaluation of all the evidence, including the out-of-court statements."  (*People v. Livingston* (2012) 53 Cal.4th 1145, 1168.)

Defendant contends that several standard instructions also relevant to witness credibility, including CALJIC Nos. 2.21.1, 2.21.2, 2.22, 2.23, and 2.27, were deficient because they too refer only to testimony and not out-of-court

170

statements. We reject this claim for the same reasons described above. (*People v. Livingston*, *supra*, 53 Cal.4th at pp. 1167-1168.)

We likewise reject defendant's additional claim that the trial court erred by refusing his proffered instruction that the testimony presented in transcripts from other proceedings that were read into the record should be considered "as if it had been given before you in this trial." Because defendant identifies no prior testimony read into the record of a person who did not testify at trial, there was no danger that the jury would fail to evaluate any prior testimony the same way as instructed under the standard witness credibility instructions.

Finally, defendant claims the cumulative effect of the asserted errors described in this claim requires reversal of his conviction. Defendant has failed to identify any error, hence there is no prejudice, individually or cumulatively.

### 7. *Understandability of the Instructions*

Defendant claims the instructions were not "sufficiently understandable" to meet the heightened Eighth Amendment reliability required for a capital trial. To support his argument, defendant observes that the Judicial Council established a commission that recommended a redrafting of the standard CALJIC instructions used at defendant's trial. (Blue Ribbon Com. on Jury System Improvement, Final Rep. (May 6, 1996) p. 93.) He claims that this reevaluation of the instructions indicates that the CALJIC instructions were seriously defective in conveying necessary legal principles to the jury.

The fact that the commission ultimately drafted the newer CALCRIM instructions, which the Judicial Council subsequently adopted (Cal. Rules of Court, rule 2.1050(e)), does not establish that the prior CALJIC instructions were constitutionally defective. "Nor did their wording become inadequate to inform the jury of the relevant legal principles or too confusing to be understood by

171

jurors. The Judicial Council's adoption of the CALCRIM instructions simply meant they are now endorsed and viewed as superior." (*People v. Thomas* (2007) 150 Cal.App.4th 461, 465-466.)

### 8. *Adequacy of the Burden-of-proof Instruction*

Defendant lodges a series of complaints against the jury instructions, claiming they failed to adequately explain the burden of proof. We find each of defendant's complaints to be meritless because CALJIC No. 2.90 sufficiently defined the prosecution's burden.[53]

First, defendant contends the trial court erred in failing to affirmatively instruct that defendant had no obligation to present or refute evidence. He argues that such an instruction is necessary to prevent any misconception amongst jurors that the defendant must produce evidence in order to raise a reasonable doubt. Defendant further argues that the court was obligated to inform the jury that the presentation of defense evidence does not shift the burden of proof to the defendant to prove a reasonable doubt. With the exception of the first claim discussed below, defendant has forfeited these claims by failing in the trial court to seek amplification or further explanation of the standard instruction given.

---

[53] The version of CALJIC No. 2.90 (5th ed. 1988) given at trial provided: "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether [his] [her] guilt is satisfactorily shown, [he] [she] is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving [him] [her] guilty beyond a reasonable doubt. [¶] Reasonable doubt is defined as follows: it is not a mere possible doubt; because everything relating to human affairs, and depending upon moral evidence is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all of the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge."

(*People v. Moon, supra,* 37 Cal.4th at p. 29.)  Moreover, on their merits, we disagree with defendant's contentions.

In *People v. Wright*, *supra*, 45 Cal.3d at page 1134, footnote 3, the defendant requested that the court instruct the jury that " '[i]t is not necessary for the defendant to prove that another person may have committed the crime, nor is it the burden of the defendant to prove his innocence.' "  We held that "the [trial] court stated this rule in CALJIC No. 2.90, which defines the presumption of innocence and the prosecutor's general burden of proof beyond a reasonable doubt.  Defendant's special instructions . . . [were] thus repetitious of instructions already given, and the trial court correctly refused them on this ground." (*Id.* at p. 1134.)  In this case, CALJIC No. 2.90 adequately informed the jury that the prosecution had the burden of proof and never suggested that any presentation of evidence would shift this burden.  Thus, the trial court did not err in omitting the instructions defendant now proffers on appeal.

Defendant next claims that CALJIC No. 2.90 was faulty because it failed to inform the jury that the presumption of innocence continues throughout the entire trial.  Defense counsel sought such an instruction, but the trial court denied the request.  However, the other instructions provided by the trial court adequately imparted this information to the jury.  The court instructed the jury that it should consider the evidence only for the purpose of reaching a verdict "after discussing the evidence and instruction [during deliberations] with the other jurors."  The court also instructed the jury that it should not form or express any opinion on the case until the cause was finally submitted to the jury.  Thus, the trial court did not err in refusing defendant's instruction because these other instructions adequately apprised the jury of the need to presume innocence throughout the entirety of the trial.

173

In a forfeited claim, defendant finds fault in the use of the term "until" in a portion of CALJIC No. 2.90. That relevant portion of CALJIC No. 2.90 provided, "[a] defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his or her guilt is satisfactorily shown, he or she is entitled to an acquittal, but the effect of this presumption is only to place upon the state the burden of proving him or her guilty beyond a reasonable doubt." He suggests that CALJIC No. 2.90 undermines the presumption of innocence because the use of the term "until" instead of "unless" implies that proof will necessarily be forthcoming. We dismissed this precise argument in *People v. Lewis* (2001) 25 Cal.4th 610 (*Lewis*). In *Lewis*, we found that the instruction does not suggest that such evidence will inevitably be produced because it expressly dictates what should occur in the event the jury finds a reasonable doubt. (*Id*. at p. 651.) Thus, the use of the word "until" does not create misconceptions regarding the burden of proof.

In another forfeited claim, defendant argues that the word "burden" is a technical term that the court was required to define for the jury as "a line" that the prosecution must successfully "cross." The claim is meritless. "If a statutory word or phrase is commonly understood and is not used in a technical sense, the court need not give any sua sponte instruction as to its meaning." (*People v. Rodriguez* (2002) 28 Cal.4th 543, 546-547.) The word "burden," as used in CALJIC No. 2.90, utilizes the term's common definition as a duty or responsibility. (Webster's 3d New Internat. Dict. (2002) p. 298.) To the extent that the term "burden" acquires a technical definition when used in the phrase "burden of proof," the term is wholly defined in CALJIC No. 2.90 as that establishing proof beyond a reasonable doubt.

In a final forfeited claim, defendant argues that CALJIC No. 2.90 was incomplete and misleading because it did not adequately define how a jury could

174

find a reasonable doubt. He asserts the court should have instructed the jurors that conflicting evidence or a lack of evidence could leave them with a reasonable doubt. However, the court instructed the jury that the prosecution had the burden to prove defendant's identity as the perpetrator and each element of the charged crime. Thus, the jury was informed that the prosecution would not meet its burden of proof if the evidence was lacking on any of these points. Additionally, the court provided the standard jury instruction for the treatment of circumstantial evidence, which instructed the jurors that if the evidence is capable of two conflicting, reasonable interpretations, then they must adopt the one that points to the defendant's innocence. These instructions provided at trial sufficiently explained the manner in which the jurors could find the existence of a reasonable doubt.

Therefore, the court adequately instructed the jury regarding the prosecution's burden of proof.

### 9. Other Challenges to the Burden of Proof Instructions

Defendant claims the trial court erred by refusing to give his requested instructions defining both the clear and convincing evidence standard and his version of the reasonable doubt standard[54] and making clear that proof beyond a reasonable doubt is a higher standard than that for clear and convincing evidence and is, indeed, the "heaviest burden imposed in law." But nothing in his case required the application of the clear and convincing standard, and we have

---

[54] Defendant's rejected definition of "reasonable doubt" stated: "Proof beyond a reasonable doubt requires evidence that is clear, explicit, and unequivocal, so clear as to be unmistakable, which persuades to a near certainty of the truth of the facts for which it is offered as proof, so as to leave no reasonable doubt as to its truth, and is sufficiently strong to command the assent of every reasonable and impartial mind to a moral certainty and an abiding conviction."

175

repeatedly held that the standard CALJIC jury instruction defining reasonable doubt is correct and adequate. (*People v. Brown* (2004) 33 Cal.4th 382, 392; *Lewis*, *supra*, 25 Cal.4th at p. 652.)

Defendant complains that the 1988 version of CALJIC No. 2.90's definition of "reasonable doubt," unlike his own proffered definition (see *ante*, fn. 54), improperly suggested to the jurors that the reason and logic for their doubt should be measured against "mere possible" or "imaginary doubt."[55] That portion of the standard instruction cautions jurors that reasonable doubt is "not a mere possible doubt, because everything relating to human affairs and depending on moral evidence is open to some possible or imaginary doubt" and that reasonable doubt is, "state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction to a moral certainty, of the truth of the charge." (CALJIC No. 2.90 (5th ed. 1988).) Defendant argues that this language improperly obligated jurors to have a reason for any doubt about defendant's guilt. But defendant cites no applicable authority to support his argument, and, as stated previously, we repeatedly have held that the standard CALJIC jury instruction defining reasonable doubt is correct and adequate. (*People v. Brown*, *supra*, 33 Cal.4th at p. 392; *Lewis*, *supra*, 25 Cal.4th at p. 652.)

Defendant claims that a portion of the standard definition of reasonable doubt given to the jury improperly excluded "mere possible doubt" as a basis for

---

**55** Defendant further argues that this asserted error was exacerbated by the prosecutor's closing argument that, if the jury could "attach reason and logic" to doubt, then it should acquit defendant but that "possible doubt or an imaginary doubt" should not result in acquittal. Defendant forfeited such a claim by failing to object to this argument. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 504.)

finding reasonable doubt. But the high court has already rejected a "challenge to this portion of the instruction," noting that "[a] fanciful doubt is not a reasonable doubt." (*Victor v. Nebraska* (1994) 511 U.S. 1, 17.)

Defendant complains of certain portions of the standard reasonable doubt instruction referring to morality — specifically, the references to some modicum of doubt as "depending upon moral evidence" and that reasonable doubt exists if jurors "cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge." He claims the references to "moral evidence" and "moral certainty" improperly allowed the jurors to consider moral factors in ascertaining guilt. We note that defendant has at least partially forfeited this claim because his own proffered instruction defining reasonable doubt made a similar reference to "moral certainty" (see *ante*, fn. 54), and defendant voiced no objection to its use in the standard instruction (see *ante*, fn. 53) that the court ultimately gave to the jury. In any event, we have previously rejected similar claims, noting that the high court has ruled that such language, although unnecessary, does not render the instruction unconstitutional. (*People v. Brown*, *supra*, 33 Cal.4th at p. 392, citing *Victor v. Nebraska*, *supra*, 511 U.S. at pp. 14-15; *People v. Freeman* (1994) 8 Cal.4th 450, 503-504.)

Defendant contends the trial court's circumstantial evidence instructions, derived from CALJIC Nos. 2.01 and 2.02 (5th ed. 1988), lightened the prosecution's burden of proof by informing the jury that, if one interpretation of the evidence appeared reasonable and another unreasonable, it would be the jury's duty to accept the reasonable interpretation — allegedly undermining the requirement that guilt be proved with the higher beyond a reasonable doubt standard. We have repeatedly rejected similar claims, noting that "the disputed language does not undermine the instructions on the presumption of innocence and the standard of proof beyond a reasonable doubt" because other instructions make

177

clear the applicable standard of proof.  (*People v. Wilson* (1992) 3 Cal.4th 926, 943; accord, *People v. Kipp*, *supra*, 18 Cal.4th 349, 375; *People v. Crittenden* (1994) 9 Cal.4th 83, 144.)

Defendant also complains that the trial court erred by refusing his requested instruction that, similar to the standard instruction concerning circumstantial evidence, stated:  "if direct evidence is susceptible of two reasonable interpretations, one of which points to the defendant's guilt and the other to his innocence, you must adopt that interpretation which points to the defendant's innocence, and reject that interpretation which points to his guilt."  He claims that the conflicting interpretation rule applicable to circumstantial evidence applies equally to direct evidence.  We have previously rejected this claim because direct evidence, unlike circumstantial evidence, does not generate conflicting inferences. " 'Circumstantial evidence involves a two-step process — first, the parties present evidence and, second, the jury decides which reasonable inference or inferences, if any, to draw from the evidence — but direct evidence stands on its own.  So as to direct evidence no need ever arises to decide if an opposing inference suggests innocence.' " (*People v. Livingston*, *supra*, 53 Cal.4th at p. 1166, quoting *People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1187.)

### *10.  Duties of the Jury Foreperson*

Finally, defendant complains that the trial court erred by failing to instruct the jury on the duties of its foreperson at the guilt and penalty phase deliberations. He claims the lack of instruction concerning the role of the foreperson gave that person undue influence during deliberations and that the jury should have been instructed that the foreperson's vote carried no greater weight than the vote of any other juror.  Because defendant requested no such instructions, the claim is forfeited.

The trial court told the jury that each juror must "decide the case for yourself" and not "decide any question any particular way because a majority of the jurors or any of them favor such a decision." These instructions negated the concerns.

**C. Providing the Jury with Trial Transcripts During Deliberations**

For the first time on appeal, defendant claims the trial court committed prejudicial error in allowing the jury to read requested trial transcripts in the jury room rather than having the testimony read to the jury. Specifically, defendant complains that the rereading proceedings were conducted without "special directions or cautionary instructions" to the jury regarding the use of the transcripts. He argues that the error violated his state and federal constitutional rights to be personally present, to counsel, and to the presence of a judge, as well as section 1138. We disagree.

*1. Right to Personal Presence*

First, defendant argues that he did not waive his right to personal presence at trial and was therefore entitled to be present at the rereading of testimony to oversee the fairness of the proceeding. But regardless of whether defendant waived his right to be present, the rereading of testimony is not considered a critical stage of trial in which the defendant has a constitutional right to personal presence. (*People v. Ayala*, *supra*, 23 Cal.4th at pp. 288-289, fn. 8.) A criminal defendant's right to be personally present at trial is guaranteed by the Sixth and Fourteenth Amendments to the federal Constitution, as well as article I, section 15 of the California Constitution. (*People v. Davis* (2005) 36 Cal.4th 510, 530.) " ' "A defendant, however, 'does not have a right to be present at every hearing held in the course of a trial.' " ' " (*Ibid.*) A " 'defendant is not entitled to be personally present during proceedings which bear no reasonable, substantial

179

relation to his or her opportunity to defend the charges against him, and the burden is on defendant to demonstrate that his absence prejudiced his case or denied him a fair and impartial trial.' " (*People v. Horton* (1995) 11 Cal.4th 1068, 1120-1121.) We have held that "[t]he reading back of testimony ordinarily is not an event that bears a substantial relation to the defendant's opportunity to defend . . . ." (*Id.* at p. 1121.) Therefore, the contested trial court proceedings did not violate defendant's right to be present.

In any event, defendant's contentions are without merit. Absent a showing of prejudice, a defendant's "absence from a rereading of testimony does not raise due process concerns." (*People v. Fauber* (1992) 2 Cal.4th 792, 837.) The defendant fails to explain how his presence would have assisted the defense in any way or altered the outcome of his trial. His suggestion that the proceedings could have involved "an inadvertent omission of a part of the testimony, a mistake in the reading . . . or an inappropriate emphasis of voice" is entirely speculative. Thus, we find no error.

### 2. *Right to Presence of Counsel*

Defendant forfeited his claim when he did not object to the plan proposed by the trial court in handling jury requests for testimony. It has long been the rule "that communications from the jury should be entertained in open court, with notification of counsel." (*People v. Bloyd, supra,* 43 Cal.3d at p. 361.) However, when, as here, defense counsel is notified and does *not* disagree with the court's handling of jury requests, we reject defendant's claim that he was denied his constitutional right to counsel during jury deliberation. (*Ibid*.) Defendant further argues that the rereading proceedings violated his constitutional right to counsel. The right to counsel "is required at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected." (*Mempa v. Rhay* (1967)

180

389 U.S. 128, 134.) But as discussed above, we have established that a readback proceeding is not a critical stage of trial. Further, counsel has discretion to consent to a reading of testimony outside the presence of the court, counsel, and defendant. (See *People v. Medina*, *supra*, 51 Cal.3d at p. 904; *People v. Lang* (1989) 49 Cal.3d 991, 1028; *Bloyd*, *supra*, at p. 361.)

### 3. Right to Presence of Trial Judge

Finally, defendant claims that the rereading proceedings violated his statutory and constitutional right to the presence of a trial judge. He relies on section 1138, which provides that "[a]fter the jury have retired for deliberation, if there be any disagreement between them as to the testimony, if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court." The requested information "must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called." (§ 1138.) Defendant argues, for the first time on appeal, that this statute "obliges the trial court to supervise and control a readback of testimony . . . ."

Section 1138.5, however, allows for the absence of the trial judge, providing: "Except for good cause shown, the judge in his or her discretion need not be present in the court while testimony previously received in evidence is read to the jury." Thus, the rereading proceedings did not violate defendant's statutory right to the presence of the trial judge.

Defendant's constitutional claim also fails. We have interpreted section 1138 to provide that " ' "the trial court must satisfy requests by the jury for rereading of testimony." ' " (*People v. Cox* (2003) 30 Cal.4th 916, 968.) But "[t]his statutory right is not of constitutional dimension," because, as discussed above, " '[t]he rereading of testimony is not a critical stage of the proceedings.' "

181

(*Ibid*.) "When a trial judge exercises control over whether and what testimony previously introduced in evidence should be read to the jurors at their request after deliberation has begun, and the judge remains available to address any questions from the jurors to the court that might arise during the readback of the testimony, nothing in logic, reason, due process of law, or the right to a trial before an impartial jury compels the judge to be present while the testimony is read to the jurors." (*People v. Rhoades* (2001) 93 Cal.App.4th 1122, 1127.)

### 4. Right to a Public Trial

Defendant contends that the rereading proceedings, conducted in the jury room and not in open court, violated his right to a public trial in both the guilt and penalty phases. We disagree.

"Every person charged with a criminal offense has a constitutional right to a public trial, that is, a trial which is open to the general public at all times." (*People v. Woodward* (1992) 4 Cal.4th 376, 382.) However, the scope of that right is not absolute. "The right to public trial may be waived [citation], the waiver may be implied from failure to object [citations], and the waiver may be made by defense counsel on defendant's behalf." (*People v. Lang*, *supra*, 49 Cal.3d at p. 1028.) Although defense counsel initially expressed concerns about how counsel would be notified of jury requests and the form in which testimony would be read back to the jury, defense counsel understood that the readback of testimony would be conducted in the jury deliberation room and not in open court when it discussed the rereading proceedings with the trial judge and the prosecution. Therefore, "[a]ssuming the right to public trial extends to the reading of testimony during jury deliberations," the defendant effectively waived the right by failing to object below. (*Ibid*.)

### 5. *Proper Use of Transcripts*

Finally, defendant argues that the trial court erred by failing to instruct the jury on the proper use of transcripts during its guilt and penalty phase deliberations. He claims that the jury's request for certain transcripts created the danger that it might unduly emphasize those portions of the trial and that the court should have admonished the jury to weigh all of the evidence and not give undue focus to any particular portion of the trial. This claim is forfeited because the defense made no request for such an instruction.

In any event, defendant cites no binding authority that compels our courts to give additional instructions concerning the use of transcripts. Moreover, the trial court had already instructed the jurors with the standard instructions admonishing them to consider "all the evidence," that witness testimony was only one form of evidence, and that both direct and circumstantial evidence are both acceptable means of proof with neither being entitled to weight greater than the other. Under these circumstances, the jury was fully informed of its duty to weigh all of the evidence and not to rely solely on witness testimony.

### D. Asserted Cumulative Error

Defendant argues that the cumulative effect of his asserted errors require reversal of his convictions. The sole errors we have identified that are relevant to the guilt phase of defendant's trial were the admission of Shannon Lucas's statement concerning the dog collar (see *ante*, at pp. 105-108), the trial court's ruling on the cross-examination of John Massingale for financial bias (see *ante*, at pp. 138-140) and failing to give a jury instruction on contested authentication concerning the photographs of the Love Insurance note (see *ante*, at pp. 127-128). We also assumed, without deciding, the trial court erred by not permitting the defense to introduce evidence to evaluate the joining of a weak case with a strong case for purposes of joinder and cross-admissibility (see *ante*, at p. 63), by

183

refusing to allow the impeachment of two detectives in the Jodie Santiago Robertson case using evidence from an unrelated matter (see *ante*, at p. 97), and by not instructing the jury that a grant of immunity may be a factor in judging a witness's credibility (see *ante*, at p. 165). But we explained that these errors could not have prejudiced defendant. Any cumulative effect of these errors does not rise to a level requiring the reversal of defendant's convictions. (*People v. Panah* (2005) 35 Cal.4th 395, 479-480.)

## IV. PENALTY PHASE

### A. Disqualification of the Trial Judge in Determining the Admissibility of Defendant's Prior Rape Conviction

Defendant contends Judge Hammes was biased in determining the admissibility of his prior 1973 rape conviction and that she should have disqualified herself from deciding the issue. He claims the judge's refusal to grant his motion to disqualify herself violated his state statutory rights and his state and federal due process rights to an impartial judge. Defendant's claim is not cognizable on appeal, and, in any event, the judge was not biased.

In pretrial proceedings, defendant filed a motion to preclude admission of his 1973 rape conviction on the ground that the conviction was the result of ineffective assistance of trial and appellate counsel. The trial court questioned whether defendant could attack his prior conviction in such a manner or whether it was more appropriate for him to challenge the validity of his prior conviction by filing a separate petition for writ of habeas corpus. After further briefing and argument, the court ruled that defendant could not attack his conviction by his motion but should instead proceed by habeas corpus. Judge Hammes also made clear that she believed that defendant's motion, if construed as a petition for writ of habeas corpus, did not establish  a prima facie showing that would entitle him to an evidentiary hearing based on his allegations of ineffective assistance of counsel.

184

Defendant successfully sought writ relief for the trial court's ruling, and the Court of Appeal issued a peremptory writ of mandate directing the court to consider defendant's motion to strike the prior rape conviction. (*Lucas v. Superior Court* (1988) 201 Cal.App.3d 149, overruled by *Garcia v. Superior Court* (1997) 14 Cal.4th 953.)[56]

One month after that decision became final, defendant filed a statement to disqualify Judge Hammes from hearing his motion to strike the prior rape conviction, alleging under Code of Civil Procedure section 170.1, subdivision (a), that the judge had prejudged the admissibility of the prior conviction. Defendant's statement referenced comments Judge Hammes had made months earlier concerning her belief that defendant had not made a prima facie showing. It also cited a brief comment from the judge made one week before defendant filed his disqualification motion in which she stated her belief that defendant needed to make an offer of proof and argument before the motion to strike could proceed.

Judge Hammes struck defendant's disqualification statement in a written order on dual grounds — untimeliness and an insufficient basis for disqualification. In the order, Judge Hammes noted that defense counsel had known the basis for defendant's alleged claim of bias for at least the prior three

---

[56]    We disapproved *Lucas v. Superior Court*, *supra*, 201 Cal.App.3d 149, based on the high court's decision in *Custis v. United States* (1994) 511 U.S. 485, which, in a noncapital context, generally held that "a defendant has no right under the federal Constitution to challenge the constitutional validity of a prior conviction in proceedings involving a subsequent offense . . . ." (*Garcia v. Superior Court*, *supra*, 14 Cal.4th 953, 963.) But we declined to impose this bar in a capital case when the prior conviction was a special circumstance making the defendant eligible for the death penalty. (*People v. Horton, supra,* 11 Cal.4th at p. 1134.) We have not decided whether the bar applies to a case such as this one where a prior conviction is being used as an aggravating factor in a capital case. We express no opinion on this matter here.

185

months. She also concluded that defendant's statement was legally insufficient because the complained-of comments merely reflected her then-tentative legal opinion of the merits of defendant's motion to strike based on the evidence defendant had provided at that point and such opinions cannot be grounds for disqualification. She further noted that nothing defendant referenced in his statement suggested that she had prejudged the matter without regard to whatever additional evidence might be presented or arguments made.

Defendant then made an offer of proof to augment his original motion to strike the prior conviction, and the trial court subsequently held an evidentiary hearing. After considering defendant's evidence, the court denied defendant's motion to strike.

Defendant's claim that he was statutorily entitled to the disqualification of Judge Hammes is not cognizable on appeal because a "determination of the question of the disqualification of a judge is not an appealable order and may be reviewed only by a writ of mandate from the appropriate court of appeal sought only by the parties to the proceeding" within 10 days of notice to the parties of the decision. (Code Civ. Proc., § 170.3, subd. (d).) Because defendant failed to seek writ review, his statutory claim is not cognizable here. For this same reason, defendant's due process claim is forfeited as well. (*People v. Brown* (1993) 6 Cal.4th 322, 335-336.)

In any event, even if defendant had preserved these issues on appeal, his claims are without merit. As the trial court correctly recognized, "[i]t is well settled . . . that the expressions of opinion uttered by a judge, in what he conceives to be a discharge of his official duties, are not evidence of bias or prejudice." (*Kreling v. Superior Court of Los Angeles County* (1944) 25 Cal.2d 305, 310-311.)

186

**B. Challenges to the Admissibility of Defendant's Prior Rape Conviction**

Defendant lodges several challenges to the admissibility of his prior 1973 rape conviction. We reject all of them.

### 1. *Ineffective Assistance of Trial Counsel*

Defendant argues that the trial court erred in failing to grant his motion to strike his prior rape conviction on the grounds that he had received constitutionally inadequate assistance of counsel during that prior trial. Defendant claims his trial counsel failed to discover that a friend of the victim had called the victim and that the timing of this call was inconsistent with the prosecution's theory of when defendant had abducted and raped the victim. According to defendant, had trial counsel presented evidence of this telephone call at trial, it would have severely undermined the prosecution's case against him.

To meet his burden, defendant must demonstrate both that counsel's performance was deficient when measured against the standard of a reasonably competent attorney, and that counsel's deficient performance resulted in prejudice, in that it " 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " (*People v. Kipp*, *supra*, 18 Cal.4th at p. 366, quoting *Strickland v. Washington* (1984) 466 U.S. 668, 686.) If petitioner fails to show prejudice, a reviewing court may reject the claim without determining whether counsel's performance was adequate. (*People v. Mendoza* (2000) 24 Cal.4th 130, 164.)

Defendant claims the evidence the prosecution presented at trial showed that the conduct involving the victim's abduction and rape occurred between 9:30 p.m. and 10:30 p.m. on May 27, 1973. Because the telephone call between the victim and her friend, Alejandrina Casas, occurred at 10:00 p.m., while the victim was still at her residence, and the victim made no indication that she had

been abducted and raped, defendant contends that this call constituted exonerating evidence that his counsel should have discovered and presented at trial.**57** The record does not reveal why trial counsel did not interview Casas before trial and discover the 10:00 p.m. call. But even assuming counsel was deficient in this regard, defendant fails to show prejudice.

First, the exact time of the victim's abduction and rape and the duration of the crimes were far from certain based on the testimony presented at defendant's rape trial. The victim testified that she was unsure of the exact time of her abduction, placing it as early as 9:30 p.m. or as late as 10:30 p.m. The victim's estimate about the duration of the abduction and rape was 30 to 35 minutes. A neighbor testified that she saw defendant return home at 10:30 p.m., although she had told an officer two days after the crimes that defendant returned between 10:30 and 11:00 p.m. Therefore, even if the defense had presented evidence of Casas's 10:00 p.m. telephone call, it would not have exonerated defendant nor contradicted the prosecution's theory of when defendant had abducted and raped the victim.

More important, Casas's testimony fortified the victim's identification of defendant as her attacker. After the original rape trial, defendant's counsel learned of the 10:00 p.m. telephone call and filed a petition for *coram nobis* after which the trial court held a hearing and heard testimony from Casas concerning the telephone call. At this hearing, Casas testified that she saw defendant with his friends having a party at the victim's residence earlier on the night in question, and that, around 9:00 p.m., the victim asked her to tell him and his friends to leave.

---

**57** Defendant also alleges that the victim told her friend not to tell investigators about this telephone call, but there is no such evidence in the record.

188

Casas testified that she told defendant to leave, and he responded, "Yes, ma'am, I'll leave the house." After Casas left, she returned home and called the victim at 10:00 p.m. to determine whether defendant and his friends had left, and the victim reported that they were gone. According to Casas, the next day, she received a telephone call from the victim in which she hysterically explained that the same person that Casas had told to leave had later returned to rape her at knifepoint.

Consequently, Casas's testimony would not have impeached the prosecution's version of events and would have only solidified the victim's identification of defendant as her assailant. Defendant has failed to demonstrate constitutionally inadequate assistance of his counsel in his prior rape case, and the trial court correctly rejected his motion to strike that conviction.[58]

### 2. Conflict of Interest of Appellate Counsel and the Failure to Seek Rehearing

Defendant asserts the trial court erred in failing to grant his motion to strike his prior conviction based on his claim that his appellate counsel performed under a conflict of interest. Defendant contends a conflict existed because defendant's mother paid for appellate counsel's representation of him and controlled the issues he raised on appeal, including preventing him from raising a claim critical of trial counsel. He further contends that the failure to pay appellate counsel to file a petition for rehearing, after his rape conviction was affirmed on appeal, also required the court to strike his prior conviction. The trial court held a hearing in which appellate counsel testified concerning his work on appealing defendant's

---

[58] For these same reasons, appellate counsel in defendant's rape case did not render constitutionally inadequate representation by failing to raise this issue on appeal, and, therefore, this circumstance also did not constitute a basis for the trial court to strike the prior conviction.

rape conviction.  We conclude the court properly rejected a claim that appellate counsel labored under a conflict that rendered his rape conviction invalid.

Defendant claims that, without his consultation, his mother convinced appellate counsel not to raise on appeal a claim that trial counsel rendered constitutionally inadequate representation because of his alleged failure to seek a psychiatric examination of the rape victim under *Ballard*, *supra*, 64 Cal.2d 159. But the record demonstrates that defendant was 19 years old at the time, unsophisticated, and had intentionally delegated supervision of appellate counsel's representation to his mother.  Defendant provides no evidence that he wanted to make decisions concerning his case or was otherwise excluded from the decisionmaking process concerning his appeal.  Although appellate counsel characterized the mother's decision to delete the ineffective assistance claim as "stupid," the proper way to raise a claim of ineffective assistance of counsel is generally by writ of habeas corpus, not appeal (*People v. Pope* (1979) 23 Cal.3d 412, 426), and defendant fails to explain why the appellate record was sufficient to raise such a claim successfully on appeal.[59]

Defendant also alleges that his mother's inability to pay appellate counsel for additional services resulted in a lack of investigation, the failure to transcribe the opening and closing statements at trial, and the failure to file a petition for rehearing or seek review before this court.  But "[t]he right of a nonindigent criminal defendant to discharge his retained attorney, with or without cause, has

[59]    Defendant also claims his appellate counsel should have raised several other claims of ineffective assistance of counsel, but defendant raises these claims under the theory that his mother's supervision of appellate counsel created a conflict of interest that prevented appellate counsel from raising claims critical of trial counsel.  According to appellate counsel, the *Ballard* claim is the only issue that defendant's mother had precluded appellate counsel from raising.

long been recognized in this state" (*People v. Ortiz* (1990) 51 Cal.3d 975, 983), and defendant clearly had the right to appointed counsel if he became indigent (*Douglas v. California* (1963) 372 U.S. 353, 355; *People v. Jones* (1991) 53 Cal.3d 1115, 1137).  Consequently, defendant has forfeited these issues by failing to seek appointment of counsel.  By choosing to proceed as he did, there was no conflict that adversely affected the appeal — rather, defendant and his mother simply chose to limit the scope and cost of the appeal.  For this same reason, appellate counsel did not render constitutionally inadequate assistance by failing to file a petition for rehearing because counsel "must always respect and defer to those decisions properly reserved to his client."[60]  (*Davis v. State Bar* (1983) 33 Cal.3d 231, 238.)

> ### 3. *Admissibility of Evidence Attacking the Reliability of Defendant's Prior Conviction*

Defendant claims the trial court erred by refusing to admit certain evidence that defendant argues was relevant to whether he actually committed the prior 1973 rape.  We reject these claims.

Defendant asserts the trial court erred by refusing to admit evidence showing he had passed a polygraph test concerning his alleged innocence regarding his prior rape conviction.  Despite acknowledging the existence of a statutory bar to the admission of such evidence (see Evid. Code, § 351.1), he claims the asserted error violated his Eighth Amendment right to present

---

[60]    The only issue defendant identifies that should have been included in a petition for rehearing is the appellate court's alleged misunderstanding of the importance of Casas's telephone call insofar as it related to the prosecution's theory of when the abduction and rape occurred.  But, as explained above, Casas's testimony would not have assisted the defense.  (See *ante*, at pp. 187-189.)

mitigating evidence, his right to due process, and his state right to present relevant evidence.

We have recognized that " 'there is simply no consensus that polygraph evidence is reliable,' " — and indeed, "this lack of consensus is 'reflected in the disagreement among state and federal courts concerning both the admissibility and the reliability of polygraph evidence' "; in this setting, "the per se exclusion of polygraph evidence 'is a rational and proportional means of advancing the legitimate interest in barring unreliable evidence' . . . ." (*People v. Wilkinson* (2004) 33 Cal.4th 821, 849, quoting *United States v. Scheffer* (1998) 523 U.S. 303, 309-311, 312 (lead opn. of Thomas, J.).)  Nor are we persuaded that a different rule should apply in the penalty phase of a capital trial.  The right to present mitigating evidence in the penalty phase "does not trump or override the ordinary rules of evidence." (*People v. Thornton* (2007) 41 Cal.4th 391, 454.)  The trial court correctly applied the statutory bar to the admission of defendant's polygraph testing.

Defendant further argues that the trial court should have admitted evidence concerning Casas's telephone call and evidence of his trial counsel's alleged inadequate representation.  He claims the failure to admit such evidence violated his Eighth Amendment rights to challenge aggravating evidence and to present evidence in mitigation and his right to heightened reliability in a capital trial, as well as his federal due process rights.

Because the record shows no request by trial counsel to admit evidence of Casas's telephone call, this claim is forfeited.  The trial court did allow trial counsel to testify about his knowledge and opinion of defendant and his belief that defendant was innocent of the rape, but refused to admit testimony that would, in effect, relitigate the prior conviction.  The court also allowed defendant to present the testimony of Curt Andrewson, who had been a witness in the rape trial, and

192

allowed him to testify as an alibi witness and to his belief that defendant was innocent of the 1973 rape.

The trial court properly exercised its discretion to exclude evidence of any alleged deficient representation because its probative value was substantially outweighed by the probability that exploring trial counsel's alleged deficiencies would have created a substantial danger of confusing the issues or misleading the jury. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1145.) As previously explained, defendant's claim primarily concerns counsel's failure to discover evidence of Casas's telephone call before trial, but that call did little to thwart the prosecution's theory of the case or to establish defendant's innocence. (See *ante*, at pp. 187-189.) Moreover, as explained earlier, it appears that Casas's testimony, if probed, would have identified defendant as the rape victim's attacker. Because, viewed as a whole, Casas's telephone call carried little probative value in defendant's favor, a lengthy exploration concerning why trial counsel failed to learn of the telephone call earlier would have been confusing to the jury, and its omission could not have affected the verdict.

## C. Prosecutorial Misconduct

Defendant asserts several claims of prosecutorial misconduct. At the outset, we reject the Attorney General's argument that defendant forfeited these claims by failing to object at trial. The trial court stated its preference for the parties not to interrupt and make objections during closing statements, and instead asked that objections be made at the end of argument or before breaks. Defense counsel did make objections for all of the claimed misconduct, typically after the prosecution was done speaking.

193

### 1. *References to the Bible and "Good versus Evil"*

Defendant contends the prosecutor committed misconduct in his penalty phase argument by (1) referring to a biblical verse at the beginning and end of his closing statement in which he quoted, without citing, Proverbs 24:20 — "The candle of the wicked shall be put out"; and (2) invoking "good versus evil" as a central theme, and expressly telling jurors it was their role to be involved in the "battle between good versus evil" in choosing a penalty of death or a penalty of life without the possibility of parole. Defendant argues the prosecutor's conduct was improper and prejudicial because his closing argument invoked higher religious law, erroneously implied jurors could justify a death verdict based on that law, and misstated the jurors' role and their sense of penalty responsibility in violation of his Eighth Amendment right to a reliable penalty determination.

In the prosecutor's lengthy penalty argument, after the opening reference to the biblical verse, he stated, "Ladies and gentlemen by your verdicts of guilty you have determined that these vile, cold-blooded, savage, and brutal murders committed by Mr. Lucas indeed make him a wicked person. Your decision will be to decide whether or not the candle of life within Mr. Lucas shall be put out. And I submit to you and I suggest to you that the evidence in aggravation is astonishing. It is overwhelming in support of a finding of death in your verdict."

The prosecutor then explained how the jurors were to decide what penalty to impose on Mr. Lucas. He said, " Your duty is one that requires that you both impose a penalty that is mandated by law that will be given to you and, secondly, a penalty that is just." Next, the prosecutor explained how to identify and weigh aggravating factors. He advised the jury that only two of the applicable factors in aggravation had to be proven beyond a reasonable doubt and that the jurors need not be unanimous in determining whether an aggravating factor existed. He then explained that, because defendant had stipulated to the two factors (both

194

concerning the 1973 rape), those two factors had effectively already been proved to exist beyond a reasonable doubt.  Then the prosecutor said:  "The ultimate test — the ultimate test for you to concern yourself with is this; in the event, after full and complete consideration of the penalty evidence and the guilt evidence, you feel that the circumstances in aggravation are so substantial in comparison to the mitigating circumstances, only in that event are you capable of rendering a verdict of death.  And I submit to you, again, indeed this evidence is overwhelming in support of a verdict of death.  I am going to begin, first of all, by discussing these factors which support the legal mandate of your decision, and then I will move to the second half  of your responsibility, and that is to make a determination as to what is the just penalty."

The prosecutor then described the 10 factors in aggravation and explained that the jurors had to consider all the factors independently and accord each of them appropriate weight.  The prosecutor explained that the defense would plead for sympathy and mercy and further stated, "His lawyers will beg for mercy from you, but we all know that mercy is not an earthly gift.  It is a divine gift, and only God can grant mercy.  Your duty, ladies and gentlemen, is to dispense justice, and after you have done so, then Mr. Lucas will seek his mercy from God, and God will consider whether mercy is appropriate."

Finally, in concluding, the prosecutor theorized that "[w]ithin the story of life, ladies and gentlemen, is the battle between good and evil.  There are times when we have to enter into the battle of good and evil.  Sometime it's not pleasant, but sometimes we have to do that.  And as sworn jurors, you have agreed to do that.  And one of those times is now for you to enter into this battle between good and evil.  Capital punishment has been with us for thousands of years, as Moses laid it down, as the punishment for premeditated murder, and we have had it ever since because it is a just penalty when someone commits the ultimate act of evil.

195

We know now by your verdicts that Mr. Lucas has indeed committed the ultimate acts of evil in murders.  You are going to hear, I am sure, that the death penalty is inhumane; it is immoral.  I say to you, ladies and gentlemen, it is — that notion is historical and logical nonsense.  For in that battle between good and evil there are times when we must, when we must get into that battle and do what is right and what is just and sometimes that requires that we impose the death penalty, and it is proper and just in this case.  However, it can never be just for the purpose or the reason that someone fails to get into that battle, because if you fail to get into that battle and deal with it and do what is just, if you fail, then justice is not done.  You may be told that the battle will be won by giving Mr. Lucas life without the possibility of parole, and I say no, no, ladies and gentlemen, no.  The appropriate penalty is death, because his lawyers will ask you for life . . . .  No one is going to try to tell you that your task is a pleasant one; no one.  But you must get into the battle between good and evil and take care of that problem.  This case cries for the penalty of death, and the candle of the wicked shall be put out."

Defense counsel then objected to the prosecutor's "good versus evil" argument, to the reference to Moses as an improper invocation of "religious passion," and to the reference that only God could grant mercy.  The court agreed to give a curative instruction to address the prosecutor's comments about mercy,[61] but stated it was not concerned about the other comments.

---

[61]     Before the defense began its closing statements, the court admonished the jury:  "I want to advise you that the law does specifically provide that the jury may consider mercy for the defendant in considering his sentence."

"It is well settled that biblical law has no proper role in the sentencing process."**62** (*People v. Roybal*, *supra*, 19 Cal.4th at p. 520.)  And we have said repeatedly that "[a] prosecutor may not cite the Bible or religion as a basis to impose the death penalty." (*People v. Zambrano*, *supra*, 41 Cal.4th at p. 1169; see *People v. Ervin*, *supra*, 22 Cal.4th at p. 100; *People v. Roybal*, *supra*, at pp. 519-521.)  Yet, we have suggested that some biblical reference may be permissible "to argue, for the benefit of religious jurors who might fear otherwise, that application of the death penalty according to secular law does not *contravene* biblical doctrine [citations], or that the Bible shows society's historical acceptance of capital punishment." (*Zambrano*, *supra*, at p. 1169.)  The prosecutor's biblical reference to Moses merely emphasized the historical existence and acceptance of capital punishment.  (*People v. Williams* (1988) 45 Cal.3d 1268, 1325 [no prosecutorial misconduct for stating that " 'you will find that Moses laid down capital punishment as the punishment for premeditated murder' "].)

The one obviously improper reference to higher authority — that only God may grant mercy — was cured by the court's admonition and the court's standard instructions listing mercy as a factor to consider.

Defendant argues that the prosecutor's theme of good versus evil has biblical roots and that the reference to the candle of the wicked "was unmistakably biblical in style and readily recognizable by persons schooled in the Christian

---

**62** We note, however, that our holdings clearly condemning prosecutorial references to biblical authority in penalty phase closing argument were filed in 1992 and thereafter, whereas the argument here occurred in 1989.  (See *People v. Wash* (1993) 6 Cal.4th 215, 260-261; *People v. Sandoval* (1992) 4 Cal.4th 155, 193-194; *People v. Wrest* (1992) 3 Cal.4th 1088, 1107.)  Accordingly, we make no finding concerning whether the prosecutor committed misconduct, but instead focus on whether any improper references unduly prejudiced defendant.

religion." (*People v. Sandoval, supra,* 4 Cal.4th at p. 193.) Even so, these statements were harmless beyond a reasonable doubt.

This court has held that, in similar contexts, when improper biblical references " 'were part of a longer argument that properly focused upon the factors in aggravation and mitigation' " such improper statements are harmless because "there is no likelihood his biblical references diminished the jury's sense of responsibility or displaced the court's standard penalty instructions. [Citations.]" (*Zambrano*, *supra*, 41 Cal.4th at p. 1170.) The record shows the asserted biblical references were but a fraction of the prosecutor's overall argument when compared to his focus on the factors in aggravation and mitigation.

Defendant argues that the references may have made a difference because the deliberations were closely balanced based on the jury's repeated announcements of deadlock, the length of deliberations, and its requests for transcripts and for reinstruction. But in a case as long and complex as this one, lasting nearly one year, with nearly 800 exhibits and more than 13,000 pages of reporter's transcript for the trial alone, the requests for transcripts and reinstruction and the length of deliberations is unsurprising. Consequently, "the length of the deliberations demonstrates nothing more than that the jury was conscientious in its performance of high civic duty." (*People v. Cooper*, *supra*, 53 Cal.3d at p. 837.)

### 2. *Implying That a Death Sentence Was Preordained*

Defendant assigns as prejudicial error the prosecutor's statement during closing argument: "If Mr. Lucas does not deserve the death penalty in this case, we should abolish it as a measure of punishment in the state of California." He claims the trial court's refusal to address or correct this statement had the effect of suggesting that the authors of the death penalty law had preordained a death sentence in a case like this, implied a duty that jurors must decide on a sentence of

198

death, and minimized the significance of any mitigating evidence.  He argues the error violated his rights under the Eighth and Fourteenth Amendments.  We disagree.

The complained-of statement cannot be viewed in isolation.  Throughout the prosecutor's argument, he repeatedly emphasized the jury's role in following the law by weighing the applicable factors in order to determine whether a death sentence was appropriate.  The prosecutor's statement was merely an attempt to emphasize the weight of the aggravating factors, and argue that this is the kind of case in which a death sentence should be imposed.  Under these circumstances, the prosecutor's comments were within the bounds of proper argument.  (See *People v. Jones* (1997) 15 Cal.4th 119, 185 [prosecutor's argument that not imposing death would make death penalty meaningless is not misconduct because "the import of this comment is that the present case is precisely the type in which the death penalty should be imposed" and "[t]his is within the bounds of proper argument"].)

### 3. *Arguments Minimizing Mitigating Evidence*

Defendant takes issue with the following remark made by the prosecutor during closing statements:  "[Defendant's] friends came in and said he was a good guy. . . .  Ted Bundy was a good guy when he wasn't murdering people."  Defendant claims the trial court should have addressed his objection to this reference because it improperly encouraged the jury to disregard and discount his mitigating evidence and was improperly based on facts outside the trial record.

But the remark was anchored to a matter of common knowledge concerning a well-publicized serial killer and constituted fair comment on the evidence.  The general rule against referring to matters outside the record does not apply to matters of common knowledge or illustrations drawn from experience, history, or

literature. (*People v. Boyette*, *supra*, 29 Cal.4th at p. 463.) In *People v. Ervin*, *supra*, 22 Cal.4th 48, 99, the prosecutor addressed the testimony of defendant's mother, who claimed her son was " 'a nice person' " by stating, " 'To say Curtis Ervin is a nice person is like saying Charles Manson is the Messiah.' " We concluded that this comment, which used an infamous killer to make a point, "was within the scope of fair comment on the evidence" regarding the defendant's crimes of kidnapping and killing his victim. (*Ibid.*) The challenged comment here is no different.

### 4. *Cumulative Effect of Misconduct*

Defendant claims that, if not individually prejudicial, his claims of prosecutorial misconduct cumulatively require reversal. But we have found only one error in the prosecutor's argument (see *ante*, at p. 197), and the trial court corrected that error with an admonition and again with an instruction. This rendered the error harmless. We also assumed, without deciding, various other errors in the prosecutor's argument that the court did not correct, but we concluded all were harmless in light of the prosecutor's whole argument. The combined effect of the error and asserted errors did not prejudice defendant. (*People v. Panah*, *supra*, 35 Cal.4th at pp. 479-480.)

## D. Instructional Error

### 1. *Use of Guilt-phase Convictions in Determining Defendant's Guilt in the 1973 Rape*

Defendant contends the trial court prejudicially erred by failing to instruct the jury on its own motion that the jury could not consider the guilt-phase convictions in determining whether the 1973 prior rape had been proved beyond a reasonable doubt. He claims this instruction was necessary because the jury may have applied the cross-admissibility instructions from the guilt phase during its penalty phase deliberations. He argues the error violated his state and federal

rights to due process and the Eighth Amendment in determining the reliability of his death sentence. There was no error.

As defendant acknowledges, we have previously rejected the claim that a guilt phase jury cannot hear evidence of other crimes at the penalty phase. (*People v. Williams*, *supra*, 16 Cal.4th at p. 239.) More important, defendant merely speculates that the jurors applied cross-admissibility instructions to the penalty phase in determining defendant's guilt for the 1973 rape, even though such instructions were not given at the penalty phase. If defendant nonetheless believed the circumstances required additional attention, he should have requested a limiting instruction, because, even in the penalty phase trial of a capital case, "a trial court is under no duty to instruct on the limited admissibility of evidence of past criminal conduct in the absence of a request." (*People v. McLain* (1988) 46 Cal.3d 97, 113.) The trial court did not err.

### 2. *Instructions Concerning Defendant's Guilt and Conviction in the 1973 Rape*

Defendant contends the trial court's instructions concerning defendant's 1973 rape case caused the jury to avoid determining whether he had committed that crime beyond a reasonable doubt. As explained below, one instruction concerned defendant's conviction for that offense whereas the other concerned his guilt for that offense. There was no error.

In order to prove the aggravating factor of a prior conviction under section 190.3, factor (c), the prosecution introduced evidence of defendant's conviction for the 1973 rape, and the trial court gave the following instruction: "Evidence has been introduced for the purpose of showing that the defendant has been convicted of the crime of forcible rape while armed with a deadly weapon prior to the offenses of murder in the first degree of which he has been found guilty in this case. [¶] Before you may consider such alleged crime as an aggravating

201

circumstance in this case, you must first be satisfied beyond a reasonable doubt that the defendant was in fact convicted of such prior crime."

Defendant claims this instruction allowed the jury to accept defendant's guilt as having been proved by this conviction without determining whether defendant had in fact committed the rape beyond a reasonable doubt for purposes of establishing prior violent conduct under section 190.3, factor (b). But defendant ignores the fact that the jury was given an instruction specific to the factor (b) evidence: "Evidence has been introduced showing that the defendant has committed a criminal act which involved the express or implied use of force or violence or the threat of force or violence. The act is as follows: [¶] Forcible rape while armed with a deadly weapon; to wit, a knife. [¶] Before you may consider such criminal act as an aggravating circumstance in this case, you must first be satisfied beyond a reasonable doubt that the defendant did in fact commit such criminal act."

Taken together, these instructions required the jury to determine beyond a reasonable doubt whether defendant had been convicted of the 1973 rape and whether he had actually committed the rape. These instructions did not conflict; the jury was permitted to accept the truth of defendant's rape conviction, made by way of a stipulation, but nonetheless entertain and act on any lingering doubts concerning whether defendant had actually committed the 1973 rape. Consequently, the jury received adequate instruction.

### 3. Lingering Doubt Instruction

Defendant contends the trial court's lingering doubt instruction was insufficient in several ways. He asserts the court should have given his requested instruction that both identified lingering doubt as a factor in mitigation and required the jury to consider such doubts, instead of merely allowing it to consider

202

any doubts. Although he made no such requests at trial, he also claims the court failed to define "lingering doubt" and failed to make clear that the concept could be applied to each of his convictions. He argues the errors violated his state and federal rights to due process and his Eighth and Fourteenth Amendment rights to have relevant mitigating evidence considered by his jury. We disagree.

"Although a defendant may assert his or her possible innocence in mitigation, and the jury may consider lingering doubt in determining the appropriate penalty, there is no requirement that the court specifically instruct the jury to consider lingering doubt." (*People v. Lewis* (2009) 46 Cal.4th 1255, 1314.) We have also rejected claims, which defendant has forfeited here, that lingering doubt must be defined, or that it must be identified as a mitigating factor. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 42; *People v. Lawley* (2002) 27 Cal.4th 102, 166.) In any event, the standard instructions that compel jurors to consider the circumstances of the crime and any other circumstance extenuating the gravity of the crime, in addition to the defense arguments highlighting the question of lingering doubt, "suffice to properly put the question before the penalty jury." (*People v. Demetrulias*, *supra*, at p. 42.) Because no lingering doubt instruction is required, defense counsel argued the issue to the jury, and the instruction given here was not otherwise misleading, the court did not err.

### 4. *Consideration of All Mitigating Evidence Presented*

Defendant contends the trial court gave the jury an instruction on mitigating evidence that improperly limited its consideration of such evidence to only defense evidence and not any mitigating evidence introduced by the prosecution. Although he made no request of the trial court to modify the relevant instruction, he claims the error violated his state and federal rights to due process and his

Eighth and Fourteenth Amendment rights to have relevant mitigating evidence considered by his jury. There was no error.

The trial court gave a modified version of CALJIC No. 8.85, which stated, in relevant part: "In determining which penalty is to be imposed on the defendant, you shall consider all of the evidence which has been received during the guilt phase of this trial insofar as such evidence is relevant to factors in aggravation or mitigation. . . . [¶] You shall consider, take into account, and be guided by the following factors, if applicable: . . . [¶] Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime; and any sympathetic or other aspect of the defendant's character, background or record *that the defendant offers* as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." (Italics added.)

Defendant argues use of the phrase "that the defendant offers" precluded the jury from considering any guilt phase evidence introduced by the prosecution that the jury might have considered mitigating. Defendant has forfeited this claim by failing to make any attempt at trial to modify this instruction.

In any event, the disputed language is consistent with the high court's construction of the federal Constitution. In *Lockett v. Ohio* (1978) 438 U.S. 586, 604, the high court held that a capital sentencer cannot be precluded from considering "*as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense *that the defendant proffers* as a basis for a sentence less than death." (Second italics added.) Based on *Lockett*, our state adopted the disputed language now found in CALJIC No. 8.85. (*People v. Easley* (1983) 34 Cal.3d 858, 878, fn. 10.)

Furthermore, defense counsel, in closing statements, offered numerous points in mitigation and did not limit his argument to evidence presented only in the defense phases of the trial. In addition, nothing in the instructions given to the

jury stated that it should ignore mitigation evidence offered by the prosecution. In fact, the challenged instruction began by informing the jury that it should "consider all of the evidence which has been received during the guilt phase of this trial" that was relevant to mitigation. Finally, in response to a jury question during deliberations, the trial court stated that "[e]vidence of the circumstances of the crimes of which defendant was convicted, and the finding of the special circumstances in the guilt phase may be considered in the penalty phase insofar as such evidence is relevant to factors in aggravation *or mitigation*." (Italics added.) Under these circumstances, the jury could not have interpreted the instruction in the manner defendant argues.

In a related claim, defendant contends the trial court's response to the jury, which asked whether it could consider evidence from the whole trial during the penalty phase, improperly limited its consideration of mitigating circumstances. Defendant has forfeited this claim by failing to seek clarification at trial of this additional instruction. Regardless, the claim is without merit.

Although the court's imprecise response stated that the jury "may view factors, (a), (b), and (c) as aggravating and/or mitigating" and that "[a]ll other specifically enumerated factors listed on pages 17 and 18 must be considered as possible mitigating factors," the court also stated that the final listed factor, the equivalent of factor (k), "is a 'catch-all' mitigating section" and that "[i]n addition to the specifically enumerated mitigating factors and the catch-all mitigating [factor], you may for the defendant consider pity, sympathy and mercy and lingering doubt." By referring to section 190.3, factor (k)'s catchall provision, the court clearly reminded the jury that it could consider as mitigation "[a]ny other circumstance which extenuates the gravity of the crimes" or "any sympathetic or

205

other aspect of the defendant's character." The additional instruction, therefore, did not improperly narrow the jury's consideration of mitigating circumstances.[63]

### 5. *Defendant's Good Behavior During Trial*

Defendant claims the trial court erred and violated his Eighth Amendment right to have the jury consider mitigating evidence by instructing the jury, during the guilt phase, to ignore reactions to the evidence by the parties, including defendant. He claims the jury improperly imported this instruction into the penalty phase, thereby ignoring defendant's good demeanor as a circumstance in mitigation. We disagree.

The complained-of guilt phase instruction stated: "The reactions to evidence introduced during the trial, if any, by the judge, court personnel, attorneys, defendant, or any spectator do not constitute evidence and cannot be considered. If you have observed any such courtroom reactions, it is your duty to disregard the observations."

---

[63] Defendant also argues, for the first time on appeal, that this additional instruction and other supplemental instructions the court gave in response to the jury's inquiries during deliberations should have been orally read to the jury instead of being submitted to the jury only in writing. We have previously rejected a related claim that the trial court erred by supplying the jury with written transcripts instead of reading back the testimony in open court. This is because "[s]ection 1138 requires the testimony to be furnished" but the statute does not specify the form in which it should be furnished, and the form "i.e., written or oral, is apparently in the trial court's discretion." (*People v. Box* (2000) 23 Cal.4th 1153, 1214.) Because section 1138 also applies to the jury's " 'desire to be informed on any point of law arising in the case' " (*id*. at p. 1213), it also was within the court's discretion whether to orally instruct the jury in addition to providing written clarification. Defendant fails to explain how the absence of oral supplemental instructions prejudiced his case and denied his rights to due process and a fair trial. Thus, in addition to being forfeited, defendant's claim fails on its merits.

Defendant forfeited this claim by failing to raise it in the trial court. Forfeiture aside, even assuming the jury applied this instruction at the penalty phase, nothing in the instruction precluded the jury from considering defendant's good demeanor during the nearly year-long trial. Instead, the instruction merely told the jury to ignore any "reactions to evidence." Moreover, defense counsel was specifically permitted to argue to the jury that defendant's respect for authority supported a life sentence as demonstrated by "his behavior day in and day out in this courtroom for many months" which was "what you have seen." Accordingly, there was no error.

6. *Aggravating and Mitigating Circumstances and the Weighing of "Good and Bad"*

Defendant claims the trial court erred and violated his state and federal rights and his right to due process under the Fourteenth Amendment by refusing to give his proffered instruction elaborating on the weighing of aggravating and mitigating circumstances. He claims that, without this instruction, the jury may have imposed a death sentence because it improperly determined that there is more bad than good about the defendant and his crimes. The trial court properly refused the instruction.

The defense requested the following instruction: "The weighing of mitigating and aggravating factors is not a weighing or balancing between good and bad, but between life and death." The trial court correctly rejected this instruction as being vague and taken out of context from our decision in *People v. Brown* (1985) 40 Cal.3d 512 (*Brown*).

In *Brown*, we rejected the claim that the death penalty statute impermissibly limits "the jury to a mechanical balancing of aggravating and mitigating factors." (*Brown*, *supra*, 40 Cal.3d at p. 538.) In upholding the death penalty statute as not requiring "a death verdict on the basis of some arithmetical formula" (*id.* at p. 540)

we noted that the terms " '[a]ggravating' and 'mitigating' are not defined by the statute" but explained that "we see no statutory intent to require death if the jury merely finds more bad than good about the defendant and to permit life without parole only if it finds more good than bad." (*Id*. at p. 541, fn. 13.) We further explained, "the statute requires *at a minimum* that he suffer the penalty of life imprisonment without parole. It permits the jury to decide only whether he should instead incur the law's single most severe penalty — extinction of life itself. [Citation.] It follows that the weighing of aggravating and mitigating circumstances must occur within the context of *those two punishments*; the balance is not between good and bad but between life and death. Therefore, to return a death judgment, the jury must be persuaded that the 'bad' evidence is so substantial in comparison with the 'good' that it warrants death *instead of life without parole*." (*Ibid*., citing § 190.3.)

We did not intend the above explanation to serve as necessary instruction in capital cases; rather, we were rejecting the argument that the death penalty statute requires a mechanical balancing to determine whether a verdict of death should be imposed. More important, defendant's proffered instruction did not include the last sentence quoted above. Without that last sentence, defendant's proposed instruction was vague.

In any event, *Brown* rejected essentially the same claim defendant raises here. The wording of the death penalty statute makes it sufficiently clear that a jury does not  perform "a mere mechanical counting of factors on each side of the imaginary 'scale,' or the arbitrary assignment of 'weights' to any of them." (*Brown*, *supra*, 40 Cal.3d at p. 541.) No further definition of " 'aggravating' " or " 'mitigating' " was required. (*People v. Williams*, *supra*, 16 Cal.4th at p. 267 [" 'aggravating' and 'mitigating' are commonly understood terms that need not be defined for the jury"].)

*7. Instruction on the Consequences of Deadlocked Jury*

Defendant contends the trial court erred by answering the jury's question about the effect of a deadlocked jury and instructing the jurors with this part of the statutory language of section 190.4, subdivision (b): "[I]f the trier of fact is a jury and has been unable to reach a unanimous verdict as to what the penalty shall be, the court shall dismiss the jury and shall order a new jury impaneled to try the issue as to what the penalty shall be."

We have previously found no error when the trial court refuses the defense request to instruct the jury about the effect of a deadlock.[64]  (*People v. Gurule* (2002) 28 Cal.4th 557, 648; *People v. Memro* (1995) 11 Cal.4th 786, 882; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193.)  In *People v. Belmontes* (1988) 45 Cal.3d 744, 814 (*Belmontes*), we rejected a claim that the trial court should have answered the jury's question by instructing it consistent with language from section 190.4, explaining that it "would have the potential for unduly confusing and misguiding the jury in their proper role and function in the penalty determination process" and that "[a]ny further instruction along the lines suggested herein could well serve to lessen or diminish that obligation in the jurors' eyes."  Defendant claims that *Belmontes* establishes that the trial court erred by instructing the jury in the language of section 190.4, even though defendant did not object to the trial court's using that language.

---

[64]  In a related claim, defendant argues that the jury committed misconduct in discussing the consequences of a deadlock and that the trial court erred by failing to inquire into this alleged misconduct.  But jurors having difficulty during deliberations would naturally be curious about the consequences of their deadlock, and this circumstance, by itself, cannot be considered misconduct.  More important, instead of relying on speculation or extrinsic information, the jury dutifully expressed its concern by asking the court about this scenario.  In this situation, the court addressed the jury's question and had no obligation to inquire further.

The Attorney General, however, argues that there was no error and cites *People v. Waidla* (2000) 22 Cal.4th 690, 746 (*Waidla*), in which we "agree[d] that, as a general matter, the superior court *may* instruct a deliberating jury in response to a request going to the consequences of its inability to reach a unanimous verdict as to penalty." We explained, however, that "we cannot agree that, in this cause, the superior court *had* to do so" under the federal Constitution. (*Waidla*, at p. 746.) Thus, *Waidla* would seem to suggest that instruction based on section 190.4, subdivision (b) is permissible, but not required.

We excuse defendant's failure to object to the instruction quoting section 190.4 because the instruction affected his substantial rights. (§ 1259; *People v. Foster* (2010) 50 Cal.4th 1301, 1346, fn. 20.) Moreover, given the tension between *Belmontes* and *Waidla*, we assume, without deciding, that it was error for the court to instruct the jury with section 190.4, subdivision (b). We note, however, that the complained-of instruction did not improperly make "reference to the expense and inconvenience of a retrial." (*People v. Gainer* (1977) 19 Cal.3d 835, 852, fn. 16.)

But any error was not prejudicial. After quoting the relevant part of section 190.4, subdivision (b), the court explained, "The issue of what happens next in the event of a deadlock is a matter that should not concern you nor should it enter into your deliberations in any way." In the absence of evidence to the contrary, we assume the jury followed this instruction. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.)

### 8. *Other Claims of Instructional Error*

Defendant raises a number of claims of penalty phase instructional error that we have previously rejected.

The trial court is not required to instruct the jury that there is no burden of proof. (*People v. Taylor* (2009) 47 Cal.4th 850, 899.) The trial court did not err in refusing to instruct the jury to consider sympathy for defendant's family as a mitigating factor. (*People v. Ochoa*, *supra*, 19 Cal.4th at pp. 454-456.)

The trial court properly refused defendant's instruction that possible belief or predictions about a defendant's future dangerousness are not to be considered for any purpose because the standard jury instructions do not permit "the jury to believe defendant's future dangerousness could be an aggravating factor" (*People v. Weaver* (2001) 26 Cal.4th 876, 993), and the prosecution presented no otherwise inadmissible expert opinion evidence on this subject (*People v. Murtishaw* (1981) 29 Cal.3d 733, 767).

### E. Other Claims

#### 1. Defendant's Absence During an In Camera Hearing

Defendant argues the trial court erred by excluding him from a hearing to discuss the testimony of a defense psychologist. Defendant claims the error violated his federal due process and his state statutory rights to be present at the proceedings against him, and he also claims the error created a conflict of interest with his defense counsel that deprived him of his state and federal rights to due process and effective representation of counsel. He further claims his absence resulted in unreliable capital proceedings in violation of the Eighth Amendment. There was no error because defendant clearly and knowingly waived his presence at the hearing in question, and his absence did not create a conflict of interest.

#### a) Background

Defense witness Dr. Alvin Marks, a clinical and forensic psychologist, testified at the penalty phase, giving his diagnosis of defendant as having inadequate personality, mixed personality disorder, and personality disorder not

otherwise specified.  During the prosecution's cross-examination of him, Dr. Marks revealed that he learned about defendant's history from a chronological report prepared by a defense investigator.  Later, the prosecution noted that it had not received this report during discovery and asked the defense to provide a copy of it.  Defense counsel claimed the report was attorney work product and implicated the attorney-client privilege.  Counsel later explained that the report, containing attorney "editorial comments," had been inadvertently provided to Dr. Marks.  Dr. Marks, however, had made his diagnoses of defendant before receiving that report and had not otherwise relied on it.

The trial court noted that the prosecution's discovery request had created a "large problem" and asked the prosecution if discovery was really necessary. When the prosecution questioned the nature of the problem, the court stated it would like to address the matter in chambers without defendant and asked whether he would waive his presence.  After defendant consulted with his attorneys, appellant waived his right to be present.  The court also had on file defendant's earlier executed written waiver that covered any absences defendant agreed to during trial.

At the in camera hearing, the trial court expressed concern that Dr. Marks's receipt of the chronological report could later be raised as a claim of constitutionally inadequate assistance of counsel.  In order to prevent the jury from hearing damaging evidence as a result of defense counsel's mistake, the court ruled that the chronological report could not be used.  At this same hearing, the court also resolved a scheduling problem concerning the prosecution's expert witness, Dr. R.M. Schumann, who had diagnosed defendant while he was incarcerated at Atascadero State Hospital for his prior rape conviction.  Because Dr. Schumann would not be available for another week, the court asked the parties if they could agree whether the substance of his testimony could be captured by a

212

stipulation.  After the in camera hearing, the parties and defendant reappeared in open court, and defense counsel announced that the parties had agreed to a stipulation to substitute for Dr. Schumann's testimony.  That stipulation stated that Dr. Schumann, a psychiatrist, had diagnosed defendant, in 1974 at Atascadero State Hospital, as having "an antisocial personality — severe, alcoholism, habitual excessive drinking, and a sexual deviation, aggressive sexuality, and the prognosis was very guarded."[65]

### b)  Analysis

Defendant clearly and knowingly waived his right to be present at this in camera hearing.  Despite the court's characterization of the discovery issue as a "large problem," defendant elected not to participate in the hearing after consultation with his counsel.  Defendant, on the record, voiced his agreement to be absent, as he did on several other occasions during trial, and his written waiver was on file.  This complied with the statutory requirements to waive personal presence during trial (§ 977, subd. (b)(1)), and we reject, as we have before,

---

[65]     In another claim, defendant challenges the trial court's instruction following the reading of this stipulation in which the court told the jury, "that's a stipulated matter . . . it's not a matter that you have to decide.  It's given to you as a fact."  Defendant claims this admonition failed to distinguish between a matter of evidence (i.e., that Dr. Schumann would testify that he examined defendant and diagnosed him) and a matter of fact (i.e., that defendant does have antisocial personality with sexual aggressions and deviances).  He claims the admonition allowed the jury to believe that defendant did in fact suffer from these mental disorders in violation of his state and federal rights to due process, trial by jury, confrontation and counsel and the reliability of the capital proceedings under the Eighth Amendment and the14th Amendment's due process clause.  But defendant forfeited this issue by failing to request clarification of the admonition.  (*People v. Catlin*, *supra*, 26 Cal.4th at p. 149.)

defendant's claim that waivers of personal presence should not be allowed in capital cases (*People v. Price* (1991) 1 Cal.4th 324, 405).

In addition, defendant's absence did not create or exacerbate a conflict of interest with his defense counsel or require that defendant be advised by other counsel. Defendant argues that his counsel's mistake in giving Dr. Marks the chronological report created grounds for a claim of constitutionally deficient assistance and that he should have been present and/or advised by nonconflicted counsel about whether he should challenge the performance of his attorneys. But the in camera hearing itself resolved any mistake made by defense counsel by precluding the admission and discovery of the chronological report. Thus, the court eliminated the potential prejudicial effect of any mistake by defense counsel. Nor did defense counsel's mistake, or the subsequent in camera hearing, result in the jury hearing evidence of Dr. Schumann's prior 1974 diagnosis of defendant. Independent of the discovery issue concerning the chronological report, the court had earlier ruled in defendant's presence that Dr. Schumann's prior diagnosis was admissible because defendant had placed his mental state at issue. At the in camera hearing, from which defendant was absent, the court merely discussed logistical issues concerning Dr. Schumann's testimony.

Consequently, defendant fails to show how his absence affected his ability to defend himself or otherwise prejudiced his case.

### 2. *Failure to Repeat Admonition for Jurors Not to Form or Express Any Opinion Until the Case Is Submitted to Them*

Defendant argues the trial court erred by failing to repeat, in the 19-day period between the end of the guilt phase and before the start of the penalty phase, the admonition required by section 1122, subdivision (b), which requires the court to admonish the jurors not to form or express any opinion concerning the case until the matter is submitted to them. He claims the error violated his state and

214

federal rights to due process, fair trial by jury, and verdict reliability. There was no error because the court gave the admonition on the first day of the penalty phase trial.

Defendant's argument rests on the premise that, because jurors were given the relevant admonition during the guilt phase, the failure to repeat that admonition after the filing of the guilt phase verdict, by implication, allowed jurors to speculate about the case during the 19-day period before the penalty phase began. But defendant has forfeited this issue by failing to request such an instruction as part of the postverdict instructions. (*People v. Catlin*, *supra*, 26 Cal.4th at p. 149.) In any event, defendant points to no evidence in the record showing that jurors improperly formed or expressed opinions about the matter during the 19-day break. In addition, defendant acknowledges that the court complied with the relevant part of section 1122 on the first day of the penalty phase trial by again admonishing the jurors "not to form or express any opinion" about the matter and to "avoid this temptation at all cost" despite having been previously able to discuss the case amongst themselves during the guilt phase deliberations.

Under these circumstances, there was no error.

### 3. Requestioning the Jury Before the Penalty Phase

Defendant asserts the trial court erred by failing to grant his request to impanel a new jury for the penalty phase or, alternatively, to requestion the existing jurors concerning whether they could judge defendant's penalty fairly despite knowing evidence of the Strang and Fisher murders on which the jury had hung. He claims this alleged error violated his state and federal constitutional rights to explore potential bias, due process, and to an impartial jury and a reliable penalty determination under state statutory law and the Sixth, Eighth, and

215

Fourteenth Amendments. The court properly denied defendant's motions, and, instead, instructed the jury not to consider these other murders.

We have previously recognized that section 190.4, subdivision (c), states the Legislature's clear intent to have the same jury adjudicate both guilt and penalty in capital cases, " 'unless for good cause shown the court discharges that jury in which case a new jury shall be drawn.' " (*People v. Rowland*, *supra*, 4 Cal.4th at p. 267, quoting § 190.4, subd. (c).) We have also previously held that "good cause" does not exist to impanel a new jury or to re-voir dire the jury if based solely on speculation (*People v. Ainsworth* (1988) 45 Cal.3d 984, 1029), and that acquittal of a charge at the guilt trial does not constitute "good cause" to impanel a new jury (*People v. Bonillas* (1989) 48 Cal.3d 757, 786). To hold otherwise would thwart the statutory preference for having the same jury in both trials because "[i]t is commonplace for a defendant in a capital case to be tried on multiple charges." (*Ibid*.)

Defendant contends he showed good cause because of the unique circumstance of the jury deadlocking on the counts for the Strang and Fisher murders by a vote of 11 to one in favor of convicting defendant. He argues that these 11 jurors were unlikely to be able to disregard the grisly evidence surrounding those murders, especially because many of the exhibits brought to the jury deliberations room contained photos and other evidence from all of the charged crimes. But defendant cites no authority for the proposition that the penalty phase jury cannot consider evidence of crimes for which it could not reach a verdict at the guilt phase. (Cf. *People v. Stitely* (2005) 35 Cal.4th 514, 563 ["Section 190.3 expressly permits proof of any violent criminal activity, whether or not it led to prosecution and conviction, except as to any offense resulting in an acquittal"].)

216

In any event, the trial court specifically instructed the jury not to "consider any evidence produced at the guilt phase with respect to the victims Gayle Garcia, Rhonda Strang, and Amber Fisher" as being relevant "factors in aggravation or mitigation." When the issue was later raised by a jury question during the penalty phase deliberations, the court stated that "no evidence relating to the Garcia and Strang-Fisher cases may be considered by you in the penalty phase." Defendant argues that these admonitions were insufficient because they did not direct the jurors to set aside their impressions of defendant's overall guilt or moral culpability or their desire to seek retribution for the murders of Strang or Fisher. But defendant has forfeited this issue by failing to request such additional clarification (*People v. Catlin*, *supra*, 26 Cal.4th at p. 149), and, in any event, the instructions given were clear and could not have allowed the jurors to think that they could nonetheless consider evidence of the Strang and Fisher murders for some emotional or moral purpose.

Finally, although defendant speculates otherwise, we presume the jury followed the court's repeated instructions not to consider evidence of the Strang and Fisher murders in its penalty phase deliberations.[66] (*People v. Yeoman*, *supra*, 31 Cal.4th at p. 139.)

---

[66] For this same reason, we reject defendant's claim that the jury improperly received extrinsic evidence during deliberations because the exhibits for the Garcia, Strang, and Fisher murders were not redacted or separated from the combined exhibits for all of the charged crimes. In any event, defendant forfeited this issue because defense counsel agreed that the exhibits could not be separated and agreed that court's admonitions were sufficient to direct the jury not to consider those portions of the exhibits.

### F. Jury Deliberations

#### 1. *Asserted Coercion of the Jury*

Defendant takes issue with how the trial court handled the jury's announcements that it was deadlocked on the second and third days of its penalty phase deliberations. He argues that the court failed to properly inquire concerning the nature of the deadlock, made an improper reference to the length of the trial in directing the jury to resume deliberations, and failed to inform jurors to follow their individual consciences in reaching a verdict. He claims these asserted errors coerced the jury in violation of his state and federal constitutional rights to a fair and impartial jury, due process, and his Eighth Amendment right to a reliable penalty determination. There was no coercion of the jury.

#### a) *Background*

On its second day of deliberations, after nearly four hours of deliberation, the jury sent the trial court a note, signed by the foreperson, stating that "it is the feeling of the jury that a unanimous decision is not possible." The court rejected defendant's motion for a mistrial and his request that the court inquire about whether further deliberations could be helpful. The court then addressed the jury, stating:

"The length and complexity of this case, the complexity of the facts and the instructions are such that I would ask that you attempt to deliberate a little further and that each of you examine your opinions in view of the other jurors' opinions. That each of you examine the instructions in light of all the instructions together, and attempt to make sure that you do understand each other's opinions fully and completely, and we will resume this afternoon. [¶] I will ask that you attempt once again, if it is possible, and we will certainly respect if you have another note that says you can't do it. And if you can't do it, you can't, and certainly no juror

218

should feel pressure. No group of jurors should feel pressure, but we do wish that you would make every attempt, if you can."

The jury resumed deliberations for just over another two hours. On the following morning, after an additional half-hour of deliberation, the trial court received a note, signed by the foreperson, asking for help from the court. The note indicated that some jurors believed that, if the jury could not reach a verdict, defendant would automatically receive a life sentence, and it inquired what would actually occur if the jury deadlocked. The note also stated that "[s]ome jurors have made their decisions and feel that we should go home because no further progress is possible" but also that "[s]ome jurors feel that further progress is possible with direction from the Court." The court again denied defendant's motions for a mistrial and to make an inquiry to determine which jurors felt further deliberations would not be useful. In denying the defense requests, the court observed that the time the jury had spent deliberating had not been proportional to the length of the trial.

The court then answered the jury's question concerning the effect of deadlock (see *ante*, at p. 209) and, later on, additional questions concerning what evidence the jury could consider in determining the appropriate penalty (see *ante*, at p. 205).

### b) Analysis

The trial court may ask jurors to continue deliberating when there is a "reasonable probability" of agreement, and that determination rests in the discretion of the court. (§ 1140; see *People v. Breaux* (1991) 1 Cal.4th 281, 319.) "The court must exercise its power, however, without coercion of the jury, so as to avoid displacing the jury's independent judgment 'in favor of considerations of compromise and expediency.' " (*People v. Breaux*, *supra*, at p. 319, quoting

219

*People v. Carter* (1968) 68 Cal.2d 810, 817.)  "Any claim that the jury was pressured into reaching a verdict depends on the particular circumstances of the case." (*People v. Pride* (1992) 3 Cal.4th 195, 265.)

Defendant first complains that the trial court failed to inquire into the nature of the deadlock.  Given that the jury had deliberated less than four hours before sending its first note and less than seven hours before its second note, the court did not abuse its discretion by declining to inquire into the jury's numerical division. Although the court may make such an inquiry (*People v. Proctor* (1992) 4 Cal.4th 499, 538), it is not required to do so.

Defendant next asserts that the court improperly coerced the jury by stating that "[t]he length and complexity of this case . . . are such that I would ask you to deliberate a little further."  But the court's comments contained no suggestion of coercion, and, instead, principally conveyed "that the jury had not deliberated for a sufficient time relative to the complexity of the case." (*People v. Breaux*, *supra*, 1 Cal.4th at p. 320.)  The comments contained no impermissible "reference to the expense and inconvenience of a retrial." (*People v. Gainer*, *supra*, 19 Cal.3d at p. 852, fn. 16.)

Finally, defendant argues that the trial court erred by refusing his request to remind the jurors that they were required to reach an individual opinion and not take any cue from the court, and he claims the court improperly directed the minority jurors to reexamine their views.  We have never required that jurors be readvised after they have already been instructed to reach individual opinions and not take cues from the court.  Moreover, nothing in the court's comments called on *minority* jurors to reexamine their views, and defendant fails to identify language that allegedly did so.  Instead, the court asked the jurors to examine their opinions in light of other jurors' opinions and to understand each other's opinions.  The

court further urged the jurors not to be pressured.  The court's comments were proper.

### 2.  *Asserted Jury Tampering*

Defendant contends the trial court tampered with the jury by investigating whether it was viewing guilt phase exhibits during the penalty phase deliberations and then giving the jury a biased supplemental instruction.  He claims the errors violated his state and federal rights to due process and fair trial by jury, his Eighth Amendment and due process right to a reliable determination of penalty, and his federal rights of confrontation, compulsory process, and representation of counsel. There was no error.

### a)  *Background*

After the court addressed the jury's first two notes, the jury sent a third note, which it revised when the court asked for clarification of one of its questions. As relevant, the revised question asked, "Does evidence from the whole trial pertain to juror decisions during penalty phase or just evidence from penalty phase may be used?"  The court responded:

"Evidence of the circumstances of the crimes of which defendant was convicted, and the finding of the special circumstances in the guilt phase may be considered in the penalty phase insofar as such evidence is relevant to factors in aggravation or mitigation.  Such evidence may be considered in the penalty phase just as if it had been presented in the penalty phase.  [¶]  The exception is that no evidence relating to the Garcia and Strang-Fisher cases may be considered by you in the penalty phase."[67]

---

[67]    In another claim of instructional error, defendant asserts, for the first time on appeal, that this instruction impermissibly limited the jury's consideration of mitigating evidence to "circumstances of the crime" instead of evidence of

*(Footnote continued on next page.)*

After sending the jury back for further deliberations, that same day the court called the parties into court and the judge explained that she had asked her bailiff about the condition of the deliberations room. According to the judge, the bailiff reported that the guilt phase exhibits all remained in the file drawers, where they had been put after the guilt phase trial, suggesting that the jurors had not examined the exhibits during their penalty phase deliberations. The judge expressed concern to the parties about whether her prior response to the jury had been adequate and proposed giving further instruction. Defense counsel objected to the bailiff's observations as constituting an invasion of the jury's province and objected to any further instruction. According to the judge, by the end of the day, it still appeared that none of the guilt phase exhibits had been accessed. The court also rejected defense counsel's request to allow the parties to inspect the deliberations room.

The next day, the court informed the parties that the bailiff had noted that perhaps one guilt phase exhibit had been moved in the file drawers. Defendant made numerous objections to the court's proposed further instruction, arguing, among other things, that it would communicate the court's belief that the exhibits were relevant, would emphasize exhibits concerning the Garcia, Strang, and Fisher murders, and that the jury had a right not to consider exhibits it had already

(Footnote continued from previous page.)

lingering doubt and aspects of defendant's character otherwise unrelated to the crimes. But this supplemental instruction was given along with the other supplemental instruction reminding the jurors of the factor (k) "catch-all" mitigating section that allowed the jury to consider any other extenuating circumstances and defendant's character. (§ 190.3, factor (k); see *ante*, at p. 205.) Viewed in context with the catchall instruction, this complained-of instruction could not have had the effect that defendant contends.

considered in the guilt phase.  The court overruled the objections and instructed as follows:  "A matter of clarification.  In case there is any question, the jury should understand it has access to the following during deliberations at the Penalty Phase:  [¶]  Jury Instructions, Jurors' Notes, Exhibits, and Verdict Forms from the Penalty Phase.  [¶]  Jury Instructions, Jurors' Notes, and Exhibits from the Guilt Phase.  (Except: The Jury must exclude from consideration those Guilt Phase Instructions, Notes and Exhibits relating to the Garcia and Strang-Fisher cases.)  [¶]  The jury may also request from the court:  (1) answers to legal questions, and (2) transcripts of testimony as needed."

### b)  Analysis

Defendant claims the trial court improperly invaded the province of the jury by examining the deliberations room.  But the court merely asked the bailiff his observations of the deliberations room made during his regular duties of cleaning it.  The bailiff made no communications to the jury about the case or the law, nor did the bailiff or the court intrude on the jurors' mental processes.  The observation that the guilt phase exhibits had not been moved merely generated the inference that the jury was not using those exhibits — an inference made more reasonable given the jury's apparent confusion about whether it could consider guilt phase evidence in the penalty phase.

Defendant also contends that the trial court's supplemental instruction improperly emphasized the guilt phase exhibits and improperly communicated the trial court's opinion that the guilt phase exhibits were important.  Yet the court's supplemental instruction did not emphasize the exhibits in particular, but instead reminded the jurors that they could consider not only the exhibits, but also the instructions, their notes, verdict forms, transcripts, and the court's responses to their questions.  Nothing in the language of the complained-of instruction had the

223

effect of emphasizing the exhibits or communicating that the court believed the exhibits were of unique importance.

Finally, defendant argues the trial court violated his constitutional rights to confrontation and due process in relying on the court's and the bailiff's observations of the jury room without allowing defense counsel the opportunity for cross-examination or to inspect the deliberations room. Defendant has forfeited this issue by failing to object based on the confrontation clause. In any event, that provision of the "Sixth Amendment guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.' " (*Delaware v. Van Arsdall, supra,* 475 U.S. at p. 678.) The judge and the bailiff were not witnesses against defendant. Instead, they merely communicated their observations of the deliberations room as part of their supervisory role over jury deliberations.

### 3. *Death of a Juror's Father*

Defendant asserts two claims associated with Juror P.W.'s request during deliberations to be excused from the proceedings to attend her father's funeral. First, defendant claims the court erred by failing to notify his counsel about the juror's request, which he claims violated his state and federal constitutional rights to counsel, due process, and his Eighth Amendment right to a fair and reliable sentencing proceeding. Second, defendant contends the court erred and abused its discretion by failing to inquire whether the juror was capable of continuing deliberations, which he claims violated his state and federal constitutional rights to a fair and impartial trial, due process, and his Eighth Amendment right to a fair and reliable sentencing proceeding. These contentions have no merit.

Defendant's asserted lack of notice concerning Juror P.W.'s request is not supported by the record. On Monday, Juror P.W. sent a note to the court

explaining that her father had died over the weekend and advising that his funeral would be sometime that week and that she would let the court know once the date was set. The clerk's minutes state that the note was incorporated as part of court exhibit No. 32, but that "[c]ounsel are not notified at this time." The following Tuesday morning, the court received notes from two other jurors asking to be excused early on Thursday and to have Friday off. One of the notes was from the foreperson, who also remarked that Friday "may be good for the other jurors to have an extra day off." The clerk's minutes indicate that the notes were incorporated into court exhibit No. 32 and that "counsel are notified of the notes and agree that the jury need not deliberate on Friday." That same morning, the court received a note from the foreperson informing the court that the funeral for Juror P.W.'s father was on Friday and that she asked to be excused that day.

Under these circumstances, it appears from the record that defense counsel were informed of Juror P.W.'s note and her father's death. The clerk's minutes show that counsel were informed of "notes" the court had received, and there is no reason to believe that this reference was limited to the notes received Tuesday morning and excluded Juror P.W.'s note dated on Monday. In any event, in the absence of any contrary indication in the record, we "assume the court followed established law by contacting trial counsel and affording them an opportunity to respond before communicating with the jury." (*People v. Carter*, *supra*, 30 Cal.4th at p. 1215.) Defendant bore the burden of developing a record sufficient to ensure review of his claim, and he could have sought a settled statement to clarify whether he received notice. (*Ibid.*, citing *People v. Osband* (1996) 13 Cal.4th 622, 663.) He did not.

Defendant further claims that the death of a juror's parent during deliberations may be good cause to discharge the juror and that the court abused its discretion in failing to inquire whether Juror P.W. could continue to deliberate.

225

As defendant observes, we have acknowledged that "[t]he death of a juror's parent constitutes good cause to discharge the juror if it affects the juror's ability to perform his or her duties" and that such good cause invokes the court's duty to inquire whether the juror should be discharged. (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 1029.) But we have also recognized that "[a]lthough such inquiry is preferred, it is not required." (*People v. Beeler* (1995) 9 Cal.4th 953, 989.) To be sure, it is wrong to assume that "a more detailed inquiry by the court would have served no purpose," because such an inquiry could have provided insight into Juror P.W.'s state of mind and whether the court abused its discretion by allowing her to continue to deliberate. (*Ibid.*) But in *Beeler*, we rejected the assumption that "as a matter of law that the death of a juror's parent is so debilitating that the juror is presumptively unable to deliberate." (*Id.* at p. 990.)

In the circumstances here, an inquiry was not mandatory. Juror P.W. gave no indication that she sought to be discharged or that she felt coerced to reach a speedy verdict. Nothing suggests the remainder of the jury felt compelled to reach a speedy verdict to accommodate Juror P.W. The jury deliberated for two weeks following the penalty phase closing arguments. In fact, the jury deliberated for more than two full days following the Friday recess. There is no indication that the court abused its discretion or that defendant was prejudiced by the lack of further inquiry.

### G. Asserted Unconstitutionality of the Death Penalty Statute

Defendant raises numerous constitutional challenges to California's death penalty law, all of which we have repeatedly rejected for lack of merit.

California's death penalty law "adequately narrows the class of murderers subject to the death penalty" and does not violate the Eighth Amendment. (*People v. Loker*, *supra*, 44 Cal.4th at p. 755.)

226

Section 190.3, factor (a), in allowing the jury to consider the circumstances of the crime, does not result in the arbitrary or capricious application of the death penalty. (*People v. Stevens* (2007) 41 Cal.4th 182, 211.)

The federal Constitution does not require the jury to achieve unanimity as to the aggravating circumstances or that it be given a burden of proof or standard of proof instructions for finding the existence of aggravating factors, finding that aggravating factors outweigh mitigating factors, or finding that death is the appropriate penalty. (*People v. Loker*, *supra*, 44 Cal.4th at p. 755.) The United States Supreme Court decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Ring v. Arizona* (2002) 536 U.S. 584, and *Blakely v. Washington* (2004) 542 U.S. 296, do not compel a different result. (*Loker*, at p. 755.)

A jury in a capital case is not required to make written findings in support of its verdict. (*People v. Stevens*, *supra*, 41 Cal.4th at p. 212.)

Intercase proportionality review is not required under either the state or federal Constitution. (*People v. Loker*, *supra*, 44 Cal.4th at p. 755; *People v. Crittenden*, *supra*, 9 Cal.4th at pp. 156-157.)

A penalty phase jury properly may consider a defendant's unadjudicated criminal activity, and it need not instruct the jury that it could consider the unadjudicated criminal activity only if it unanimously found such crimes had been proved beyond a reasonable doubt. (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1059; *People v. Hoyos* (2007) 41 Cal.4th 872, 927.)

The use of restrictive adjectives, such as "extreme" and "substantial," in section 190.3's list of potential mitigating factors does not render it unconstitutional. (*People v. Stevens*, *supra*, 41 Cal.4th at p. 213.)

A penalty phase jury need not be instructed regarding which factors are aggravating and which are mitigating or to restrict its consideration of the

227

evidence to such factors. (*People v. Barnwell*, *supra*, 41 Cal.4th at p. 1059; *People v. Brown*, *supra*, 33 Cal.4th at p. 402.)

Capital defendants and noncapital defendants are not similarly situated, therefore, the death penalty law does not violate equal protection or the Eighth Amendment by denying capital defendants various procedural rights given to noncapital defendants. (*People v. Loker*, *supra*, 44 Cal.4th at p. 756.)

Finally, we again reject the contention that the death penalty violates international law or is contrary to international norms or that these norms require the application of the penalty to only the most extraordinary crimes. (*People v. Martinez* (2010) 47 Cal.4th 911, 968.)

## H. Asserted Cumulative Error Affecting the Reliability of Defendant's Sentencing Determination

Defendant finally contends that the collective impact of errors during all phases of the proceedings deprived him of his rights to due process, to a fair trial, to compulsory process and to confront the evidence against him, to a fair and impartial jury, to the right to present a defense, to the right to representation of counsel, and to fair and reliable guilt and penalty determinations in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments. We have concluded that any errors or assumed errors were not prejudicial. Viewing them cumulatively, we conclude defendant is not entitled to reversal of his judgment.

## V. Disposition

The judgment is affirmed.

CANTIL-SAKAUYE, C. J.

WE CONCUR:

BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.
THOMPSON, J.*

* Associate Justice of the Court of Appeal, Fourth Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Lucas
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S012279
**Date Filed:** August 21, 2014
_____

**Court:** Superior
**County:** San Diego
**Judge:** Laura Palmer Hammes, Franklin B. Orfield and William H. Kennedy

_____

**Counsel:**

Thomas Lundy, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Kamala D. Harris, Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Thomas Lundy
2777 Yulupa Avenue, PMB 179
Santa Rosa, CA  95405
(707) 538-0175

William M. Wood
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2202